**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

*In re:* APPLICATION OF ISAAC LEVI PILANT, FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING

Case No. 1:25-mc-00760-JMA-LKE

**ORAL ARGUMENT REQUESTED**

---

**MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S
APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

Jake Karr
(*petition for admission pending*)
Technology Law & Policy Clinic
245 Sullivan Street
New York, NY 10012
(212) 998-6042
jake.karr@nyu.edu

Timothy W. Grinsell
Margaret B. Hoppin
Hoppin Grinsell LLP
11 Hanover Street
New York, NY 10005
(646) 475-9554
tim@hoppingrinsell.com

*Counsel for Respondents*
*Democracy for the Arab World Now, Inc. and Sarah Leah Whitson*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ......................................................................................................................... 2

    A.    The Parties ................................................................................................................. 2

    B.    Respondents' Human Rights Investigations, Reporting, and Advocacy ..................... 3

    C.    The U.S. Government's Sanctions Against Petitioner ................................................. 5

    D.    Petitioner's Multiple Lawsuits ................................................................................... 6

    E.    The Scope of Petitioner's Proposed Subpoenas ......................................................... 7

ARGUMENT .............................................................................................................................. 7

    I.    The First Amendment and Reporters' Privileges Bar the Requested Discovery.     7

        A.    The requested discovery would chill Respondents' protected activities while serving no compelling interest. ................................................................. 8

        B.    The requested discovery seeks material gathered for public reporting without making any heightened showing of relevance or need. ..................... 13

    II.    The Requested Discovery Would Not Be "For Use" in a Foreign Proceeding.     15

    III.    The Court Should Exercise Its Discretion to Deny the Application.     18

        A.    Petitioner can obtain any conceivably relevant discovery in Israel. ............... 18

        B.    Petitioner seeks to circumvent both Israeli proof-gathering restrictions and U.S. policies promoting free speech. ......................................................... 20

            1.    The Application circumvents Israeli proof-gathering restrictions. ...... 20

            2.    The Application contravenes U.S. free speech policies. ..................... 22

        C.    Petitioner's proposed subpoenas are unduly burdensome and intrusive. ....... 23

            1.    The requested discovery is irrelevant, and the proposed subpoenas are overly broad and vague. ............................................................. 23

            2.    The requested discovery constitutes harassment intended to chill Respondents' First Amendment rights. ............................................... 24

CONCLUSION ......................................................................................................................... 25

i

## TABLE OF AUTHORITIES

**Cases**

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*,
  954 F. Supp. 2d 127 (E.D.N.Y. 2013) ................................................................. 9, 10, 11, 12

*Cohen v. City of New York*,
  2010 WL 1837782 (S.D.N.Y. May 6, 2010) ......................................................... 13

*Est. of Ungar v. Palestinian Auth.*,
  332 F. App'x 643 (2d Cir. 2009) ......................................................................... 24

*Euromepa S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995) ............................................................................... 2, 25

*Gonzales v. Nat'l Broad. Co.*,
  194 F.3d 29 (2d Cir. 1999) ................................................................................. 14

*In re 000 Promneftstroy*,
  134 F. Supp. 3d 789 (S.D.N.Y. 2015) ................................................................. 19

*In re Action & Prot. Found.*,
  2014 WL 2795832 (N.D. Cal. June 19, 2014) ..................................................... 18

*In re Arida, LLC*,
  2021 WL 2226852 (S.D.N.Y. June 2, 2021) ....................................................... 8

*In re Ativos Especiais II*,
  2024 WL 4169550 (S.D.N.Y. Sept. 12, 2024) ..................................................... 16, 19

*In re de Leon*,
  2020 WL 1047742 (S.D.N.Y. Mar. 4, 2020) ....................................................... 24

*In re Dechert LLP*,
  2018 WL 3455808 (N.D. Cal. July 18, 2018) ..................................................... 14

*In re Eurasian Nat. Res. Corp., Ltd.*,
  2018 WL 1557167 (N.D. Cal. Mar. 30, 2018) ..................................................... 14

*In re Green Dev. Corp.*,
  2015 WL 10319091 (D. Md. Oct. 1, 2015) ......................................................... 22, 23

*In Re Guo*,
  965 F.3d 96 (2d Cir. 2020) ................................................................................. 8

*In re Harbour Victoria Inv. Holdings Ltd.*,
  2015 WL 4040420 (S.D.N.Y. June 29, 2015) ..................................................... 16, 18

*In re Joint Stock Co. Raiffeinsenbank*,
  2016 WL 6474224 (N.D. Cal. Nov. 2, 2016) ....................................................... 21

*In re Klein*,
   2022 WL 14786787 (S.D.N.Y. Oct. 26, 2022) ...................................................... 24

*In re McCray*,
   928 F. Supp. 2d 748 (S.D.N.Y. 2013) ................................................................. 14

*In re Microsoft Corp.*,
   28 F. Supp. 2d 188 (S.D.N.Y. 2006) .................................................................. 25

*In re Murchinson Ltd.*,
   2024 WL 489175 (C.D. Cal. Jan. 26, 2024) ................................................. 17, 19

*In re O'Keeffe*,
   660 F. App'x 871 (11th Cir. 2016) ...................................................................... 17

*In re Order Pursuant to 28 U.S.C. § 1782*,
   286 F. Supp. 3d 1 (D.D.C. 2017) ........................................................................ 13

*In re Petroleum Prods. Antitrust Litig.*,
   680 F.2d 5 (2d Cir. 1982) .................................................................................... 15

*In re Plan. & Dev. of Educ., Inc.*,
   2022 WL 228307 (N.D. Cal. Jan. 26, 2022) ....................................................... 22

*In re RSM Prod. Corp.*,
   195 F. Supp. 3d 899 (S.D. Tex. 2016) ................................................................ 22

*In re RSM Prod. Corp.*,
   2018 WL 1229705 (S.D.N.Y. Mar. 9, 2018) ...................................................... 19

*In re Shervin Pishevar*,
   439 F. Supp. 3d 290 (S.D.N.Y. 2020) ................................................................ 14

*In re Tagami*,
   2021 WL 5322711 (N.D. Cal. Nov. 16, 2021) .................................................... 22

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
   1985 WL 315 (S.D.N.Y. Feb. 28, 1985) ............................................................... 9

*Intel Corp. v. Advanced Micro Devices*, Inc.,
   542 U.S. 241 (2004) ..................................................................... 8, 19, 21, 24

*Kiobel v. Cravath, Swaine & Moore LLP*,
   895 F.3d 238 (2d Cir. 2018) ............................................................................... 21

*Mangouras v. Squire Patton Boggs*,
   980 F.3d 88 (2d Cir. 2020) ............................................................................ 8, 16

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) ................................................................ 15, 17, 18, 21

*Menashe v. Covington & Burling LLP*,
  552 F. Supp. 3d 35 (D.D.C. 2021) ....................................................... 12, 20, 24, 25

*N.Y. State Nat'l Org. for Women v. Terry*,
  886 F.2d 1339 (2d Cir. 1989) ............................................................. 9, 10

