## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

*In re:* APPLICATION OF ISAAC LEVI PILANT, FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING

Case No. 1:25-mc-00760-JMA-LKE

---

## DECLARATION OF SARAH LEAH WHITSON
## IN SUPPORT OF RESPONDENTS' OPPOSITION

1.      I, Sarah Leah Whitson, submit this declaration in support of Respondents' Opposition and declare, under 28 U.S.C. § 1746, as follows:

### Experience and Expertise

2.      I am the executive director of Democracy for the Arab World Now ("DAWN"), a nonprofit organization that supports democracy and human rights in the Middle East and North Africa ("MENA"). I have held this position since the organization was launched in 2020, overseeing DAWN's operations, investigations, and advocacy. I am an expert on international human rights and humanitarian law, policy, and politics in the MENA region.

3.      I publish widely on human rights and foreign policy in the MENA region in international and regional media outlets, including analyses and opinion pieces appearing in *The New York Times*, *Foreign Affairs*, *The Washington Post*, *Foreign Policy*, *The Los Angeles Times*, *The Guardian*, *World Politics Review*, *Responsible Statecraft*, and *The American Prospect*. Based on years of research and experience, I have authored a forthcoming book on human rights and democracy in Israel-Palestine. I hold an International Federation of Journalists press card issued

1

through the National Writers Union, of which I am a member. A list of my publications is attached herewith.[1]

4.      I appear regularly as a commentator on international news programs across major networks, including Al-Jazeera, BBC, NPR, MSNBC, and CNN, providing expert analysis on human rights issues and U.S. foreign policy in the MENA region. I have testified and presented findings pertaining to human rights and international humanitarian law abuses in the MENA region before government bodies and international and academic conferences, including in Israel and the Occupied Palestinian Territory and before the United Nations Security Council, the U.S. Congress Leahy Commission, and the European Parliament Human Rights Committee. I am also a member of the Council on Foreign Relations.

5.      Prior to my role at DAWN, I served as executive director of Human Rights Watch ("HRW")'s Middle East and North Africa Division from 2004 to 2020, leading the work of the division in 19 countries, with staff located in 10 countries. During my tenure at HRW, I led hundreds of investigative and advocacy missions throughout the MENA region, focusing on issues of armed conflict, accountability, legal reform, migrant workers, and human rights, including in numerous conflict zones in Israel, the Occupied Palestinian Territory, Lebanon, Iraq, Yemen, Egypt, Tunisia, and Libya. I opened 6 staff offices in the region, including in Jerusalem and Ramallah, and was responsible for leading the work of a 35-person staff investigating human rights and international humanitarian law abuses across the MENA region. My division carried out

---

[1] For recent notable articles, see, for example, Sarah Leah Whitson, *Shared Zones of Interest*, Am. Prospect (Sept. 27, 2024), https://prospect.org/world/2024-09-27-shared-zones-of-interest; Sarah Leah Whitson, *France's Shift on Western Sahara Comes With a Huge Cost*, World Politics Review (Sept. 6, 2024), https://www.worldpoliticsreview.com/france-morocco-western-sahara; Sarah Leah Whitson, *How Saudi Arabia Went from Pariah to Patron*, Responsible Statecraft (Aug. 16, 2024), https://responsiblestatecraft.org/saudi-arabia.

dozens of investigations specifically on human rights abuses in Israel and the Occupied Palestinian Territory, conducting on-the-ground research in Gaza, Israel, East Jerusalem, and the West Bank and extensive interviews of victims, witnesses, attorneys, medical professionals, security forces, and government officials.

6.      Previously, I worked in New York for Goldman, Sachs & Co. as Vice President and Associate General Counsel from 1996 to 2004, and for Cleary, Gottlieb, Steen & Hamilton as an attorney from 1991 to 1996. I graduated from the University of California, Berkeley and Harvard Law School, where I was a member of the human rights clinic as well as a co-founder of the Middle Eastern Law Students Association and the Armenian Law Students Association.

7.      I am a citizen of the United States, and I reside in the State of New York.

### DAWN's History, Mission, and Investigatory Methods

8.      DAWN was founded by the late journalist Jamal Khashoggi in June 2018 to support democracy, human rights, and the rule of law in the MENA region. DAWN continues the investigative and advocacy work championed by Mr. Khashoggi, who was killed in the Saudi consulate in Istanbul on October 2, 2018. Our organization approaches this work with a deep understanding of the historical challenges to democracy in the region and the need for sustained advocacy for human rights protections. We carry on Mr. Khashoggi's journalistic traditions through our work, understanding that credibility is indispensable in our efforts to safeguard human rights.[2]

9.      As a U.S.-based organization, DAWN focuses on MENA governments with close ties to the United States and on the military, diplomatic, and economic support the U.S.