*N.Y. Times v. Sullivan*,
  376 U.S. 254 (1964) ......................................................................... 23

*NAACP v. Alabama*,
  357 U.S. 449 (1958) ........................................................................ 9, 10

*Pilant et al. v. U.S. Dep't of Treasury et al.*,
  No. 25-CV-55-RDM (D.D.C. Jan. 9, 2025) ............................................. 6, 12

*Schiller v. City of New York*,
  245 F.R.D. 112 (S.D.N.Y. 2007) ......................................................... 14, 15

*United States v. Meta Platforms, Inc.*,
  2023 WL 8438579 (N.D. Cal. Dec. 5, 2023) ........................................... 23

*Vaigasi v. Solow Mgmt. Corp.*,
  2016 WL 616386 (S.D.N.Y. Feb. 16, 2016) ............................................ 24

*von Bulow by Auersperg v. von Bulow*,
  811 F.2d 136 (2d Cir. 1987) ............................................................... 14

*Zuru, Inc. v. Glassdoor, Inc.*,
  614 F. Supp. 3d 697 (N.D. Cal. 2022) .................................................. 23

**Statutes**

28 U.S.C. § 1782 ................................................................................ 1, 7, 8

28 U.S.C. §§ 4101–05 ......................................................................... 23

N.Y. Civ. Rights §§ 70-a, 76-a ............................................................. 23

**Other Authorities**

"Gather," Merriam-Webster ................................................................... 21

*Background Press Call on Upcoming Measures to Address Actions That Undermine Peace,
  Security, and Stability in the West Bank*, White House (Feb. 1, 2024) .................. 5

E.O. 14115, 89 Fed. Reg. 7605, 2024 WL 404478 (Feb. 1, 2024) ................... 5

E.O. 14148, 90 Fed. Reg. 8237, 2025 WL 305765 (Jan. 20, 2025) .................. 6

Press Release, U.S. Dep't of State, Sanctions on Israeli Entity and Individual (Aug. 28, 2024) ... 6

## PRELIMINARY STATEMENT

The Court should deny Petitioner's § 1782 Application because it is a fishing expedition that threatens fundamental First Amendment rights. Respondents Democracy for the Arab World Now (DAWN) and its executive director Sarah Leah Whitson investigate human rights abuses and advocate for accountability, democracy, and the rule of law in the Middle East and North Africa (MENA). Respondents' activities—gathering facts, collaborating with partners and sources abroad, reporting findings, and petitioning the U.S. government for redress—rest at the core of constitutional protection.

Petitioner—a former subject of DAWN's advocacy and a former target of U.S. government sanctions—asks this Court to force Respondents to turn over a sweeping range of materials related to their protected and vitally important investigative and advocacy efforts. In requesting this broad and intrusive discovery, Petitioner merely points to a draft of a complaint alleging that Yesh Din, an independent Israeli organization, defamed him in social media posts that do not reference DAWN, a U.S. organization, or its executive director, a U.S. citizen. But if foreign litigants can weaponize § 1782 in this way as an end-run around the First Amendment rights of U.S.-based organizations and individuals, it would rightly send a chill down the spine of human rights advocates and journalists across the country and embolden human rights abusers around the world.

Protections against such a harassing Application are written into § 1782 itself. The statute prevents discovery that would violate any "legally applicable privilege," and the discovery requested here would violate both the First Amendment and reporters' privileges. Petitioner also fails to meet the bare minimum statutory requirement to show how any of the requested discovery could possibly be "for use" in a legitimate foreign proceeding, laying bare the extent to which this is a fishing expedition disconnected from any conceivable action against Yesh Din in Israel.

Even if the Application satisfied these threshold requirements, the Court has strong reasons to deny discovery in its discretion. First, any material relating to Yesh Din could be obtained directly from that organization in Israel. Second, the Application seeks to circumvent Israeli proof-gathering restrictions and contravene U.S. policies that favor free speech. Third, the requested discovery is irrelevant, and Petitioner's proposed subpoenas are overbroad and vague, perpetuating a harassment campaign that would impose costly burdens on Respondents' First Amendment-protected activities. Because the Application "is made in bad faith, for the purpose of harassment, [and] unreasonably seeks cumulative [and] irrelevant materials," the Court should deny it "in toto." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1101 n.6 (2d Cir. 1995).

## BACKGROUND[1]

### A. The Parties

Respondent Democracy for the Arab World Now (DAWN) is a U.S.-based human rights organization. Founded by the journalist Jamal Khashoggi shortly before his death, DAWN supports democracy, human rights, and the rule of law in the MENA region. Whitson Decl. ¶ 8. DAWN focuses its investigative and advocacy efforts on MENA governments with close ties to the United States, including in Saudi Arabia, Egypt, the United Arab Emirates, Israel-Palestine, and Jordan. Whitson Decl. ¶ 9. DAWN accomplishes its mission by engaging in research, analysis, journalism, media outreach, and foreign policy advocacy. Whitson Decl. ¶ 10.

Respondent Sarah Leah Whitson is a U.S. citizen who serves as DAWN's executive director, overseeing the organization's operations, investigations, and advocacy. Whitson Decl. ¶¶ 2, 7. Ms. Whitson is an expert on international human rights and humanitarian law in the MENA

---

[1] We set forth below only the facts most relevant to the disposition of the Application. We do so without conceding that any part of Petitioner's recitation of the alleged facts is accurate.

region, with over twenty years of experience leading hundreds of investigative and advocacy missions. Whitson Decl. ¶¶ 2, 5. Ms. Whitson was previously executive director of the Middle East and North Africa Division of Human Rights Watch from 2004 to 2020. Whitson Decl. ¶ 5. A member of the National Writers Union with an International Federation of Journalists press card, Ms. Whitson publishes widely in international and regional media outlets, appears regularly as a commentator on major news programs, and is the author of a forthcoming book on democracy and human rights in Israel-Palestine. Whitson Decl. ¶¶ 3–4. She has testified and presented findings before numerous government bodies and international conferences. Whitson Decl. ¶ 4.

Petitioner Isaac Levi Pilant is a dual U.S.-Israeli citizen living in the West Bank. Pilant Decl. ¶ 4 (App. Ex. B, ECF No. 6-2). He is head of security for the Israeli settlement of Yitzhar and commander of a regional defense unit of the Israel Defense Forces. Pilant Decl. ¶ 5.

**B. Respondents' Human Rights Investigations, Reporting, and Advocacy**

The core of Respondents' human rights work revolves around gathering information, facts, and data to publish articles, briefing papers, and reports for the foreign policy community and the broader public and to seek accountability for abusers in domestic and international fora. Whitson Decl. ¶ 11. Supported by multiple staff members with strong journalism backgrounds, DAWN adheres to rigorous investigative, fact-finding, data-gathering, and editorial processes. Whitson Decl. ¶ 15. Staff members publish original analyses and investigative findings in the organization's online journal, *Democracy in Exile*, and in major publications. Whitson Decl. ¶¶ 12–13. They also appear on television and radio shows to share expert insights. Whitson Decl. ¶ 13.