---

[2] *See generally* DAWN, *Challenging Impunity: 2024 Annual Report* (2025), https://dawnmena.org/wp-content/uploads/2025/04/DAWN-2024-Annual-Report-Final-Online.pdf.

government provides them, since that is where we believe we have the greatest responsibility and the greatest opportunity for influence. Accordingly, the countries where we currently focus our efforts include Saudi Arabia, Egypt, the United Arab Emirates, Israel-Palestine, and Jordan.

10.    Our goal is to ensure that U.S. foreign policy promotes the people in the MENA region by ending support for their abusive, undemocratic governments. We believe that U.S. national interests are ill-served by support for these governments and better protected by policies that foster peace, freedom, equality, and justice. DAWN challenges conventional wisdom about the MENA region and the U.S. role in it, rallies support for policies that uphold human rights and democracy, and leads the development of new solutions to long-standing regional problems. Our key initiatives include: ending U.S. support for abusive Middle East governments; accountability and sanctions against abusive officials; curbing malign foreign influence; and reshaping approaches to foreign policy and international law.

11.    DAWN carries out its mission by engaging in research, analysis, journalism, media outreach, and foreign policy advocacy. The core of DAWN's work revolves around gathering information, facts, and data to publish impactful articles, briefing papers, and reports that engage the foreign policy community and broader public.

12.    The organization's online journal, *Democracy in Exile*, has become a leading publication for insight and analysis on the Middle East and North Africa by voices from the region. Driven by its editorial mission to magnify MENA writers, activists, and exiles and give them an equal platform to outside experts, *Democracy in Exile* publishes a wide range of news, analysis,

opinion, essays, book excerpts, in-depth interviews, and expert roundtables on both major news and under-covered developments, as well as arts and culture coverage.[3]

13.    DAWN staff members regularly publish original analysis and investigative findings in major publications. In 2024 alone, DAWN staff members authored twelve opinion pieces in outlets such as *Foreign Policy*, *The Guardian*, *Responsible Statecraft*, *World Politics Review*, and *The American Prospect*, ranging from analyses of U.S. foreign policy in the MENA region, international legal issues related to the Israel-Gaza conflict, and assessments of U.S. relations with countries like Saudi Arabia and Morocco. DAWN staff members also frequently appear on major television and radio shows and podcasts, including Al Jazeera English, MSNBC, France 24, ABC News, CBC News, Democracy Now!, Public Radio International's The World, BBC Radio, and Pod Save the World. DAWN's work has also been covered extensively by news outlets across the United States and around the world, including by the *Associated Press*, *Reuters*, *The New York Times*, *Washington Post*, *NBC News*, *Foreign Policy*, *The Guardian*, MSNBC, and ABC News.

14.    DAWN's work includes providing sensitive information to government agencies and officials. Because accountability is central to DAWN's mission, advocating for appropriate sanctions against individuals who have committed or contributed to human rights abuses, violence, and instability is an indispensable component of our work. DAWN engages in these activities with the understanding that the U.S. government actively solicits and relies on sensitive information from civil society organizations like DAWN.[4] In public statements and testimony before Congress,

---

[3] *See generally* Democracy in Exile: The DAWN Journal, https://dawnmena.org/democracy-in-exile.

[4] *See, e.g.*, Human Rights First, *U.S. Targeted Sanctions for Human Rights Abuses and Corruption* 10 (2025), https://humanrightsfirst.org/wp-content/uploads/2025/01/2025.01.28-HRF-GloMag-Sanctions-Slides.pdf ("About 1/3 of US Global Magnitsky sanctions have a basis in civil society recommendations.").

U.S. sanctions officials have described "the U.S. government's ongoing effort to coordinate with civil society"[5] and declared that "[a]ll of our efforts are underpinned by bilateral and multilateral engagement with partners, international organizations, and civil society organizations."[6] Sanctions under the Global Magnitsky Human Rights Accountability Act, for example, explicitly require the President to consider "credible information obtained by . . . nongovernmental organizations that monitor violations of human rights."[7] U.S. officials have similarly emphasized the critical value of the information that human rights organizations provide in the sanctions process.[8]

15.    DAWN adheres to rigorous investigative, fact-finding, data-gathering, and editorial processes in all aspects of its work. Our organization is supported by staff members with strong journalism backgrounds, and our work is guided by the journalistic principles of accuracy, truth, and integrity. We take seriously our role as human rights advocates and recognize the need to maintain our credibility to advance and safeguard human rights. We strive to be fair and thorough,

---

[5] Press Release, U.S. Dep't of Treasury, Treasury Targets Corruption Linked to Dan Gertler in the Democratic Republic of Congo (Dec. 6, 2021), https://home.treasury.gov/news/press-releases/jy0515.