DAWN's work includes providing sensitive information to government agencies and officials, including with respect to the U.S. sanctions process. Whitson Decl. ¶ 14. As the U.S. government recognizes, this work is extremely dangerous. Whitson Decl. ¶¶ 16–18, 25–31.

3

DAWN routinely receives and handles sensitive information from at-risk individuals living in conflict zones where even indirect association with organizations like DAWN can lead to fatal consequences. Whitson Decl. ¶ 16. Exposure of information and identities of sources and victims has led to retaliation and reprisals in the past. Whitson Decl. ¶ 30. DAWN's founder, Mr. Khashoggi, was himself murdered after the Saudi government infiltrated the phone of his colleague and discovered his plan to found DAWN. Whitson Decl. ¶ 17, 25.

Accordingly, DAWN takes extensive precautions to protect its staff members, partners, and sources. Whitson Decl. ¶¶ 16–18, 22, 31. DAWN provides explicit assurances of confidentiality to sources and whistleblowers, and the organization maintains a sophisticated security infrastructure to protect sensitive communications and information. Whitson Decl. ¶ 16. DAWN submits information to the U.S. government with an expectation that this confidentiality will be maintained. Whitson Decl. ¶ 18.

DAWN's August 26, 2024 submission to the U.S. Departments of State and Treasury ("August 26 Submission") was no different. The August 26 Submission contained detailed evidence that certain public officials and figures, including the Petitioner, had contributed to violence and instability in the West Bank. Whitson Decl. ¶ 21. DAWN adhered to its rigorous investigative, fact-checking, and editorial standards in preparing the August 26 Submission, which relied on numerous credible and corroborating sources, including reputable news media outlets, prominent human rights organizations, and confidential sources and witnesses to whom DAWN, consistent with its investigative practice, provided assurances of confidentiality given the sensitive nature of the information and credible fears of retaliation. Whitson Decl. ¶ 22. DAWN provided the August 26 Submission to the U.S. government with its own expectation of confidentiality. Whitson Decl. ¶ 22. In a public article that DAWN published on its website on the same day as its

submission to the U.S. government ("August 26 Article"), DAWN provided a summary that did not reveal confidential or sensitive information. Whitson Decl. ¶ 21.

### C. The U.S. Government's Sanctions Against Petitioner

On August 28, 2024, following an investigation by the U.S. government, Petitioner was sanctioned under Executive Order ("E.O.") 14115, which addressed "the situation in the West Bank—in particular high levels of extremist settler violence, forced displacement of people and villages, and property destruction." E.O. 14115, 89 Fed. Reg. 7605, 2024 WL 404478 (Feb. 1, 2024); *see also* Pilant Decl. ¶ 6. Sanctions under this E.O. "require[d] multiple forms of evidence . . . to ensure that that evidence can be corroborated from [] credible sources" and the government "must have multiple well-documented pieces of credible information before designating any individual."[2] A press release issued by the U.S. Department of State announcing the sanctions on August 28, 2024 stated that Petitioner "engaged in malign activities outside the scope of his authority. In February 2024, he led a group of armed settlers to set up roadblocks and conduct patrols to pursue and attack Palestinians in their lands and forcefully expel them from their lands."[3] The press release further noted that Petitioner was sanctioned "for being responsible for or complicit in, or having directly or indirectly engaged or attempted to engage in planning, ordering, otherwise directing, or participating in an act of violence or threat of violence targeting civilians,

---

[2] *Background Press Call on Upcoming Measures to Address Actions That Undermine Peace, Security, and Stability in the West Bank*, White House (Feb. 1, 2024), https://web.archive.org/web/20240530123758/https://www.whitehouse.gov/briefing-room/press-briefings/2024/02/01/background-press-call-on-upcoming-measures-to-address-actions-that-undermine-peace-security-and-stability-in-the-west-bank.

[3] Press Release, U.S. Dep't of State, Sanctions on Israeli Entity and Individual (Aug. 28, 2024), https://web.archive.org/web/20240830064200/https://www.state.gov/sanctions-on-israeli-entity-and-individual.

affecting the West Bank."[4] On January 20, 2025, President Trump issued E.O. 14148, which terminated E.O. 14115 and lifted sanctions that had been imposed pursuant to that authority. E.O. 14148, 90 Fed. Reg. 8237, 2025 WL 305765 (Jan. 20, 2025); *see also* Pilant Decl. ¶ 7.

### D. Petitioner's Multiple Lawsuits

On January 9, 2025, Petitioner filed a complaint in the U.S. District Court for the District of Columbia against the U.S. Departments of State and Treasury and multiple U.S. officials challenging the government's decision to sanction him. Compl., *Pilant et al. v. U.S. Dep't of Treasury et al.*, No. 25-CV-55-RDM (D.D.C. Jan. 9, 2025), ECF No. 1. The complaint in that case includes a conclusory allegation that the State Department's statements in its August 28, 2024 press release "appear to be based on a 'comprehensive dossier' submitted just a few days prior to the sanctioning by Democracy for Arab World Now." *Id.* ¶ 32. The complaint goes on to quote at length from DAWN's August 26 Article—which Petitioner claims contains "false[]" accusations"—and it ultimately discusses DAWN in five separate paragraphs. *Id.* ¶¶ 32–33, 59, 75, 84. The complaint does not allege that any other organization aside from DAWN was responsible for the State Department's statements or U.S. sanctions against Petitioner.

On February 24, 2025, Petitioner commenced the instant action against Respondents with an application for discovery pursuant to 28 U.S.C. § 1782. Petitioner states that he has "authorized" his attorneys to file a defamation lawsuit in Israel against Yesh Din, an Israeli human rights organization, for public statements that it made on the social media platform X on August 28, 2024, two days after the August 26 Submission and the August 26 Article. Pilant Decl. ¶ 8; Draft Yesh Din Compl. ¶¶ 29–52 (App. Ex. C, ECF No. 6-3). Petitioner accuses DAWN of "aid[ing] and abett[ing] the spread of the false reports" and "seek[s] documents and communications (as

---

[4] *Id.*

well as deposition testimony) that relate to false allegations made against me by DAWN." Pilant Decl. ¶¶ 1; 10; App. 4, ECF No. 6.

**E.  The Scope of Petitioner's Proposed Subpoenas**

Petitioner's proposed subpoenas for documents and deposition testimony broadly seek all materials in DAWN's possession that mention, discuss, or concern Petitioner. *See* Proposed Subpoenas (App. Ex. A, ECF No. 6-1). Petitioner's proposed document subpoenas seek "[a]ll Documents and Communications" that "mention or otherwise discuss Pilant": (i) "prepared by DAWN"; (ii) "exchanged between employees of DAWN"; (iii) exchanged between DAWN and "any other third party"; and (iv) exchanged between DAWN and "any U.S. government agency." *Id.* at 4–5, 11–12 (Requests 1, 3, 4, and 5). They also seek the August 26 Submission as well as "[a]ll Documents and Communications" that DAWN "used or relied upon" in making the allegations that appear in the [August 26] Article or any other allegations concerning [Petitioner]." *Id.* (Requests 2 and 6). Petitioner's proposed deposition subpoenas—one addressed to Respondent Whitson and one demanding a Rule 30(b)(6) corporate representative—seek testimony on Petitioner's "alleged involvement in violent activity," communications between DAWN and "other third parties concerning" Petitioner, and documents "prepared by DAWN related to" Petitioner. *Id.* at 4, 16.