[6] *Statement of Under Secretary Sigal Mandelker Before the U.S. House Appropriations Subcommittee on Financial Services and General Government*, U.S. Dep't of Treasury (Mar. 12, 2019), https://home.treasury.gov/news/press-releases/sm624.

[7] 22 U.S.C. § 10102(c)(2).

[8] Press Release, U.S. Dep't of Treasury, Treasury Targets Corruption Linked to Dan Gertler in the Democratic Republic of Congo (Dec. 6, 2021), https://home.treasury.gov/news/press-releases/jy0515 ("Civil society organizations around the world are often eyewitnesses to corruption and human rights abuses and can shine a light on activities that corrupt actors and authoritarian regimes try to keep hidden. . . . Treasury highly values the information shared by NGOs all over the globe to expose corruption and human rights abuse, which can be used to support and develop cases like Treasury's action today."); Press Release, U.S. Dep't of Treasury, Treasury Sanctions Members of a Significant Corruption Network in South Africa (Oct. 10, 2019), https://home.treasury.gov/news/press-releases/sm789 ("[W]e commend the extraordinary work by South Africa's civil society activists, investigative journalists, and whistleblowers, who have exposed the breadth and depth of the Gupta family's corruption.").

and seek out corroborating information. This helps establish trust with, and enhances our ability to effectively communicate complex human rights issues to, the public and policymakers alike. Among the journalists who serve on DAWN's staff are:

    a. Our executive editor for *Democracy in Exile*, previously Managing Editor of *World Politics Review* and Staff Editor at *Foreign Affairs*, whose writing and reporting on the Middle East have appeared in *The Nation*, *Foreign Policy*, *The New Republic*, *The National*, and *The Los Angeles Review of Books*.

    b. Our director of communications, a journalist who was previously imprisoned by the Iranian government for his reporting, has written for *Inter Press Service*, *The Daily Beast*, *The New York Times*, *The Los Angeles Times*, *Foreign Affairs*, *The Wall Street Journal*, *Time, The San Francisco Chronicle*, *Politico*, and *OpenDemocracy*.

    c. Our director of research for Israel-Palestine, previously Editor-in-Chief of *+972 Magazine* and News Desk Manager at *The Jerusalem Post*.

    d. As noted above, I am myself a member of the National Writers Union with an International Federation of Journalists press card.

16. DAWN routinely receives and handles sensitive information from at-risk individuals living in dangerous conflict zones across the MENA region. Because we gather this information for the purpose of public advocacy or information-sharing with government agencies or officials, we generally provide explicit assurances of confidentiality to vulnerable sources and whistleblowers given well-founded fears of harm and retaliation. Protecting sources from potential harm and retaliation is paramount and critical to our human rights advocacy, and we maintain a

sophisticated confidentiality infrastructure that includes encrypted communications and secure file transfers designed to ensure document traceability while protecting source identities. Our security protocols include compartmentalized information access, offline storage of sensitive materials, and heightened email security measures. The life-threatening consequences for exposed sources necessitate these extraordinary precautions and the highest standards of confidentiality throughout our investigative and documentation processes.

17.    We are particularly sensitive to the confidentiality of our sources and information about our work and methodologies in light of the circumstances surrounding the murder of our organization's founder, Mr. Khashoggi. As described in the United Nations investigation into his death, the academic research lab Citizen Lab reported that the cellphone of a close associate had been infected with spyware known as Pegasus, which allowed a Saudi-linked operator to access the associate's communications with Mr. Khashoggi.[9] Citizen Lab and *The Washington Post* later also revealed that this same spyware had been installed on the cellphone of Mr. Khashoggi's wife months before his death.[10]

18.    When DAWN submits evidence and documentation to the U.S. government about human rights abuses and abusers, our non-public sources generally provide materials or testimony with the explicit understanding that their identities and information will remain confidential. In turn, DAWN provides such submissions to the U.S. government with its own expectation that they will be treated confidentially, since the exposure of information can lead to the exposure of source

---

[9] Human Rights Council, *Annex to the Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions: Investigation into the Unlawful Death of Mr. Jamal Khashoggi* 14 (2019), https://digitallibrary.un.org/record/3809582?v=pdf.