## ARGUMENT

**I.  The First Amendment and Reporters' Privileges Bar the Requested Discovery.**

Two principal privileges apply to, and bar, the discovery sought here: the Second Circuit's broad First Amendment privilege and the related reporters' privilege. Disclosure of the requested testimony, communications, and documents would implicate and chill Respondents' constitutionally protected activities, and Petitioner cannot make the heightened showings

sufficient to overcome either privilege. Far from it: the discovery Petitioner seeks is of no relevance to the hypothetical action in Israel that he declares he has "authorized" his attorneys to file.

"[A] court has no discretion under [§ 1782] to grant discovery that is otherwise protected by a legally applicable privilege . . . ." *In re Arida, LLC*, 2021 WL 2226852, at *2 (S.D.N.Y. June 2, 2021) (referring to "section 1782's statutory limitation on the production of privileged materials"). Section 1782 commands that "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782(a). This "mandatory requirement[]" that discovery not violate a properly invoked privilege must be "satisfied" before the Court can consider whether or not to "grant the application in its discretion." *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 97 (2d Cir. 2020); *see also In Re Guo*, 965 F.3d 96, 102 (2d Cir. 2020); *Intel Corp. v. Advanced Micro Devices*, Inc., 542 U.S. 241, 260 (2004) (noting that "§ 1782(a) expressly shields privileged material"). The Court should deny the Application outright on the statutory ground that discovery would violate the First Amendment and reporters' privileges.

## A. The requested discovery would chill Respondents' protected activities while serving no compelling interest.

The Supreme Court and the Second Circuit have long held that a broad First Amendment privilege applies in civil discovery. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449, 462 (1958) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association . . . ."); *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989) (a party may withhold information after making a "*prima facie* showing that disclosure would infringe its First Amendment rights"). "Mindful of the crucial place speech and associational rights occupy under our constitution," the Second Circuit has explained that "in making out a *prima facie* case of harm the burden is light"—

8

"[a] party resisting discovery need" only "articulate some resulting encroachment on their liberties." *Terry*, 886 F.2d at 1355. The burden then shifts to the party seeking discovery to demonstate a "necessary compelling interest in having discovery," *Terry*, 886 F.2d at 1355, by showing that "the information sought is crucial to the party's case . . . or that it goes to the heart of the claims . . . or that it is directly relevant to the [party's] claim[s]," *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 1985 WL 315, at *8 (S.D.N.Y. Feb. 28, 1985) (citations and quotation marks omitted); *see also Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 954 F. Supp. 2d 127, 140 (E.D.N.Y. 2013) (denying discovery for failure to show a "compelling need").

In this case, while the requested discovery would chill a panoply of First Amendment-protected activities, Petitioner fails to demonstrate the slightest connection to his putative claims in a foreign proceeding, let alone that any of the requested discovery would be "crucial" or strike at the "heart" of his purported grievance with Yesh Din in Israel. Petitioner seeks a broad range of documents and communications that mention, discuss, or concern Petitioner, *see* Proposed Subpoenas 4–5, 11–12, all of which Respondents created or gathered in exercise and service of their recognized First Amendment rights to speak, listen, associate, and petition the U.S. government for redress, *see* U.S. Const. amend. I; *NAACP*, 357 U.S. at 462; *Terry*, 886 F.2d at 1355. As Respondent Whitson describes at length and in detail in her declaration, the requested discovery would negatively impact Respondents' ability advocate for democracy and human rights in the MENA region, share with and receive information from partners and sources abroad, and seek accountability through the U.S. government's sanctions process. Whitson Decl. ¶¶ 25–31. This litigation has already forced Respondent Whitson and other members of DAWN's staff to divert time and resources away from the organization's core—and protected—advocacy,

investigative, and research activities. Whitson Decl. ¶ 28. Prolonging the proceedings would further burden the limited resources DAWN has to devote to its mission. Whitson Decl. ¶ 29.

More alarming is the acute risk that disclosure of information would lead to threats and harassment, resulting in a profound chilling effect on Respondents' investigative, fact-finding, data-gathering, and editorial processes. Whitson Decl. ¶¶ 25–27, 30–31. DAWN's founder, journalist Jamal Khashoggi, was killed when his sensitive communications were leaked to the Saudi government. Whitson Decl. ¶ 17. DAWN staff regularly experience threats, harassment, and intimidation online, including one particularly grim incident where photographs of a DAWN senior staff member's children were posted on the social media platform X along with veiled threats. Whitson Decl. ¶ 26. Based on this and many similar past incidents, Respondent Whitson and other DAWN staff members have concrete fears that exposure would inevitably lead to future harms and retaliation. Whitson Decl. ¶ 27. Consequently, the requested discovery would hamper Respondents' ability and willingness to carry out their mission of investigating abuses and advocating for human rights in public fora and with the U.S. government, and it would deter them from sharing information with civil society partners and vulnerable sources. Whitson Decl. ¶ 27; *see Centro De La Comunidad Hispana*, 954 F. Supp. at 140 (noting that parties resisting disclosure can meet their burden by showing "evidence of actual past harm" or "a reasonable probability that the compelled disclosure will lead to threats, harassment, or reprisal" (citations and quotation marks omitted)).

Discovery would also discourage DAWN's partners and sources across the MENA region—who operate and live in extremely high-risk environments—from communicating with and providing information to Respondents, severely undermining Respondents' ability to conduct research and gather evidence, and making some of their work not only harder, but impossible.

Whitson Decl. ¶¶ 30–31. Exposure of source identities has led to arrests, physical threats, violence, incarceration, murder, loss of employment, and increased surveillance. Whitson Decl. ¶ 30. Disclosure of DAWN's external and internal communications and documents could expose or help reveal the identities of sources who have provided Respondents with sensitive information with explicit promises of confidentiality. Whitson Decl. ¶ 31. Even non-confidential sources could be at risk of reprisal were their associations with DAWN to be publicized. Whitson Decl. ¶ 31. Several of DAWN's partners and sources have already expressed concern about this litigation, fearing that their identities or communications could be exposed, and the risk that additional sources would decline to engage with DAWN if it were forced to provide discovery here is acute. Whitson Decl. ¶¶ 28, 31. These widespread and serious impacts make clear that the requested discovery poses a cognizable danger to Respondents' "ability to carry out First Amendment activities without deterrence or chill and accordingly justifies invocation of a qualified privilege." *Lee*, 1985 WL 315, at *7; *see also Centro De La Comunidad Hispana*, 954 F. Supp. 2d at 140. Indeed, it is difficult to imagine a clearer showing of past harm and concrete chill.