[10] Dana Priest, *A UAE Agency Put Pegasus Spyware on Phone of Jamal Khashoggi's Wife Months Before His Murder, New Forensics Show*, Wash. Post (Dec. 21, 2021), https://www.washingtonpost.com/nation/interactive/2021/hanan-elatr-phone-pegasus.

identities. It is my understanding that the U.S. government takes precautions to ensure the confidentiality of such submissions.[11]

### DAWN's Israel-Palestine Program

19.    DAWN's Israel-Palestine program focuses on investigating human rights abuses, calling for accountability, and advocating for U.S. policy changes. DAWN's work related to Israel-Palestine has included: documenting violent crackdowns on Gaza protests in countries like Jordan and advocating for an end to repression; exposing companies funding or helping to fund violence against Palestinians; and submitting confidential dossiers to the State and Treasury Departments providing detailed evidence on individuals and entities contributing to human rights abuses and fueling instability in the West Bank.

20.    DAWN's director of research for Israel-Palestine is Michael Schaeffer Omer-Man, a long-time journalist and editor accredited by the Israeli government during his tenure as Editor-in-Chief of *+972 Magazine* from 2013 to 2019, and previously as News Desk Manager at *The Jerusalem Post* from 2010 to 2013. Mr. Omer-Man brings his extensive investigative and reporting methods to bear on his work leading human rights investigations into perpetrator accountability, interviewing interested parties, gathering data and facts, contributing to global media publications including *The Guardian*, *Al Jazeera*, and DAWN's online journal *Democracy in Exile*, producing policy papers, and creating advocacy materials based on both confidential sources and public reporting.

---

[11] *See* Human Rights First, *Global Magnitsky Sanctions: Frequently Asked Questions* 11 (2020), https://humanrightsfirst.org/wp-content/uploads/2022/09/Global-Magnitsky-FAQs.pdf    ("The safety and security of people and groups working to build and submit case files to the [U.S. government] is a primary concern. The State and Treasury departments have been clear that they treat the information shared with them by NGOs as confidential and there are no known cases of leaks of sensitive information related to the sanctions process.").

**DAWN's August 26, 2024 U.S. Government Submission
and Public Reporting Regarding Violence in the West Bank**

21.    On August 26, 2024, DAWN submitted a report to the U.S. Departments of State and Treasury containing detailed evidence that certain public officials and figures had contributed to violence and instability in the West Bank in the Occupied Palestinian Territory ("August 26 Submission"). DAWN identified the Petitioner as one of these individuals. That same day, DAWN published an article on its website announcing the submission and summarizing the evidence that it had gathered ("August 26 Article").

22.    DAWN adhered to its rigorous investigative, fact-checking, and editorial standards in preparing the August 26 Submission and the August 26 Article. DAWN relied on numerous credible and corroborating sources, including reputable news media outlets, prominent human rights organizations, and confidential sources and witnesses to whom DAWN, consistent with its investigative practice, provided assurances of confidentiality given the sensitive nature of the information and fears of retaliation. DAWN provided the August 26 Submission to the U.S. government with our own expectation of confidentiality because it contains confidential and sensitive material not included in the August 26 Article.

**The U.S. Government's Sanctions Against Petitioner**

23.    On February 1, 2024, President Biden issued Executive Order 14115, which created a sanctions program to address "the situation in the West Bank—in particular high levels of extremist settler violence, forced displacement of people and villages, and property destruction."[12] On a press call that same day, National Security Council officials explained that sanctions designations under this new program "require[] multiple forms of evidence . . . to ensure that that

---

[12] Executive Order 14115, *lmposing Certain Sanctions on Persons Undermining Peace, Security, and Stability in the West Bank*, 89 Fed. Reg. 7605, 2024 WL 404478 (Feb. 1, 2024).

evidence can be corroborated from [] credible sources" and that the government "must have multiple well-documented pieces of credible information before designating any individual."[13] They also explained that "we have a process, as we do for all of our sanctions, that requires us to build evidentiary packages that would pass judicial review. . . . [A]ll of our sanctions are subject to a very robust legal review process to ensure that we do have designation packages that stand up to judicial review."[14]

24.    On August 28, 2024, Petitioner was sanctioned and added to the Specially Designated Nationals list in accordance with Executive Order 14115 following the U.S. government's investigation and review. A press release issued by the U.S. Department of State announcing the sanctions stated that Petitioner "engaged in malign activities outside the scope of his authority. In February 2024, he led a group of armed settlers to set up roadblocks and conduct patrols to pursue and attack Palestinians in their lands and forcefully expel them from their lands."[15] The press release further noted that Petitioner was sanctioned "for being responsible for or complicit in, or having directly or indirectly engaged or attempted to engage in planning, ordering, otherwise directing, or participating in an act of violence or threat of violence targeting civilians, affecting the West Bank."[16]

---

[13] *Background Press Call On Upcoming Measures to Address Actions That Undermine Peace, Security, and Stability in the West Bank*, The White House (Feb. 1, 2024), https://web.archive.org/web/20240530123758/https://www.whitehouse.gov/briefing-room/press-briefings/2024/02/01/background-press-call-on-upcoming-measures-to-address-actions-that-undermine-peace-security-and-stability-in-the-west-bank.