Yet despite Petitioner's threadbare assertion that the requested discovery is "fundamental" to a hypothetical Israeli proceeding, App. 14, the Application's inability to connect the dots demonstrates that this is exactly the sort of fishing expedition that the First Amendment privilege serves to protect against. In fact, Petitioner says the quiet part out loud, explicitly acknowledging in his declaration that he seeks discovery against Respondents related to their First Amendment-protected activities: "documents and communications (as well as deposition testimony) that relate to false allegations made against me by DAWN"—not by Yesh Din, the putative defendant in Petitioner's draft defamation complaint. Pilant Decl. ¶ 1; *see also* Compl. ¶ 32, *Pilant et al. v. U.S. Dep't of Treasury et al.*, No. 25-CV-55-RDM (D.D.C. Jan. 9, 2025), ECF No. 1 (alleging solely

that DAWN was responsible for the U.S. government's sanctions against Petitioner, not Yesh Din). In "evaluating infringement of First Amendment rights" in the context of a discovery request, the Court may "consider common sense." *Centro De La Comunidad Hispana*, 954 F. Supp. 2d at 140.

Even ignoring Petitioner's transparent targeting of DAWN, Petitioner does not show how any material possessed by DAWN could conceivably relate to the claims that Petitioner has "authorized" his lawyers to bring against Yesh Din in Israel. *See Menashe v. Covington & Burling LLP*, 552 F. Supp. 3d 35, 42 (D.D.C. 2021) ("Petitioners also fail to support their claim that Covington is likely to possess documents relating to the allegations made" in the foreign proceeding (quotation marks omitted)). Petitioner's draft complaint asserts three defamation claims against Yesh Din based on social media posts that the organization published on August 28, 2024—after DAWN provided the August 26 Submission to the U.S. government, after DAWN published the August 26 Article, and after the government announced its sanctions against Petitioner. Draft Yesh Din Compl. ¶¶ 29–52. None of these posts could have "led to the sanctioning of [Petitioner]." App. 14. The complained-of August 28 statements from Yesh Din could not have contributed to DAWN's investigation, culminating in its August 26 Submission and August 26 Article, or the government's own independent investigation, culminating in its sanctions decision. *See Menashe*, 552 F. Supp. 3d at 41 ("Petitioners 'fail[] to connect the dots between th[e] evidence and the [Israeli] proceeding.'" (alterations in original) (citation omitted)). For the same reasons, the requested discovery from DAWN would have no bearing on whether and the extent to which Petitioner suffered any damages from Yesh Din's allegedly defamatory, later-in-time statements.

Similarly unavailing is Petitioner's suggestion that a wide-ranging fishing expedition could turn up material relevant to ascertaining defamation damages against Yesh Din, presumably related to additional, non-public statements that Petitioner has not yet discovered but hopes exist. App.

13–14. In his draft complaint's section on remedies and damages, Petitioner describes "long-term consequences that are likely to occur as a result of prolonged exposure on social networking sites and listings in search engines," the results of Google searches, and "web viewers," and he urges the hypothetical Israeli court to consider "[t]he effect of the Posts," "[t]he extended period of time that the Posts are accessible," and the "extent of public exposure" the Posts had. Draft Yesh Din Compl. ¶¶ 53, 56, 58, 61. None of these damages theories implicate anything but the social media posts of an unrelated human rights organization in another country. Moreover, under Israeli law, a plaintiff does not need to allege damages to survive a motion to dismiss and proceed to discovery. Berman Decl. ¶ 21 (explaining that an Israeli defamation plaintiff also does not need to "provide proof of damages to ultimately prevail on a defamation claim"). Thus, if Petitioner would like to sue Yesh Din in Israel, he has no need, let alone a compelling one, to engage in damages discovery against DAWN. Such "thin and tenuous relevance and limited usefulness" of the requested discovery to the foreign proceeding is sufficient on its own to deny the petition. *In re Order Pursuant to 28 U.S.C. § 1782*, 286 F. Supp. 3d 1, 4 (D.D.C. 2017) (citation and quotation marks omitted). "Particularly in light of the First Amendment concerns implicated by the [Petitioner's] demands, [he has] failed to show a sufficient need for the information requested." *Cohen v. City of New York*, 2010 WL 1837782, at *4 (S.D.N.Y. May 6, 2010).

**B.  The requested discovery seeks material gathered for public reporting without making any heightened showing of relevance or need.**

The Second Circuit also recognizes an expansive reporters' privilege that protects the requested discovery from disclosure. *See, e.g.*, *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 35 (2d Cir. 1999); *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 143 (2d Cir. 1987). Courts have applied this privilege in the § 1782 context. *See, e.g.*, *In re Shervin Pishevar*, 439 F. Supp. 3d 290,

307 (S.D.N.Y. 2020); *In re Eurasian Nat. Res. Corp., Ltd.*, 2018 WL 1557167, at *3 (N.D. Cal. Mar. 30, 2018); *In re Dechert LLP*, 2018 WL 3455808, at *3 (N.D. Cal. July 18, 2018) (same).

Respondents and the requested discovery qualify for the Second Circuit's reporters' privilege, which applies to those who gather information "with the intent of using the information collected, at least in part, to publish a report that would be widely and publicly circulated." *Schiller v. City of New York*, 245 F.R.D. 112, 119 (S.D.N.Y. 2007) (finding that the New York Civil Liberties Union qualified "as a journalistic enterprise for purposes of the privilege"); *see also In re McCray*, 928 F. Supp. 2d 748, 753 (S.D.N.Y. 2013) (finding that a film production company qualified for the privilege). As noted above, all of Respondents' work involves gathering information, facts, and data with the intent of using that information to publish articles, briefing papers, and reports for the foreign policy community and the broader public. Whitson Decl. ¶ 11. DAWN is staffed by journalists committed to the principles of accuracy, truth, and integrity. Whitson Decl. ¶ 15. DAWN staff members, including Respondent Whitson, publish original analysis and investigative findings in DAWN's own online journal as well as major publications around the world. Whitson Decl. ¶ 12–13. And DAWN's thorough investigation related to Petitioner—which culminated in widely circulated public advocacy and reporting as well as government petitioning—adhered to the organization's rigorous, journalistic standards, including assurances of confidentiality to certain sources. Whitson Decl. ¶ 21–22.

The Second Circuit has laid out two standards that govern protection under the reporters' privilege. For confidential material, Petitioner could overcome the privilege only upon a clear and specific showing that the material is highly material and relevant, necessary or critical to the claim, and not obtainable from other available sources. *See In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982). For nonconfidential material, Petitioner could overcome the privilege

14

only by demonstrating that the material is of likely relevance to a significant issue in the case and not reasonably obtainable from other available sources. *See Schiller v. City of New York*, 245 F.R.D. 112 (S.D.N.Y. 2007).

Here, some of the requested material is explicitly confidential and sensitive, while other material is not confidential but still sensitive, the disclosure of which would reveal Respondents' investigative methods and sources. Whitson Decl. ¶ 22. But Petitioner cannot overcome even the lower of these two standards. As discussed above, the requested discovery is of no possible relevance to any anticipated issue between Petitioner and Yesh Din, *supra* Section I.A, and any materials from Yesh Din are reasonably obtainable—in fact, much more easily and efficiently obtainable—directly from Yesh Din in Israel, *infra* Section III.A.