[14] *Id.*

[15] Press Release, U.S. Dep't of State, Sanctions on Israeli Entity and Individual (Aug. 28, 2024), https://web.archive.org/web/20240830064200/https://www.state.gov/sanctions-on-israeli-entity-and-individual.

[16] *Id.*

### If Granted, the Requested Discovery Would Harm
### DAWN's Core Mission and Activities

25.     *Threats of harm, harassment, and hostility directed at DAWN and DAWN staff members*. Since our organization's founding, DAWN and DAWN staff members have regularly experienced harassment, threats, intimidation, and even bodily harm. As mentioned above and has been widely reported, our organization's founder, Mr. Khashoggi, was kidnapped and brutally murdered by Saudi government agents at the Saudi consulate in Istanbul in direct retaliation for his efforts to advocate for democracy and human rights in the MENA region, including by establishing DAWN.[17] This tragedy underscores the profound risks inherent in our work. DAWN staff members continue to face direct threats and intimidation abroad, including interrogation, arrests, and deportations or denials of entry into certain MENA countries specifically because of their association with our organization. DAWN's staff includes journalists and activists who have been imprisoned, persecuted, threatened, and harassed for their work, or whose family members have been imprisoned, tortured, or sanctioned for their work. Two of our staff members from the Middle East have received political asylum in the United States in light of the persecution they experienced.

26.     We also experience harassment, threats, and intimidation online as well as baseless legal threats, often from individuals linked to MENA government actors and their associates and agents in the United States. In one particular incident, individuals posted photographs of a DAWN senior staff member's children on the social media platform X accompanied by veiled threats, prompting us to report the matter to the FBI. On social media, individuals and entities with named

---

[17] *See, e.g.*, Ben Hubbard & David D. Kirkpatrick, *For Khashoggi, a Tangled Mix of Royal Service and Islamist Sympathies*, N.Y. Times (Oct. 14, 2018) (describing how Mr. Khashoggi was "founding" DAWN and "trying to secure funding and set up a board when he disappeared").

or anonymous accounts regularly attack, insult, threaten, harass, and attempt to intimidate me and other DAWN staff members for sharing information critical of abuses by Israel and other MENA governments. These include threats of violence, detention, and even death. In addition, we have faced public attacks, including news articles alleging that we are associated with or support terrorist groups, as well as outreach and letters to our institutional donors alleging the same, all tied to our work documenting human rights abuses. Our website has been blocked by multiple MENA governments, severely restricting local access to our advocacy and reporting.

27.    If I and DAWN were required to respond to Petitioner's discovery requests in this litigation, it would substantially amplify my and other staff members' fears of retaliation. Based on my and DAWN's past experiences, I believe that disclosure of our investigative materials and methods, internal documents, and internal and external communications—including with our partners, sources, and government officials—would lead to increased threats, harassment, and hostility directed against me and other members of DAWN's staff. This would impact my and other DAWN staff members' ability and willingness to engage in our mission-critical work of investigating abuses and advocating for human rights in public forums and with the U.S. government. Additionally, the knowledge that our sensitive communications and information could be made public in the future, and the threats of retaliation that could ensue, would deter us from sharing information with civil society partners or reaching out to vulnerable sources. We would reconsider our submissions of documented, factual information about human rights abuses against Palestinians to the U.S. government for fear that we could be forced to reveal sensitive information in a future 28 U.S.C. § 1782 proceeding. These fears of potential exposure leading to retribution in the form of threats and costly litigation would chill our ability to advocate and petition the government freely and truthfully.

28.     *Diversion of resources, burdens on organizational capacity, and effects on fundraising*. This litigation has already forced senior staff—including myself, our advocacy director, and our director of research for Israel-Palestine—to redirect significant time, attention, and resources away from our core advocacy, investigative, and research activities. I and other senior staff have had to allocate substantial hours consulting with legal counsel, reviewing court documents, gathering records, and preparing materials related specifically to this case, diverting attention from critical ongoing work documenting human rights abuses in the MENA region. The litigation has also hampered DAWN's fundraising efforts. As a result of this litigation, current and potential donors have communicated concerns about the organization's legal risk related to our work documenting abuses by Israeli officials and public figures as well as the confidentiality of their contributions and involvement.