## II.    The Requested Discovery Would Not Be "For Use" in a Foreign Proceeding.

Petitioner would have the Court ignore his Application's obvious First Amendment problems. But even if this were just a run-of-the-mill § 1782 action that did not implicate such weighty constitutional concerns, Petitioner still fails to carry his burden to show that the requested discovery would be "for use" in a foreign proceeding—that it "will be employed with some advantage or serve some use in the proceeding." *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015).

Section 1782 "[a]pplicants must show that there is a 'concrete' or 'objective' basis to believe" that "the foreign claim can or will realistically be brought on the proposed theory" under which discovery is sought, "rather than a subjective hope that the request will uncover the right evidence." *In re Ativos Especiais II*, 2024 WL 4169550, at *9 (S.D.N.Y. Sept. 12, 2024) (citation omitted) (citing cases); *see also In re Harbour Victoria Inv. Holdings Ltd.*, 2015 WL 4040420, at *8 (S.D.N.Y. June 29, 2015) (request was an impermissible fishing expedition where "[i]f the discovery Petitioner seeks confirms the existence of these bank accounts, it appears that Petitioner

will then commence confirmation proceedings . . . [and] [i]f the discovery does not confirm the existence of these bank accounts, it appears that Petitioner will not commence such proceedings").

Here, Petitioner has failed to connect the dots between any theory underlying his foreign claims and the discovery sought before this Court.[5] In *Mangouras*, the Second Circuit vacated the grant of an application for discovery whose use "depend[ed] on what the evidence shows." 980 F.3d 88, 101–02. The court explained that litigants misuse § 1782 when they seek discovery that would help determine "whether or not" there was a claim under a proposed theory—that is, discovery which, "if" it exists, could "then" be used in a foreign proceeding. *Id.* Petitioner's draft complaint and declaration reveal that any claim he might wish to bring against Yesh Din that involves DAWN depends, at bottom, on mere speculation as to whether DAWN was involved in the first place: did DAWN "use[] or otherwise rel[y] upon false reports, evidence, documents, information etc. created, produced or disseminated by Yesh Din"? App. 14. Did DAWN use this information "in formulating DAWN's own allegations and sending them to additional third parties"? *Id.*[6] But § 1782 is intended to provide an efficient mechanism for discovery in aid of concrete claims, not permit foreign litigants to cast a wide net in the hopes of digging up evidentiary support for as-of-yet unsupported theories. Petitioner's theories involving DAWN are "at best speculative" and accordingly fail the "for use" test. *Mangouras*, 980 F.3d at 101.

First, Petitioner's draft complaint nowhere mentions DAWN, instead alleging "on information and belief"—that is, on hope—that Yesh Din provided information "either directly or

---

[5] Petitioner states that he has "authorized" his attorneys to file—but not that he will actually file—a defamation lawsuit in Israel against Yesh Din. Pilant Decl. ¶ 8. At the very least, to show that the requested discovery would be "for use" in a foreign proceeding, Petitioner should be required to attest that he will in fact initiate the proceeding, whether or not his Application his granted.

[6] Petitioner also does not explain how the discovery sought "will assist Pilant and his legal team to ascertain the level of recklessness in creating" Yesh Din's allegedly "false narratives." App. 15.

via third-parties" to the U.S. government. Draft Yesh Din Compl. ¶ 17. But as noted above, his draft complaint describes "THE GROUNDS FOR THIS SUIT" as three separate X posts by Yesh Din published after DAWN's August 26 Article and August 26 Submission. *Id.* ¶¶ 29–52.

Second, Petitioner's declaration provides no basis to connect DAWN's supposed statements with those of Yesh Din. Petitioner explains his theory of DAWN's relevance in one, and only one, sentence. Petitioner "maintain[s]"—again, hopes—that Yesh Din "provided false and offensive accusations to various third parties . . . including DAWN." Pilant Decl. ¶ 9. Petitioner has thus failed to provide a "concrete" or "objective" basis to believe that any discovery from Respondents could be "for use" in his hypothetical Israeli action. *Contra In re Murchinson Ltd.*, 2024 WL 489175, at *3 (C.D. Cal. Jan. 26, 2024) (noting that petitioner submitted a declaration explaining exactly how "the documents sought here may be used in the Foreign Proceedings to evidence the pattern of actions that Nano has taken or considered to entrench itself and thwart [petitioner]'s efforts or future litigation that may result in a derivative suit").[7] Petitioner's "subjective hope," even when phrased as a firm conviction, does not satisfy his § 1782 burden.

Third, the broad scope of Petitioner's subpoenas goes far beyond information that could plausibly "serve some use in the proceeding." *Mees*, 793 F.3d at 298. Petitioner seeks from DAWN all documents and communications mentioning, discussing, or concerning Petitioner, including those prepared by DAWN, those in DAWN's possession, those reviewed by DAWN, those

---

[7] Petitioner's cited cases are either distinguishable or off-base. In *Mees*, for instance, the petitioner corroborated her request for materials regarding "romantic encounters" between herself and the respondent with exhibits including "over a dozen emails between [petitioner and respondent]." 793 F.3d at 295–96; *see also In re O'Keeffe*, 660 F. App'x 871, 874 (11th Cir. 2016) (finding no abuse of discretion under the fourth *Intel* factor where "counsel's personal conversations" with respondent corroborated petitioner's discovery request). Petitioner's remaining case does not substantively analyze the "for use" standard as applied to the facts at all. *In re Action & Prot. Found.*, 2014 WL 2795832, at *4–5 (N.D. Cal. June 19, 2014).

exchanged between DAWN employees, those exchanged "between DAWN and any other third party," and those "between DAWN and any U.S. government agency." Proposed Subpoenas (Requests 1–5). None of these categories are confined to communications with Yesh Din in any way, and Petitioner can make no showing of how, for example, a hypothetical document unconnected to Yesh Din and exchanged between DAWN employees may be "employed with some advantage" in the hypothetical Israeli proceeding. *See Harbour Victoria*, 2015 WL 4040420, at *7 ("Courts typically analyze such 'fishing expeditions' under § 1782's statutory requirements to determine whether discovery is sought for 'use' in a foreign proceeding.").

## III.    The Court Should Exercise Its Discretion to Deny the Application.

Even if the Application satisfied these threshold statutory requirements, the Court has discretion to deny discovery. Four primary factors, announced by the Supreme Court in *Intel*, should guide this exercise of discretion, taking into consideration the efficiency rationale underlying § 1782: 1) whether the documents and testimony sought are within the foreign tribunal's jurisdictional reach; 2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign court; 3) whether the application conceals an attempt to circumvent foreign-proof gathering restrictions or other policies of a foreign country or the United States; and 4) whether the request is unduly intrusive or burdensome. *In re OOO Promneftstroy*, 134 F. Supp. 3d 789, 791 (S.D.N.Y. 2015). Each of the *Intel* discretionary factors weighs against discovery here.