29.     If I and DAWN were required to respond to Petitioner's discovery requests in this litigation, it would significantly compound the existing disruptions to our work and operations and severely strain our resources and organizational capacity. Complying with such discovery demands would require even more extensive diversion of senior leadership and staff time from critical investigations, reporting, and advocacy efforts. The necessity to search, review, redact, and produce potentially sensitive communications and documents would result in substantial administrative burdens. Moreover, required disclosure would heighten the aforementioned concerns among our donors regarding confidentiality and security and lead to further reluctance or refusal to support DAWN, which would directly impact DAWN's ability to sustain our investigative and advocacy work.

30.     *Threats of harm, harassment, and hostility directed at DAWN's partners and sources*. DAWN's partners and sources abroad operate in extremely high-risk environments,

where the revelation of their identities and even indirect association with organizations like DAWN can lead to grave consequences. The risk is not hypothetical—disclosure has resulted in serious bodily harm, retaliation, and targeted harassment. We are aware of multiple instances where the exposure of activists' or researchers' identities, sometimes through online posts or leaked communications, has led to arrests, physical threats, violence, incarceration, murder, loss of employment, and surveillance by security services. For example, imprisoned Saudi activists reportedly faced harsher conditions after DAWN documented abuses against them and their associations with DAWN were revealed. Most recently, one of our Israeli partners asked us to remove any mention of their identification with our organization for fear that they would be subject to harassment, retaliation, and sanction in Israel because of our work seeking accountability.

31.     In light of the serious risks that they face, some partners and sources have already expressed concern about this litigation and about continuing to work with DAWN out of fear that their identities or communications could be exposed, leading to harassment and attacks against them. If I and DAWN were required to respond to Petitioner's discovery requests in this litigation, it could expose or help reveal the identities of sources who have provided us with sensitive information under explicit promises of confidentiality. It could also subject even non-confidential partners and sources to unwarranted reprisal. Such an outcome would not only endanger individuals but also shut down critical channels of information and collaboration across the region. I would expect partners and sources to withdraw from associating with us and decline to engage or share information with us. This would severely undermine our ability to conduct research, gather evidence, and publish the kind of fact-based advocacy that defines our mission. Without trusted partners and sources, our human rights work becomes not only harder, but in some cases, impossible.

32.     I declare under penalty of perjury that the foregoing is true and correct.


Executed this _17th_ day of April, 2025.

*Sarah Leah Whitson*
_____

Sarah Leah Whitson

<u>PUBLICATIONS</u>
<u>SARAH LEAH WHITSON</u>

<u>2025</u>

"From Apartheid to Democracy, A Blueprint for Israel-Palestine," with Michael Omer-Man, University of California Press, Oct. 2025, forthcoming
https://www.ucpress.edu/books/from-apartheid-to-democracy/paper

"Why We Asked the ICC to Investigate Biden for Aiding and Abetting Genocide," *The Nation*, March 5, 2025
https://www.thenation.com/article/world/icc-genocide-israel-war-crimes-biden-blinkin-austin/

"Israeli settler violence: How the US undermined its own sanctions regime," *Middle East Eye*, February 21, 2025

https://www.middleeasteye.net/opinion/us-israeli-settler-violence-undermined-own-sanctions-regime

"Why Palestinian Families are Suing the State Department to Enforce the Leahy Laws," *Just Security*, January 17, 2025
https://www.justsecurity.org/106399/suing-state-department-leahy-law/

<u>2024</u>

"Expanding Public Support for Palestinian Rights and the Counteroffensive to Quash It," chapter in "State of the Free Press 2025, The Censored Press, 2025,
https://www.project-censored.org/shop/p/state-of-the-free-press-2025

"Shared Zones of Interest," *The American Prospect*, September 26, 2024

"The White House's Defense of Israel is Undermining International Law," *Foreign Policy*, September 19, 2024,

"France's Shift on Western Sahara Comes With a Huge Cost," *World Policy Review*, September 6, 2024

"How Saudi Arabia went from Pariah to Patron," *Responsible Statecraft*, August 16, 2024

"A True Democracy is the Only Way Forward," *The Age and the Sidney Morning Herald,* January 28, 2024

2023

"It's Time to Scrap the Abraham Accords," *Time Magazine*, December 4, 2023

Defense Lobbyists and Foreign Influence: The Structural Impediments to Reforming U.S. Foreign Policy", *Democracy in Exile*, November 8, 2023