### A.    Petitioner can obtain any conceivably relevant discovery in Israel.

Under the first *Intel* factor, the Court should deny the Application because "the applicant can obtain the records from the party to the foreign proceeding." *Ativos Especiais II*, 2024 WL 4169550, at *11. Courts have recognized that the first factor rightly weighs against permitting

discovery that could be more directly and efficiently obtained in the foreign jurisdiction, no matter who may be a party to the foreign proceeding. *Murchinson*, 2024 WL 489175, at *3 (the court should not allow discovery where the petitioner has "an alternative source of discovery for the requested information"). In this case, any communications or documents that DAWN could have received from Yesh Din, an Israeli organization, would be subject to discovery in Petitioner's hypothetical Israeli case, and Petitioner could obtain them directly from Yesh Din. Berman Decl. ¶¶ 6–13 (explaining standard discovery procedures in Israel). These supposed materials form the only possible basis of Petitioner's belief that DAWN "used or otherwise relied upon false reports, evidence, documents, information etc. created, produced or disseminated by Yesh Din" outside of the three Yesh Din social media posts identified in the draft complaint. App. 14. And they are available from Yesh Din in Israel. *See Intel*, 542 U.S. at 264 (describing the first factor in the context of evidence "unobtainable absent § 1782(a) aid").

Similarly, courts consider whether the discovery sought is available through the foreign jurisdiction's *procedures*. This approach is consistent with the purpose underlying the first *Intel* factor: to avoid circumvention of foreign discovery procedures when direct discovery is available. *See In re RSM Prod. Corp.*, 2018 WL 1229705, at *4 (S.D.N.Y. Mar. 9, 2018) ("[I]t would be a poor exercise of discretion" and "an end-run around Israeli discovery procedures" to permit discovery of documents that are "within the Israeli court's jurisdiction."); *Menashe*, 552 F. Supp. 3d at 43 ("The Court is wary of granting discovery under § 1782 when it appears that the party seeking discovery may be using the United States statutes and federal court system to 'jump the gun' on discovery in the underlying foreign suit." (citation omitted)).

In this case, any hypothetical discovery relevant to Yesh Din is available through direct channels in Israel, and Petitioner impermissibly seeks to "jump the gun" on discovery in the

hypothetical Israeli proceeding. *Menashe*, 552 F. Supp. at 43. Any communications that might exist between DAWN and Yesh Din are in Yesh Din's possession and could be obtained through normal Israeli discovery procedures after filing suit against Yesh Din, which would be required to provide discovery as the defendant in the action. And if the Israeli court hearing Petitioner's case ultimately determined that additional, cross-border discovery would be appropriate and relevant, it would have the power to seek evidence from third parties as well as judicial assistance for discovery from foreign entities. Berman Decl. ¶¶ 14–18. As in *Menashe*, "[i]nstead of taking the direct path to subpoena these records from [the party] in the Israeli Action, Petitioner[] chose the less efficient route to impose unwarranted discovery here that burdens [a non-party]." 552 F. Supp. 3d at 43. Petitioner fails to explain why he should not seek materials directly from Yesh Din, rather than DAWN. The fact that Petitioner seeks discovery that could be much more efficiently obtained in the foreign proceeding betrays an ulterior purpose: to retaliate against Respondents through this harassing fishing expedition. The Court should consider Petitioner's failure to seek discovery in Israel in finding that the first *Intel* factor weighs against him.

**B. Petitioner seeks to circumvent both Israeli proof-gathering restrictions and U.S. policies promoting free speech.**

**1. The Application circumvents Israeli proof-gathering restrictions.**

Under the third *Intel* factor, the Court should deny the Application because Petitioner seeks to circumvent Israeli proof-gathering restrictions. *Intel*, 542 U.S. at 265. This factor weighs against an applicant who seeks to gather evidence in the United States that it would not be able to obtain under the more restrictive discovery rules of the foreign jurisdiction. *Kiobel v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 n.3 (2d Cir. 2018) (finding that district court abused its discretion in granting discovery from applicant who sought to "bypass Dutch discovery restrictions and gain access to documents she could not otherwise acquire"). "Although courts need not determine if an

applicant has exhausted its discovery attempts abroad, a perception that an applicant has side-stepped less-than-favorable discovery rules by resorting immediately to § 1782 can be a factor in a court's analysis." *In re Joint Stock Co. Raiffeisenbank*, 2016 WL 6474224, at *6 (N.D. Cal. Nov. 2, 2016) (citation and quotation marks omitted).

Here, Petitioner seeks discovery that is prohibited in Israel. For example, Petitioner seeks deposition testimony, but Israeli law does not permit depositions in civil discovery. Berman Decl. ¶ 10. Petitioner also seeks pre-filing discovery, but Israeli law does not permit civil discovery prior to filing an action. Berman Decl. ¶¶ 6, 9; *see Kiobel*, 895 F.3d at 245 n.3 (finding circumvention where "it is hardly possible for a party to obtain evidence from another party pre-trial" in the foreign jurisdiction). These restrictions "prohibit the acquisition" of certain information—they prohibit certain proof "gathering," rather than merely "fail[ing] to facilitate investigation of claims." *Mees*, 793 F.3d at 303 n.20; *see* "Gather," Merriam-Webster, https://www.merriam-webster.com/dictionary/gather ("to bring together: collect"). Petitioner's attempts to circumvent such restrictions should weigh against granting his § 1782 Application under *Intel*'s third factor. *See In re RSM Prod. Corp.*, 195 F. Supp. 3d 899, 905–06 (S.D. Tex. 2016) (finding that the third factor weighed against petitioners where "it is clear that Petitioners are attempting to get discovery in the United States . . . due to restrictions they face in getting the documents . . . in Israel").

Petitioner does not support his argument under the third *Intel* factor with anything more than a conclusory statement that "the Israeli court is not opposed to these cross-border discovery proceedings." App. 18. But Petitioner's breezy attempt to satisfy the third *Intel* factor—speaking vaguely of a hypothetical court "not opposed" to "cross-border proceedings"—does not address

Israel's bar on depositions in civil cases, its bar on pre-filing discovery, or any other relevant restrictions under Israeli law.[8]

### 2. The Application contravenes U.S. free speech policies.

The Court should also deny the Application because it scarcely conceals its attempt to contravene U.S. policies that favor freedom of speech. As multiple courts have noted in the § 1782 context, the free speech principles embodied in the First Amendment may weigh against discovery in appropriate circumstances. *See, e.g.*, *In re Green Dev. Corp.*, 2015 WL 10319091, at *3–5 (D. Md. Oct. 1, 2015) (finding that the third factor weighs against discovery in part because of "significant First Amendment concerns"); *In re Plan. & Dev. of Educ., Inc.*, 2022 WL 228307, at *4 n.3 (N.D. Cal. Jan. 26, 2022) ("[T]he third discretionary factor may . . . weigh against granting an application that conceals an attempt to contravene the First Amendment's purpose without justification."); *In re Tagami*, 2021 WL 5322711, at *3 (N.D. Cal. Nov. 16, 2021) ("[T]he principles underlying the First Amendment may counsel against a court of the United States exercising its discretion to aid in punishing speech that would be protected in this country."). This "general public policy of the United States in favor of freedom of speech worldwide," *United States v. Meta Platforms, Inc.*, 2023 WL 8438579, at *6 (N.D. Cal. Dec. 5, 2023), is also reflected in federal laws like the SPEECH Act, a statute unanimously passed by Congress that precludes enforcement in U.S. courts of foreign defamation judgments that are "inconsistent" with First Amendment protections. Pub. L. No. 111-223, 124 Stat. 2380, 2380 (2010) (codified at 28 U.S.C. §§ 4101–05). New York, too, has recently expanded its anti-Strategic Lawsuit Against Public

---

[8] Indeed, Petitioner failed to support his Application with a declaration from an attorney licensed in Israel that explains or attests to any relevant point of law or procedure in the foreign jurisdiction. Instead, the Application relies on bare assertions or stray quotations from out-of-circuit cases. For this reason alone, the Court should find that Petitioner has failed to meet his burden to show that this action is not merely an attempt to circumvent Israeli proof-gathering restrictions.