The Greatly Exaggerated US Pivot and America's Failures on Human Rights, chapter in book, "A US Pivot Away from the Middle East: Fact or Fiction?", September 13, 2023, https://arabcenterdc.org/wp-content/uploads/2020/09/The-Greatly-Exaggerated-US-Pivot-and-Americas-Failures-on-Human-Rights.pdf

Jordan's King Abdullah Joins Other Arab Autocrats in Targeting Dissidents Abroad, *Democracy in Exile*, July 19, 2023

"How Not to Artwash Saudi Arabia's Gruesome Human Rights Record," *Hyperallergic*, March 14, 2023

2022

"Human Rights Organizations Should Not Be in the Business of Calling for War," *Democracy in Exile*, August 26, 2022

"How Israel's Campaign against the 'Apartheid' Label Threatens Free Speech," *Democracy in Exile*, July 5, 2022

"America's Middle East Withdrawal Breathes its Last Breath," *American Prospect*, June 24, 2022

"How Ukraine is Clarifying the Costs of America's Middle East Alliances," *Democracy in Exile*, March 17, 2022

"Biden Can't Let Sisi Get Away with Spying on Egyptians in the U.S.," *Democracy in Exile*, February 3, 2022

"The Biden Administration Could have Ended the Brutal War in Yemen. It's Now Making it Worse," *Washington Post*, January 26, 2022

"Remember the Clarion Call of Egypt's Revolution," *Democracy in Exile*, January 26, 2022

"The Human Rights Vs. National Security Dilemma is a Fallacy," *Foreign Policy*, January 10, 2022

2021

"Biden's Middle East Policy is Just Sugar-Coated Business as Usual," *Responsible Statecraft*, September 22, 2021

"Saud Crown Prince MBS Seeks to Escape Accountability for Murder of Khashoggi," *Democracy in Exile*, September 15, 2021

"Congress Must Halt Biden's Arms Sales to Saudi Arabia," *Foreign Polic*y, December 6, 2021

"With Weak Response, U.S. Will Pay the Price of Israel's Terror Designations," *Responsible Statecraft*, October 29, 2021

"A Hard Look at America's Embrace of Jordan's King," *Democracy in Exile*, July 21, 2021

"Time to Cut Egypt Off," *Foreign Affairs*, July 16, 2021

"New Khashoggi revelations show we don't have the full story about his killing," *Washington Post*, July 6, 2021

"The Israel Palestine Narrative Has Evolved," *American Prospect*, May 18, 2021

Testimony to Lantos Human Rights Commission, U.S. Congress, *U.S. Policy in the Middle East Ten Years after the Arab Uprisings*, April 29, 2021

"Mr. President, recognize the Armenian Genocide, *Boston Globe*, April 23, 2021

"Now is the Time to End our 30-Year War in Iraq," *American Prospect*, April 15, 2021

"MBS is Failing the People of Saudi Arabia; It's Time for Him to Go," *Arabi 21*, February 16, 2021

"10 years after: Why the Arab Spring ended in a cruel winter," *Responsible Statecraft*, February 3, 2021

"Why the US is wrong to designate the Houthis as 'terrorists'," *Aljazeera*, January 24, 2021

<u>2020</u>

"Jailed Saudi women's activist poses early test for Biden," *Responsible Statecraft*, December 20, 2020

Remarks to the Tom Lantos Human Rights Commission of the U.S. Congress briefing on "Human Rights in Saudi Arabia," November 10, 2020

"Biden Must Block Trump's Arms Sale to the UAE," *The Nation*, December 9, 2020

"What would a Biden presidency look like for Qatar, GCC region?," *Doha News*, September 30, 2020

"A big step to amplify Jamal Khashoggi's vision," *Washington Post*, September 29, 2020

"The Rabaa Massacre: Seven Years Later, a Measure of Justice for Egypt's Victims," *Inside Arabia*, August 14, 2020

"Middle Eastern Dissidents Find No Peace in Exile," *Al Jazeera*, July 5, 2020

"The US Goes to Bat for Lebanon's "Butcher of Khiam"," *Just Security*, May 21, 2020

"Mohammed bin Salman's Bloody Dream City of Neom, "*Foreign Policy*, April 27, 2020

"Collective punishment against ICC officials – and their families," *Responsible Statecraft*, March 21, 2020

"We're starting to end endless war in Afghanistan, now let's do Iraq," *Responsible Statecraft*, March 13 2020