Participation law to ensure it aligns with state policy and protects litigants from costly and harassing discovery related to their protected activities. N.Y. Civ. Rights §§ 70-a, 76-a.

As discussed above, the requested discovery "raises significant First Amendment concerns." *Green*, 2015 WL 10319091, at *3. Indeed, Petitioner's aim appears to be retaliation for Respondents' speech—and to try to uncover additional speech that could form the basis of a substantive action against them. *See supra* Section I. Petitioner may be hoping to put the cart before the horse and obtain discovery without needing to properly plead a defamation claim against Respondents. Permitting such discovery here would therefore circumvent the most fundamental of U.S. policies: our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964).[9]

### C. Petitioner's proposed subpoenas are unduly burdensome and intrusive.[10]

#### 1. The requested discovery is irrelevant, and the proposed subpoenas are overly broad and vague.

Under the fourth *Intel* factor, the Court should deny the Application because the requested discovery is irrelevant, overly broad, and vague. *See* 542 U.S. at 245, 265; *In re Klein*, 2022 WL 14786787, at *1 (S.D.N.Y. Oct. 26, 2022) (applying the standards of Fed. R. Civ. P. 26 to § 1782

---

[9] For similar reasons, under the second *Intel* factor, the Court should deny the Application because the "character" of Petitioner's hypothetical Israeli defamation action would be inconsistent with U.S. free speech policies and our country's First Amendment tradition. *See Zuru, Inc. v. Glassdoor, Inc.*, 614 F. Supp. 3d 697, 703 (N.D. Cal. 2022) (noting that in § 1782 proceedings courts may "consider the merits of a foreign claim"). Israeli law is much less protective of defendants' speech rights in defamation actions. For example, an Israeli defamation plaintiff need not allege damages to survive a motion to dismiss, or even provide proof of damages to ultimately prevail on a defamation claim. Berman Decl. ¶ 21. Moreover, the burden of proof as to truth and falsity falls on the defendant. Berman Decl. ¶ 22. Allowing Petitioner to take advantage of these critical aspects of the character of the hypothetical foreign proceeding here would undermine the First Amendment rights of a U.S. organization and its U.S. citizen executive director.

[10] Respondents reserve all rights to object to any subpoena the Court permits Petitioner to serve.

discovery). As a general matter, and for the reasons discussed above, all of the requested discovery is irrelevant to Petitioner's hypothetical lawsuit in Israel. *See supra* Sections I.A, II; *In re de Leon*, 2020 WL 1047742, at *3 (S.D.N.Y. Mar. 4, 2020) (considering "the relevance of the requested discovery to the foreign proceeding" under the fourth factor).

More specifically, Petitioner's proposed subpoenas are overbroad and vague. *See Menashe*, 552 F. Supp. 3d at 45 ("[T]he district court ha[s] no obligation to trim [Petitioners'] discovery request after it determine[s] it was overbroad and vague." (citation omitted)). The document subpoenas seek all materials mentioning, discussing, or concerning Petitioner. *See* Proposed Subpoenas 4–5, 11–12. "Blanket requests of this kind are plainly overbroad and impermissible." *Vaigasi v. Solow Mgmt. Corp.*, 2016 WL 616386, at *15 (S.D.N.Y. Feb. 16, 2016); *see also Est. of Ungar v. Palestinian Auth.*, 332 F. App'x 643, 645 (2d Cir. 2009) (summary order) ("[T]he district court acted well within its discretion in quashing the subpoena—which asked for essentially every document White & Case LLP possessed relating to its representation of Orascom all over the world—because it was overly broad and burdensome."). The deposition subpoenas suffer from these same defects, and proposes deposition topics that are unbounded and woefully imprecise. *See* Proposed Subpoenas 4, 16.

### 2. The requested discovery constitutes harassment intended to chill Respondents' First Amendment rights.

Discovery would raise serious constitutional concerns under the First Amendment and the reporters' privilege. *See supra* Section I. Even if the Court were to find that these First Amendment burdens did not *require* denial of the petition, it should still find that they compel denial as an exercise of the Court's discretion. Far from Petitioner's assertion that "[n]othing indicates" that the requested discovery would "pose an unusual burden" on Respondents, App. 18, the concerns presented here—as the Court recognized in denying *ex parte* issuance of the proposed subpoenas—

24

are substantial. And a "significantly narrowed" set of requests would "remain[] unduly intrusive and burdensome" because they would "seek[] documents that may be protected as confidential . . . and that are privileged under U.S. law." *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 196 (S.D.N.Y. 2006). This is true in part because, among other First Amendment burdens, the requested discovery would require Respondents to make impossible predictions about whether and how certain information could be used to reveal the identities or associations of at-risk individuals.

The requested discovery would represent a profound intrusion into Respondents' First Amendment-protected activities. Because "the relevance of the requested discovery to the [Israeli Action] is tenuous and sufficiently in question, and the burden on the respondent sufficiently onerous," *Menashe*, 552 F. Supp. 3d at 41, the Court should reject Petitioner's Application and permit Respondents to continue their important work without fear of further retribution, *see Euromepa*, 51 F.3d at 1101 n.6.

## CONCLUSION

For the foregoing reasons, Petitioner's Application for discovery pursuant to 28 U.S.C. § 1782 should be denied.

DATED: April 18, 2025                           Respectfully submitted,

                                                 */s/ Timothy W. Grinsell*

Jake Karr                                        Timothy W. Grinsell
(*petition for admission pending*)               Margaret B. Hoppin
Technology Law & Policy Clinic                   Hoppin Grinsell LLP
245 Sullivan Street                              11 Hanover Street
New York, NY 10012                               New York, NY 10005
(212) 998-6042                                   (646) 475-9554
jake.karr@nyu.edu                                tim@hoppingrinsell.com

*Counsel for Respondents*
*Democracy for the Arab World Now, Inc. and Sarah Leah Whitson*

## WORD COUNT CERTIFICATION

Pursuant to Local Rule 7.1(c), the undersigned hereby certifies that this memorandum of law contains 8,016 words. I utilized the word count of the word-processing program used to prepare the document in order to obtain that word count.

*/s/ Timothy W. Grinsell*
Timothy W. Grinsell