<u>2019 and earlier</u>

Briefing on Women's Human Rights Defenders in Saudi Arabia, U.S. Congress Lantos Commission, May 23, 2019

"Obama Officials' Incomplete Reckoning with Failure on Yemen," Just Security, November 19, 2018

"Movie Theaters and Women Driving Won't Placate Saudi Shiites," Foreign Policy, September 11, 2018

"Briefing on Religious Freedom and Human Rights for Shia Communities in Sunni Countries," US Congress Lantos Commission, June 26, 2019

"Why Iraq Should Limit Islamic State Trials," Reuters, December 5, 2017

"When Elites Get a Taste of Their Own Medicine," The New York Times, November 30, 2017

"For Qatar, the Gulf Crisis is a Human Rights Opportunity," Middle East Eye,

August 3, 2017 "Chipping Away at 50 Years of Occupation," Public

Diplomacy Magazine, June 5, 2017 "Winning Battles but Losing the War for

a United Iraq," The Toronto Star, May 27, 2017

"The US is Quietly Helping Saudi Arabia Wage a Devastating Aerial Campaign in

Yemen," Los Angeles Times, March 30, 2016

"How to Make Syria Peace Talks Work," Al-Jazeera, December 21, 2015

Testimony at the Tom Lantos U.S. Congressional Human Rights Commission on Human Rights in Egypt, November 6, 2015

"Why the Fight Against ISIS is Failing," *MSNBC*, February 18, 2015 "Saudi Blogger's Flogging Should Outrage U.S.," CNN, January 13, 2015 "Egypt's Cover-Up," *Open Democracy*, August 13, 20114

"Egypt Sentences 683 to Death as Military Crackdown Continues," *MSNBC*, April 30, 2014 "Libya Teetering on the Brink of Failure," *MSNBC*, February 10, 2014

"Ariel Sharon's Legacy is Deeply Disturbing," *CNN*, January 13, 2014

"The Government Cracks Down, and Egypt Shrugs," *Los Angeles Times*, December 24, 2013

"Restricting Speech Restricts Arab Freedom," *Contexts*, May 20, 2013

"How Baghdad Fuels Iraq's Sectarian Fire," *New York Times*, May 15, 2013 "Is Bahrain Serious about Reform?" *CNN*, March 15, 2013

"A Gift with Lots of Baggage," *The Huffington Post,* October 31, 2012 "Libya's Human Rights Problem," *Foreign Policy*, June 15, 2012 "How to Help Yemen Come Unstuck," *Foreign Policy*, April 20, 2012

"In Libya, Building the Rule of Law," *International Herald Tribune/The New York Times*, December 30, 2011 "Time for Tahrir 2.0," *The Huffington Post*, November 11, 2011

"Libya: To Oust a Tyrant," *Los Angeles Times*, February 24, 2011

"Tunisia's Antics Should Give the West Pause," *Los Angeles Times,* April 19, 2010

"Postcard From...Tripoli," *Foreign Policy In Focus*, February 11, 2010

"Iran: South Africa Must Speak Out," *The Times Live*, February 9, 2010 "Israel's settlements are on shaky ground," *Los Angeles Times*, June 28, 2009

"Egypt: A Record That Can't Be Ignored," *The Huffington Post*, June 1, 2009 "Tripoli Spring," *Foreign Policy*, May 2009

"Hezbollah Needs to Answer," *Al-Sharq al-Awsat*, October 4, 2006

"Hezbollah's Rockets and Civilian Casualties," *Counterpunch*, September 22, 2006 "It's Time to Tell Mubarak, 'Enough!'" *Daily Star*, May 20, 2006

"Getting an Opinion on the Wall," *Daily Star*, July 9, 2004

"Tearing Up the Rules: The Illegality of Invading Iraq," Center for Economic and Social Rights (2003) (co-author)

"Armenia: Critique of State Department Country Reports," Lawyers Committee for Human Rights (1997) "Unsanctioned Suffering: A Human Rights Assessment of United Nations Sanctions in Iraq," Center for Economic and Social Rights (1996) (with others)

"An Experiment in Alternative Dispute Resolution in India," 15 Hastings International and Comparative Law Review 3 (Spring 1992)

"Ballots without Borders: A Report on the May 1992 Elections in Iraqi Kurdistan," The International Human Rights Law Group (1992)

"Iraq: Critique of State Department Country Reports," Lawyers Committee for Human Rights (1991 and 1992) "Special Report: Public Health in Iraq," The New England Journal of Medicine (1991) (with others)

"Health and Welfare in Iraq: An In-Depth Assessment," Harvard Study Team (1991) (with others)