# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: APPLICATION OF ISAAC LEVI PILANT, FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING | Case No. 1:25-mc-00760-JMA-LKE |

## BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, NEW YORK CIVIL LIBERTIES UNION, AND HUMAN RIGHTS FIRST IN SUPPORT OF RESPONDENTS

Amanda Strayer**
HUMAN RIGHTS FIRST
825 21st Street NW
PMB 253
Washington, D.C. 20006
(202) 547-5692
strayera@humanrightsfirst.org

Molly K. Biklen
Robert Hodgson
NEW YORK CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
mbiklen@nyclu.org
rhodgson@nyclu.org

Nathan Freed Wessler
Steven M. Watt*
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
nwessler@aclu.org
swatt@aclu.org

Jennifer Stisa Granick**
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
425 California Street, Seventh Floor
San Francisco, CA 94104
(415) 343-0770
jgranick@aclu.org


*Counsel for* Amici

*\* Application for reciprocity admission from S.D.N.Y. forthcoming*
*\*\* Application for admission pro hac vice forthcoming*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................ iv

SUMMARY OF ARGUMENT......................................................................... 1

INTEREST OF AMICI ..................................................................................... 3

ARGUMENT ..................................................................................................... 4

I.   The U.S. government has established and implemented a framework to encourage and facilitate NGO information-sharing with the Treasury and State Departments for the purposes of imposing targeted human rights and corruption sanctions ................................................................................. 4

II.  Sensitive information that NGOs share with the U.S. government must be protected from disclosure to mitigate the risk of serious, irreparable harm and preserve NGOs' ability to continue providing such critical information, safeguards that are reflected in U.S. policy and law ..................................... 8

   A.  NGOs and civil society risk retaliation from sanctioned persons and governments ................................................................................... 9

   B.  The Executive branch has established measures to prevent disclosure of information shared by NGOs in light of the value that NGOs provide the U.S. government in imposing sanctions for human rights abuses and corruption ........................................................................11

   C.  Forcing NGOs to disclose information related to their reporting to the U.S. government would chill this vital process and may put the organization, its employees, or others at undue risk ...................................... 12

III. Section 1782 bars disclosure of the requested information ........................ 14

   A.  The First Amendment privilege prevents disclosure of all documents and communications relating to DAWN's protected associational and petitioning activities............................................................................. 14

   B.  All documents and communications relating to DAWN's investigative reporting and newsgathering activities are protected under the reporter's privilege ........................................................................... 19

   C.  Petitioner cannot show a compelling interest, nor even a likelihood of relevance, to justify disclosure of any privileged documents or communications ................................................................................. 22

D.  The Court should use its broad discretion under Section 1782 to deny Petitioner's discovery request as an attempt to circumvent First Amendment protections and silence critics through judicial harassment ....... 23

CONCLUSION .......................................................................................................... 25

CERTIFICATE OF COMPLIANCE ........................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*AFL & CIO v. FEC*,
    333 F.3d 168 (D.C. Cir. 2003).................................................................... 18

*Australia/E. U.S.A. Shipping Conf. v. United States*,
    537 F. Supp. 807 (D.D.C. 1982) ............................................................... 15

*Baker v. F&F Inv.*,
    470 F.2d 778 (2d Cir. 1972) ..................................................................... 20

*Branzburg v. Hayes*,
    408. U.S. 665 (1972)................................................................................. 19

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ............................................................................... 16, 18

*California Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) ................................................................................. 18

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*,
    954 F. Supp. 2d 127 (E.D.N.Y. 2013) ..................................................... 18

*Chevron Corp. v. Berlinger*,
    629 F.3d 297 (2d Cir. 2011) ..................................................................... 19

*Citizens Against Rent Control v. City of Berkeley,* w
    454 U.S. 290 (1981)........................................................................... 15, 17

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010)................................................................................. 19

*Curtis Publ'g Co. v. Butts*,
    388 U.S. 130 (1967) ................................................................................. 24

*Doordash, Inc. v. City of New York*,
    754 F. Supp. 3d 556 (S.D.N.Y. 2024) ............................................... 15, 18

*Gonzales v. Nat'l Broad. Co.*,
    194 F.3d 29 (2d Cir. 1999) ................................................................ 19, 22

*Google, Inc. v. Hood*,
    822 F.3d 212 (5th Cir. 2016)...................................................................... 3

*Grosjean v. Am. Press Co.*,
    297 U.S. 233 (1936)................................................................................. 25

iv

*In re Gliner*,
    133 F.4th 927 (9th Cir. 2025) ........................................................................ 3, 24

*In re Johns-Manville Corp.*,
    32 B.R. 728 (S.D.N.Y. 1983) ............................................................................ 18

*In re McCray, Richardson, Santana, Wise, and Salaam Litigation*,
    928 F. Supp. 2d 748 (S.D.N.Y. 2020) ............................................................. 21

*In re Petroleum Prods. Antitrust Litig.*,
    680 F.2d 5 (2d Cir. 1982) ................................................................................. 21

*In re Shervin Pishevar*,
    439 F. Supp. 3d 290 (S.D.N.Y. 2020) ............................................................. 19

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
    No. 75 Civ. 5388, 1985 WL 315 (S.D.N.Y. Feb. 28, 1985) ..................... 18, 22, 23

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) .................................................................................... 14, 23

*Kiobel ex rel. Samkalden v. Cravath, Swaine & Moore LLP*,
    895 F.3d 238 (2d Cir. 2018) ............................................................................. 23

*Local 1814 Int'l Longshoreman's Ass'n v. Waterfront Comm'n of N.Y. Harbor*,
    667 F.2d 267 (2d Cir. 1981) ............................................................................. 15

*Martin v. City of Del City*,
    179 F.3d 882 (10th Cir. 1999) .......................................................................... 18

*N.Y. State Nat'l Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989) ..................................................................... 14, 15

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) .................................................................................... 14, 16

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ......................................................................................... 24

*People v. Harris*,
    945 N.Y.S.2d 505 (N.Y.C. Crim. Ct. 2012) ..................................................... 3

*Perry v. Schwarzenegger*,
    591 F.3d 1147 (9th Cir. 2010) .......................................................................... 17

*Red Lion Broadcasting Co. v. FCC*,
    395 U.S. 367 (1969) ......................................................................................... 24

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,
547 U.S. 47 (2006) ............................................................................................. 16

*Schiller v. City of New York*,
245 F.R.D. 112 (S.D.N.Y. 2007) ............................................................ 20, 21, 22

*von Bulow ex rel. Auersperg v. von Bulow*,
811 F.2d 136 (2d Cir. 1987) ............................................................................. 19

**Statutes**

28 U.S.C. § 1782 ........................................................................................................ 2, 14

Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, Pub. L. No. 111-195, 124 Stat. 1312. ............................................................................................... 5

Hong Kong Human Rights and Democracy Act of 2019, Pub. L. No. 116-76, 133 Stat 1161....... 5

Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. No. 112-158, 126 Stat 1214.............................................................................................................. 5

Sergei Magnitsky Rule of Law Accountability Act of 2012, Pub L. No. 112-208, 126 Stat. 1496............................................................................................................. 5

The Global Magnitsky Human Rights Accountability Act of 2016, Pub. L. No. 114-328, 130 Stat. 2533 ............................................................................................... 5

**Other Authorities**

*146 Organisations Condemn Lawsuit Brought by Dan Gerlter Against the "Congo is Not for Sale" Anti-corruption Coalition*, Human Rights Watch (Apr. 17, 2023) ............................. 10

Adam Keith, Senior Dir. for Accountability, Human Rights First, *Implementation of the Global Magnitsky Laws*, Testimony to the U.S. Senate Comm. on Foreign Relations (Dec. 5, 2024).. .................................................................................................................. 6

Amanda Strayer, Human Rights First, *Comprehensive Review of the Provisions and Operation of the Sergei Magnitsky Law and the Special Economic Measures Act*, Testimony to the Senate of Canada Standing Comm. on Foreign Affairs and Int'l Trade Hearing (Mar. 6, 2023)......... 8

Bopha Phorn, *'I Quit Being a Journalist': The Arrest of a Prominent Cambodian Reporter Sends a Chilling Message*, Nieman Reports (Mar. 3, 2025) .......................................... 10

*Cambodia: Charges against Journalist Highlight Clampdown on Press Freedom*, Amnesty International (Oct. 2, 2024)....................................................................................... 10

*DR Congo: Quash Whistleblowers' Death Sentences*, Human Rights Watch (Mar. 9, 2021) ...... 10

*DRC – Two Whistleblowers Reveal Fraudulent Schemes*, Platform to Protect Whistleblowers in Africa (Feb. 26, 2021) ................................................................................. 10

EarthRights International, *Foreign Legal Assistance* .................................................. 2

George Wright, *Cambodian Journalist who Exposed Cyberscams Released on Bail*, BBC (Oct. 24, 2024) ...................................................................................................... 9

Government of UK, Foreign & Commonwealth Office, *Global Human Rights Sanctions: Information Note for NGOs and Civil Society* (July 6, 2020) ................................. 8

Human Rights First et al., *Multilateral-Magnitsky-Sanctions-at-Five-Years A Report on the Use of Global Targeted Human Rights and Corruption Sanctions Programs in the United States, Canada, the United Kingdom, and the European Union Since 2017* (2022) ........................... 8

Human Rights First, *Implementing Magnitsky-Style Sanctions Multilaterally - Government Perspectives*, Vimeo (Oct. 1, 2021) ...................................................................... 7

Human Rights First, *Shaming without Naming*: *The Limits of Confidential U.S. Visa Sanctions for Accountability* (2013) .................................................................................. 7

Human Rights Watch, *"We Will Find You" A Global Look at How Governments Repress Nationals Abroad* (2024) ......................................................................................... 17

Human Rights Watch, *World Report 2023: Bangladesh* (2003) ................................. 11

International Anti-Corruption Conference, *Deterring and Promoting Accountability for Corrupt Actors through Sanctions and Visa Restrictions*, Youtube (Feb. 2, 2023) .............. 6

Jacob Sims, *The Arrest of Mech Dara (Part I): Repression and Retaliation*, The Diplomat (Oct. 1, 2024) ............................................................................................................ 9

Josh White, Dir. of Police and Analysis, The Sentry, *How to Get Human Rights Abusers and Kleptocrats Sanctioned Under the Global Magnitsky Act*, Remarks at the Comm'n on Sec. and Coop. in Europe Briefing (Mar. 13, 2018) ................................. 6, 11, 13

Letter from Global Coalition of Civil Society NGOs to Janet Yellen, Sec'y of U.S. Dep't of Treasury & Anthony Blinken, Sec'y of U.S. Dep't of State (Sept. 5, 2024) ........... 8

Nina Moraitou-Politzi, *Magnitsky Sanctions and Political Prisoners: Lessons from the Case of Vladimir Kara-Murza*, Just Security (Aug. 23, 2024) ......................................... 12

Press Release, U.S. Dep't of State, *Sanctions on Israeli Entity and Individual* (Aug. 28, 2024)... 1

Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Cambodian Tycoon and Businesses Linked to Human Trafficking and Forced Labor in Furtherance of Cyber and Virtual Currency Scams* (Sept. 12, 2024) ...................................................................... 9

Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Perpetrators of Serious Human Rights Abuse on International Human Rights Day* (Dec. 10, 2021) ........................................ 11

Press Release, U.S. Dep't of Treasury, *Treasury Targets Corruption Linked to Dan Gertler in the Democratic Republic of Congo* (Dec. 6, 2021) ............................................. 7

Press Release, U.S. Dep't of Treasury, *United States Sanctions Human Rights Abusers and Corrupt Actors Across the Globe* (Dec. 21, 2017) ............................................. 10

Readout, Deputy Sec'y of Treasury Wally Ademayo, *Meeting with Humanitarian NGOs* (May 27, 2021) .............................................................................. 6, 7

Readout, Deputy Sec'y of Treasury Wally Ademayo, *Roundtable Discussion with Human Rights and Anti-Corruption NGOs* (Apr. 29, 2021) ...................................... 6

Redress et al., *Evaluating Targeted Sanctions: A Flexible Framework For Impact Analysis* (2023) ................................................................................ 11, 12

Rep. of the Human Rights Council on Surveillance and Human Rights, U.N. Doc. A/HRC/41/35 ................................................................................ 18

Robert G. Berschinski, *Examining the Anti-Corruption Provisions of the Global Magnitsky Act*, Remarks at the U.S. Helsinki Comm'n Briefing (Dec. 13, 2017) ................................. 6

S. Cybersecurity and Infrastructure Sec'y Agency et al., *Mitigating Cyber Threats with Limited Resources: Guidance for Civil Society* (2024) ......................................... 17

Sienna Anstis & Ronald Deibert, *Silenced by Surveillance: The Impacts of Digital Transnational Repression on Journalists, Human Rights Defenders, and Dissidents in Exile*, Knight First Amend. Inst. (Feb 18, 2025) ................................................................. 16

Tomas Hamilton et al., *Targeted Sanctions as a Pathway to Accountability*, 22 J. Int'l Crim. Just. 345 (2024) ........................................................................... 7

U.S. Dep't of State, *United States Guidance for Online Platforms on Protecting Human Rights Defenders Online* (2024) ................................................................. 17

*US: Sanction Israeli MK Sukkot, Security Officer Yitzhak Filant and Yitzhar Settlement Leadership for Promoting Violence Against Palestinian Civilians,* DAWN (Aug. 26, 2024).. 1

## SUMMARY OF ARGUMENT

This case concerns application of critical statutory and constitutional safeguards against unjustified or abusive discovery requests by foreign litigants under 28 U.S.C. § 1782. Petitioner in this matter seeks broad discovery from DAWN, a U.S.-based human rights organization, following DAWN's publication of an article to the public and provision of a confidential report to the U.S. Secretary of the Treasury. The article and report alleged that Petitioner, head of security for the Israeli settlement of Yitzhar, had "directly contributed to violence and instability in the West Bank through ideologically motivated crimes against Palestinian civilians."[1] Two days after DAWN's submission, President Biden imposed sanctions on Petitioner for his participation in "an act of violence or threat of violence targeting civilians, affecting the West Bank."[2]

Human rights organizations are a critical part of the U.S. sanctions regime. U.S. law and policy encourage, and often require, the U.S. government to consult with and consider submissions from nongovernmental organizations (NGOs) when making determinations about imposition of sanctions for human rights violations and corruption. U.S. law and policy also recognize the critical importance of protecting the confidentiality of those consultations and submissions, in recognition of the severe consequences—including harassment and violence—that can result if perpetrators of human rights violations are able to discover details about the organizations' submissions or the identities of witnesses and victims of human rights abuses with whom they have communicated.

There is no tension between these important policy considerations and the standard governing the disposition of discovery applications under Section 1782. Courts cannot grant

---

[1] *US: Sanction Israeli MK Sukkot, Security Officer Yitzhak Filant and Yitzhar Settlement Leadership for Promoting Violence Against Palestinian Civilians,* DAWN (Aug. 26, 2024), https://perma.cc/WL22-CA3L.

[2] Press Release, U.S. Dep't of State, *Sanctions on Israeli Entity and Individual* (Aug. 28, 2024), https://perma.cc/UW2D-XHHA.

discovery requests under Section 1782 where they seek testimony or documents in violation of a "legally applicable privilege." 28 U.S.C. § 1782(a). Two privileges are relevant here. The First Amendment privilege applies where disclosure implicates the exercise of fundamental speech, association, and petitioning rights. And the reporter's privilege protects information relating to investigative reporting and newsgathering activities, including those conducted by human rights organizations like DAWN. Petitioner cannot show the requisite compelling interest to overcome the First Amendment privilege, nor meet the heightened relevance threshold to overcome the reporter's privilege. And even if application of these privileges were uncertain, under Section 1782 the Court has broad discretion to deny discovery requests that are overly burdensome and intrusive, or are designed to circumvent U.S. policies and First Amendment interests. Here, Petitioner's request contravenes protective measures imbedded in the U.S. government's sanctions framework designed to encourage and facilitate NGO information-sharing with the Treasury and State Departments for the purposes of imposing targeted human rights and corruption sanctions. Petitioner's request also undermines a longstanding judicial and legislative commitment to safeguarding the fundamental public interest in free speech and a free press.

Section 1782 discovery requests are often uncontroversial, and can even aid human rights accountability efforts in foreign courts by providing proper access to evidence held by individuals or entities who are present in the United States.[3] In this case, however, where Petitioner seeks disclosure of speech, associational information, and news-gathering activities protected by the First Amendment and the reporter's privilege, granting the discovery request would violate the

---

[3] *See* EarthRights International, *Foreign Legal Assistance*, https://perma.cc/QYF2-PRN8 (noting use of Section 1782 "against several U.S. corporations to seek and acquire evidence for use in human rights cases abroad").

statute and the Constitution, and would chill essential human rights advocacy. The Court should deny Petitioner's request.

## INTEREST OF AMICI

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit organization that since 1920 has sought to protect the civil liberties of all Americans. The New York Civil Liberties Union (NYCLU) is the ACLU's New York affiliate. The ACLU and NYCLU have frequently appeared, as counsel to parties or as amicus, in cases raising significant questions about First Amendment protections for speech, association, and the right to petition, including in cases involving abusive subpoenas and discovery demands. *See, e.g.*, *Google, Inc. v. Hood*, 822 F.3d 212, 216 (5th Cir. 2016) (amicus supporting challenge to subpoena on First Amendment grounds); *People v. Harris*, 945 N.Y.S.2d 505 (N.Y.C. Crim. Ct. 2012) (same). *See also In re Gliner*, 133 F.4th 927 (9th Cir. 2025) (ACLU of Northern California as amicus addressing First Amendment protections in case involving 28 U.S.C. § 1782, the statute at issue here). The ACLU and NYCLU also regularly publish reports addressing civil and human rights violations by government entities in the United States.

Human Rights First (HRF) is a non-profit, nonpartisan international human rights organization based in New York and Washington, D.C. HRF engages in advocacy and litigation to create a just world in which every person's intrinsic human rights are respected and protected and to build societies that value and invest in all their people. Since 2017, HRF has helped lead an informal global coalition of more than 340 civil society organizations that advocates for the use of targeted human rights and corruption sanctions as a tool to promote accountability, including through the U.S. Global Magnitsky sanctions program and regionally-focused programs such as the West Bank program under which Petitioner was designated. HRF leads the coalition's efforts in the United States, and partners with NGOs to submit confidential recommendations to the U.S.

Treasury and State Departments to identify persons eligible for sanctions and visa restrictions under the Global Magnitsky and related sanctions and visa restriction programs. HRF and its coalition partners have provided more than 200 sanctions recommendations to the United States, Canada, United Kingdom (UK), European Union (EU), and Australia to date. HRF has a substantial interest in the issue before the Court and is well-suited to assist the Court in understanding how Petitioner's action, if successful, could have far-reaching consequences limiting how the U.S. government implements targeted human rights and corruption sanctions and undermining the protections needed to ensure NGOs can continue sharing information critical to this process.

Based on their extensive experience, *amici* write to expand upon the significant implications that disclosure would have for the work of human rights organizations and their ability to continue sharing information in support of international sanctions determinations. This Court must uphold protections from disclosure, as to rule otherwise would severely undermine a crucial, statute-based feature of the U.S. government's implementation of its human rights and corruption sanctions programs and put civil society actors at risk of serious, irreparable harm.

## ARGUMENT

I.    **The U.S. government has established and implemented a framework to encourage and facilitate NGO information-sharing with the Treasury and State Departments for the purposes of imposing targeted human rights and corruption sanctions.**

Spurred by the passage of certain sanctions laws, including most notably the Global Magnitsky Human Rights Accountability Act of 2016, the U.S. Treasury and State Departments have developed systems and practices to encourage NGOs to share information that enables these agencies to more effectively implement a broad range of targeted human rights and corruption sanctions programs, including to support accountability for abuse and corruption.

4

In recent years, Congress has passed several statutes authorizing or directing the President to impose sanctions in response to certain human rights abuses and corruption and to "consider" credible information or data from "nongovernmental organizations" in the process of developing targets for those sanctions. Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, Pub. L. No. 111-195, § 105(b)(4), 124 Stat. 1312, 1335; Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. No. 112-158, § 702(b)(4), 126 Stat 1214, 1266; Sergei Magnitsky Rule of Law Accountability Act of 2012, Pub L. No. 112-208, § 424(c)(3), 126 Stat. 1496, 1506; The Global Magnitsky Human Rights Accountability Act of 2016, Pub. L. No. 114-328, § 1263(c), 130 Stat. 2533, 2535; Hong Kong Human Rights and Democracy Act of 2019, Pub. L. No. 116-76, § 7(a)(3), 133 Stat 1161, 1168. Some of these statutes specify that the NGOs to be consulted should include those monitoring human rights violations or those based in the country where the abuses occurred. *E.g.*, 126 Stat. at 1266 ("In preparing the list required by paragraph (1), the President shall consider credible data already obtained by other countries and nongovernmental organizations, including organizations in Syria, that monitor the human rights abuses of the Government of Syria.").

In alignment with these statutory provisions, the Treasury and State Departments have worked in partnership with NGOs to establish systems for NGOs to provide confidential recommendations to identify possible targets for human rights and corruption sanctions. Much of this began with the 2016 enactment of the Global Magnitsky Act, which galvanized NGOs to begin providing recommendations to the U.S. government on potential sanctions targets and spurred "proactive outreach to civil society . . . by officials at the Departments of State, Justice, and

5

Treasury, as well as members of the National Security Council staff."[4] In the years since, HRF and other leading NGOs built an informal global civil society coalition ("the coalition") to further this collaboration and advocate for the use of targeted human rights and corruption sanctions and visa restrictions under relevant authorities, including by submitting detailed recommendation files to the U.S. government identifying persons eligible for such sanctions.[5] Many NGOs also submit recommendations independently of HRF and the coalition.

The Treasury and State Departments have consistently taken steps to encourage NGOs to submit such recommendations to inform their targeting work. Both agencies created publicly available email addresses to receive information from NGOs and regularly offered public guidance to NGOs on how such organizations could best prepare recommendations that would be useful for the agencies' sanctions targeting teams.[6] Officials from the Treasury Department Office of Foreign Assets Control and multiple bureaus and embassies at the State Department regularly encouraged NGO participation in sanctions advocacy, through hosting civil society roundtable discussions and one-on-one meetings, presenting at public events and off-the-record convenings organized by NGOs, and referring interested NGOs to the coalition for resources and guidance.[7]

The Executive branch has recognized that the confidential information and recommendations shared by NGOs are an invaluable part of its work imposing human rights and

---

[4] Robert G. Berschinski, *Examining the Anti-Corruption Provisions of the Global Magnitsky Act*, Remarks at the U.S. Helsinki Comm'n Briefing (Dec. 13, 2017), https://perma.cc/KRB5-ASYK.

[5] Adam Keith, Senior Dir. for Accountability, Human Rights First, *Implementation of the Global Magnitsky Laws*, Testimony to the U.S. Senate Comm. on Foreign Relations (Dec. 5, 2024), https://perma.cc/C4Q4-3LWY.

[6] Josh White, Dir. of Police and Analysis, The Sentry, *How to Get Human Rights Abusers and Kleptocrats Sanctioned Under the Global Magnitsky Act*, Remarks at the Comm'n on Sec. and Coop. in Europe Briefing 12–13 (Mar. 13, 2018), https://perma.cc/T4X6-FYH9.

[7] *See* Readout, Deputy Sec'y of Treasury Wally Ademayo, *Roundtable Discussion with Human Rights and Anti-Corruption NGOs* (Apr. 29, 2021), https://perma.cc/R346-KH56; Readout, Deputy Sec'y of Treasury Wally Ademayo, *Meeting with Humanitarian NGOs* (May 27, 2021), https://perma.cc/UF7H-P75X; International Anti-Corruption Conference, *Deterring and Promoting Accountability for Corrupt Actors through Sanctions and Visa Restrictions*, Youtube (Feb. 2, 2023), https://perma.cc/9YZB-5A28.

corruption sanctions. In a 2021 Global Magnitsky sanctions announcement, the Treasury Department described NGOs as "partners" in explaining their role in sanctions:

> Since the inception of the Global Magnitsky sanctions program, Treasury has worked hand in hand with civil society and foreign partners to develop and pursue investigations targeting perpetrators of corruption. Civil society organizations around the world are often eyewitnesses to corruption and human rights abuses and can shine a light on activities that corrupt actors and authoritarian regimes try to keep hidden. In determining whether to impose sanctions, Treasury considers credible information obtained by Non-Governmental Organizations (NGO) that monitor violations of human rights. Treasury highly values the information shared by NGOs all over the globe to expose corruption and human rights abuse, which can be used to support and develop cases like Treasury's action today.[8]

In other convenings on human rights and corruption sanctions, senior Treasury officials have acknowledged, "Treasury is made stronger because of its relationship with NGOs," and that NGOs "help[ us] meet our evidentiary burden when we may lack information from other sources" and "underpin some very successful designation packages that OFAC has implemented."[9]

These statements on the key role of NGOs to the targeting process are born out in U.S. government practice. While agencies conduct their own independent investigations before imposing sanctions, HRF estimates that one-third of U.S. Global Magnitsky sanctions have had a basis in NGO recommendations.[10] Some actions under other country-specific sanctions or visa restriction programs also appear to have had a basis in NGO recommendations.[11]

Beyond identifying targets and filling evidence gaps, NGOs can enhance the impact of U.S. sanctions meant to hold accountable perpetrators of abuse. Human rights and corruption sanctions

---

[8] Press Release, U.S. Dep't of Treasury, *Treasury Targets Corruption Linked to Dan Gertler in the Democratic Republic of Congo* (Dec. 6, 2021), https://perma.cc/NA56-GX36.

[9] Ademayo, *supra* note 7; Human Rights First, *Implementing Magnitsky-Style Sanctions Multilaterally - Government Perspectives*, Vimeo (Oct. 1, 2021), https://vimeo.com/620075732/485dff069b.

[10] Tomas Hamilton et al., *Targeted Sanctions as a Pathway to Accountability*, 22 J. Int'l Crim. Just. 345, 358 (2024).

[11] Human Rights First, *Shaming without Naming*: *The Limits of Confidential U.S. Visa Sanctions for Accountability* 11 (2013), https://perma.cc/A9RC-68QC.

are perceived as more credible and legitimate "when they reflect the priorities of independent human rights and anti-corruption groups."[12] When such sanctions are aligned with issues and incidents identified by NGOs, they can reinforce civil society's efforts to push for accountability and reform and defend against critiques that the sanctions are motivated by political priorities rather than merit.[13] In part encouraged by the benefits of this U.S. practice, the UK, EU, and Canada have also developed global human rights and corruption sanctions regimes that encourage NGOs to submit information for use in targeting decisions.[14]

## II.     Sensitive information that NGOs share with the U.S. government must be protected from disclosure to mitigate the risk of serious, irreparable harm and preserve NGOs' ability to continue providing such critical information, safeguards that are reflected in U.S. policy and law.

Almost by definition, human rights and corruption sanctions threaten the reputations and financial interests of abusive, powerful people—leaving civil society at risk of dangerous retaliation for drawing attention to their misdeeds. Given the Executive Branch's interest in protecting NGOs' ability to share sensitive information about possible sanctions targets, and NGOs' legitimate interest in advocating for the use of such accountability tools, granting requests of the sort Petitioner now makes would put civil society actors in jeopardy by forcing NGOs to disclose, for no legitimate reason, highly sensitive and confidential information about their investigations and advocacy.

---

[12] Amanda Strayer, Human Rights First, *Comprehensive Review of the Provisions and Operation of the Sergei Magnitsky Law and the Special Economic Measures Act*, Testimony to the Senate of Canada Standing Comm. on Foreign Affairs and Int'l Trade Hearing (Mar. 6, 2023) https://perma.cc/NWA8-WH5B.

[13] Letter from Global Coalition of Civil Society NGOs to Janet Yellen, Sec'y of U.S. Dep't of Treasury & Anthony Blinken, Sec'y of U.S. Dep't of State (Sept. 5, 2024), https://perma.cc/DA9B-FUK4.

[14] Human Rights First et al., *Multilateral-Magnitsky-Sanctions-at-Five-Years A Report on the Use of Global Targeted Human Rights and Corruption Sanctions Programs in the United States, Canada, the United Kingdom, and the European Union Since 2017* 8 (2022), https://perma.cc/8SPB-K94P; Government of UK, Foreign & Commonwealth Office, *Global Human Rights Sanctions: Information Note for NGOs and Civil Society* (July 6, 2020), https://perma.cc/K3GP-BP53.

**A. NGOs and civil society risk retaliation from sanctioned persons and governments.**

NGOs, activists, whistleblowers, and journalists often face serious risks of irreparable harm for their work investigating and reporting on human rights abuses and corruption anywhere in the world. When U.S. sanctions directly challenge impunity for such abuses, private individuals and repressive governments can become violent and threatening toward those in civil society who shine a spotlight on their actions—even when there is no evidence civil society actors had directly shared information with the U.S. government or advocated for sanctions. The following three cases highlight some of the harms suffered by civil society following the imposition of sanctions by the United States, and underscore why scrupulous application of protections against abusive discovery are essential to protect NGOs from being forced to disclose information that could put them or others in jeopardy.

Prominent Cambodian journalist Mech Dara was arrested by Cambodian authorities and detained for 24 days in October 2024, mere weeks after the U.S. government imposed sanctions on a powerful Cambodian senator and businessman Ly Yong Phat for the forced labor of trafficked workers in online scam centers.[15] Dara's reporting had played a pivotal role in bringing these abuses to light in recent years, and the timing of his arrest following these sanctions suggests the Cambodian government's actions may have been retaliatory.[16] Dara was charged under "incitement" laws, "a common tactic to silence government critics and intimidate them with hefty prison sentences," and was released on bail after a "deeply traumatiz[ing]" experience in detention

---

[15] George Wright, *Cambodian Journalist who Exposed Cyberscams Released on Bail*, BBC (Oct. 24, 2024), https://perma.cc/U5S5-YX5X; Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Cambodian Tycoon and Businesses Linked to Human Trafficking and Forced Labor in Furtherance of Cyber and Virtual Currency Scams* (Sept. 12, 2024), https://perma.cc/97XT-T3MX.

[16] Jacob Sims, *The Arrest of Mech Dara (Part I): Repression and Retaliation*, The Diplomat (Oct. 1, 2024), https://perma.cc/UG8P-N8UZ.

that caused physical and mental harms and led him to give up his work as a journalist.[17] In a country that was already experiencing declines in civic space and press freedom, the Cambodian government's retaliation against Dara has reportedly chilled the willingness of other journalists to report on such abuses.[18]

Following U.S. sanctions against Israeli businessman Dan Gertler in 2017 for corruption that drained more than $1 billion from the Democratic Republic of the Congo (DRC), two Congolese whistleblowers discovered evidence of a money laundering scheme involving Gertler and their employer, Afriland First Bank CD, apparently evading the sanctions.[19] Two months after their findings were published in July 2020, the whistleblowers were reportedly secretly tried *in absentia* in a DRC court on charges of "forgery," "theft," "private corruption," "breach of professional secrecy," and "criminal conspiracy," and sentenced to death.[20] NGOs noted the secret trial against the whistleblowers came against the backdrop of "a wave of lawsuits against anti-corruption activists, whistleblowers, journalists and civil society groups" initiated by Gertler in recent years.[21]

In Bangladesh, U.S. sanctions against the Rapid Action Battalion (RAB), an abusive paramilitary unit, and its leadership in 2021 led to significant declines in extrajudicial killings and

---

[17] *Cambodia: Charges against Journalist Highlight Clampdown on Press Freedom*, Amnesty International (Oct. 2, 2024), https://perma.cc/72HH-8P5.T; Bopha Phorn, *'I Quit Being a Journalist': The Arrest of a Prominent Cambodian Reporter Sends a Chilling Message*, Nieman Reports (Mar. 3, 2025), https://perma.cc/SXH4-BFJ3.

[18] Phorn, *supra* note 17.

[19] *DR Congo: Quash Whistleblowers' Death Sentences*, Human Rights Watch (Mar. 9, 2021), https://perma.cc/K3T6-SQBJ; Press Release, U.S. Dep't of Treasury, *United States Sanctions Human Rights Abusers and Corrupt Actors Across the Globe* (Dec. 21, 2017), https://perma.cc/63WP-B2PR.

[20] Human Rights Watch, *supra* note 19; *DRC – Two Whistleblowers Reveal Fraudulent Schemes*, Platform to Protect Whistleblowers in Africa (Feb. 26, 2021), https://perma.cc/AJ9P-YBVG.

[21] *146 Organisations Condemn Lawsuit Brought by Dan Gerlter Against the "Congo is Not for Sale" Anti-corruption Coalition*, Human Rights Watch (Apr. 17, 2023), https://perma.cc/7J6J-29B6.

enforced disappearances, but also to retaliation against NGOs and victims' families.[22] In explaining its grounds for imposing sanctions, the Treasury Department credited unnamed NGOs with documenting certain RAB abuses.[23] In response, the Government of Bangladesh pursued a "swift and unprecedented" retaliatory crackdown on civil society and victims, including: prosecuting the leaders of prominent human rights organization Odhikar, deregistering Odhikar, raiding the homes of victims' families and coercing them to recant reports of their loved ones' disappearances, harassing the staff of human rights groups and their families to pressure them to reveal sources, and arresting those who reported RAB abuses.[24]

**B. The Executive branch has established measures to prevent disclosure of information shared by NGOs in light of the value that NGOs provide the U.S. government in imposing sanctions for human rights abuses and corruption.**

Cognizant of the dire risks facing civil society, the Executive branch treats sanctions recommendations submitted by NGOs as confidential and takes numerous steps to protect the identities of NGOs and the information they provide. These include taking special precautions to protect information obtained from vulnerable victims or witnesses and making secure file transfer processes available to NGOs.[25] To date, these systems appear to have worked, and HRF is not aware of any disclosures or leaks of information provided by NGOs to inform human rights and corruption sanctions.

In alignment with their goals to promote accountability and reform for human rights abuses and corruption, NGOs have a strong interest in protecting their ability to safely share confidential

---

[22] Human Rights Watch, *World Report 2023: Bangladesh* (2003), https://perma.cc/8GL9-26J3.

[23] Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Perpetrators of Serious Human Rights Abuse on International Human Rights Day* (Dec. 10, 2021), https://perma.cc/6CW3-JS2D.

[24] Redress et al., *Evaluating Targeted Sanctions: A Flexible Framework For Impact Analysis* 39–40 (2023), https://perma.cc/3X7F-JEZZ.

[25] White, *supra* note 6, at 26.

information about possible sanctions targets with the U.S. government. NGOs have documented profound, life-saving impacts from the imposition of certain sanctions, including: ending abuses or reducing them through deterrence; prompting removal of corrupt officials from government positions; providing official recognition of harms, particularly when domestic courts or regional and international mechanisms have failed; building public pressure; and more.[26] For example, HRF and other NGOs advocating for the freedom of Russian political prisoner Vladimir Kara-Murza successfully pushed for sanctions from Canada, the United States, UK, EU, and Australia against those responsible for his arbitrary detention. These sanctions contributed to Kara-Murza's release in a 2024 prisoner exchange, as they demonstrated he was a heightened priority for those governments, kept crucial media attention on him, and bolstered efforts to build pressure for his release.[27]

### C. Forcing NGOs to disclose information related to their reporting to the U.S. government would chill this vital process and may put the organization, its employees, or others at undue risk.

Granting Petitioner's discovery request would effectively open a Pandora's box that would erode the ability of the U.S. government and NGOs to maintain the confidentiality of sensitive information shared for sanctions purposes. This in turn would lead to nightmarish outcomes for civil society and immediately chill the kind of information-sharing that has helped the U.S. government implement its human rights and corruption sanctions authorities.

It would invite similar actions from other sanctioned persons and could subject NGOs to near limitless exposure to harassing lawsuits. Authoritarian governments with a history of transnational repression like Russia or China could exploit U.S. courts to obtain information to

---

[26] Redress et al., *supra* note 24, at 13.

[27] Nina Moraitou-Politzi, *Magnitsky Sanctions and Political Prisoners: Lessons from the Case of Vladimir Kara-Murza*, Just Security (Aug. 23, 2024), https://perma.cc/7EWW-2UL5.

target dissidents abroad or support domestic criminal charges against activists for exercising their fundamental rights to freedom of expression and association. Without protections from disclosure, HRF and other NGOs involved in Kara-Murza's case, for example, may not have risked sharing information with the United States and its allies, knowing that doing so could gravely jeopardize their staff, families, partners, and sources. These concerns would exist even in the context of discovery requests made for use in the courts of more democratic states, given that corrupt actors are present, have access to the courts, and often enjoy political power in every country.

Not only would a grant of discovery chill future NGO information-sharing, it would tear away the protections that countless NGOs have already relied upon in submitting sensitive information to the U.S. government since at least 2017. There is no way to retract information once submitted, and NGOs may be left unable to protect themselves and their sources who are most vulnerable and at risk.

Perhaps most perversely, allowing such grants of discovery may result in faulty conclusions about the role an NGO's information played in the U.S. government's decision to sanction a particular person. Revealing that an NGO recommended sanctions against a person does not prove the NGO in fact caused the sanctions, because the U.S. government is required to draw on an array of independent sources in compiling its targeting packages.[28] At the same time, even fruitless discovery could expose an NGO's operations or details about their staff or witnesses to scrutiny and retaliation by other abusive entities. The risk of retaliation would be dramatically increased from all quarters.

---

[28] White, *supra* note 6, at 26.

III.    **Section 1782 bars disclosure of the requested information.**

In this case, there is no tension between the strong policy reasons for protecting confidentiality of human rights investigative and advocacy materials detailed above, and the statutory protections built into Section 1782. Section 1782 provides that "[a] person may not be compelled . . . to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782(a). Because Petitioner's sweeping discovery request implicates information protected under the First Amendment privilege and reporter's privilege, the statute bars issuance of the requested subpoena. And even if no privilege applied, the discretionary factors set out by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004), require this Court to give weight to the serious First Amendment and policy considerations. The Court should deny Petitioner's discovery request.

A.  **The First Amendment privilege prevents disclosure of all documents and communications relating to DAWN's protected associational and petitioning activities.**

As the Supreme Court and the Second Circuit have held, the First Amendment protects materials that reflect protected activity or speech from civil discovery. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–63 (1958); *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1354 (2d Cir. 1989). The First Amendment privilege shields a party from disclosure that would intrude on its fundamental First Amendment expressive and associational rights, unless the requesting party shows a "compelling" need for the information sought. *NAACP*, 357 U.S. at 463; *see also id.* at 466 (privilege applies absent a "controlling justification for the deterrent effect on the free enjoyment of the [First Amendment] right"); *Terry*, 886 F.2d at 1355 (movant must "demonstrate the necessary compelling interest in having discovery"). Although many First Amendment-privilege cases involve burdens on the right to association, *see, e.g.*, *NAACP*, 357 U.S. at 460–61; *Terry*, 886 F.2d at 1354–55, courts have recognized that the privilege can apply to

14

requests for information that burden any First Amendment-protected right. *See, e.g.*, *Terry*, 866 F.2d at 1355 (privilege invoked upon "a *prima facie* showing that disclosure would infringe its First Amendment rights"); *Australia/E. U.S.A. Shipping Conf. v. United States*, 537 F. Supp. 807, 810 (D.D.C. 1982) (applying First Amendment privilege to discovery request that burdened right to petition the government), *vacated on mootness grounds*, 1986 WL 1165605 (D.C. Cir. Aug. 27, 1986). As Respondents explain, Petitioner seeks records that Respondents "created or gathered in exercise and service of their recognized First Amendment rights to speak, listen, associate, and petition the U.S. government for redress." Opp. 9.

The First Amendment associational privilege extends to any type of information whose disclosure would adversely affect an organization's "mission of advocacy and chill their ability to freely speak or to associate." *Doordash, Inc. v. City of New York*, 754 F. Supp. 3d 556, 576 (S.D.N.Y. 2024). A party asserting this privilege must articulate "some resulting encroachment" of compelled disclosure on its exercise of its First Amendment rights. *Terry*, 886 F.2d at 1355 (describing this prima facie burden as "light"). The Second Circuit adopts a "commonsense approach" to the analysis of chilling effects on speech and associational rights of informational disclosure. *See Local 1814 Int'l Longshoreman's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 272 (2d Cir. 1981) (rejecting argument that plaintiffs must show that disclosure would lead to economic or physical harassment). Respondents meet their burden.

The First Amendment associational privilege is premised, in part, on the Supreme Court's view that some ideas can only be expressed through coordinated action. *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 295 (1981) ("[B]y collective effort individuals can make their views known, when, individually, their voices would be faint or lost."). Moreover, some ideas can only be expressed when this collective effort is undertaken in private; the "[i]nviolability of

privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP*, 357 U.S. at 462; *see also id.* at 460 ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association."). Thus, compelled disclosure of certain protected information "in itself[] can seriously infringe on privacy of association" and chill the exercise of other First Amendment rights. *Buckley v. Valeo*, 424 U.S. 1, 64–65 (1976); *see also Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 49 (2006) (disclosures that would make "group membership less attractive" raise serious First Amendment concerns).

This associational privacy interest is especially salient for international human rights advocacy organizations such as DAWN that investigate country conditions, publish reports on human rights violations, and petition for sanctions on perpetrators of abuse. Human rights organizations will be deterred from engaging in core advocacy activities if they are subject to intrusive discovery. Such discovery exposes staff members, sources, and other civil society partners abroad to the very same state actors and human rights violators that they investigate and whose actions are at the center of their advocacy. Rights-repressive governments and powerful private actors often engage in transnational repression and retaliation, targeting journalists, human rights advocates, and dissidents with extraterritorial intimidation and harassment, and even violence and death.[29] Increasingly, state-sponsored actors are undertaking methods of digital transnational repression, involving cyberattacks that "compromise organizational and personal

---

[29] *See, e.g.*, Sienna Anstis & Ronald Deibert, *Silenced by Surveillance: The Impacts of Digital Transnational Repression on Journalists, Human Rights Defenders, and Dissidents in Exile*, Knight First Amend. Inst. (Feb 18, 2025), https://perma.cc/BQ4R-HEPK.

devices" to order silence and surveil dissidents.[30] And individual bad actors are able to engage in retaliation, including doxxing and harassment via the Internet, with low cost but devastating effect.[31] Digital transnational repression and retaliation not only jeopardize the physical safety of targeted human rights advocates but also endanger everyone with whom they communicate, including family members and vulnerable sources who share information about human rights violations, often while living under the perpetrator's authority.

In short, the intrusion on First Amendment-protected associational privacy wrought by compelled disclosure of nonpublic, internal, and third-party communications will have a widespread chilling effect on domestic human rights advocates and their foreign sources, who will likely self-censor their speech out of fear of online targeting, repression, and violence. Avoiding such chill is a core reason for the First Amendment's robust protections. *See Citizens Against Rent Control*, 454 U.S. at 295 (acknowledging the "importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues"). *See also Perry v. Schwarzenegger*, 591 F.3d 1147, 1162–63 (9th Cir. 2010).

DAWN's fear of harassment and threats resulting from disclosure, a fear shared by its staff members, Whitson Decl. ¶ 26, is all the more reasonable given the retaliation that the organization has faced historically. Most notably, DAWN's founder Jamal Khashoggi, an outspoken critic of the Saudi Arabian government, was summarily executed by Saudi state officials following a campaign of intimidation.[32] As several courts have recognized, "evidence of actual past harm" can

---

[30] U.S. Cybersecurity and Infrastructure Sec'y Agency et al., *Mitigating Cyber Threats with Limited Resources: Guidance for Civil Society* 2 (2024), https://perma.cc/YKL5-GMK2.

[31] U.S. Dep't of State, *United States Guidance for Online Platforms on Protecting Human Rights Defenders Online* 12 (2024), https://perma.cc/D8HY-S6U3.

[32] Human Rights Watch, *"We Will Find You" A Global Look at How Governments Repress Nationals Abroad* 6 (2024), https://perma.cc/X73N-24EG.

be sufficient to invoke a First Amendment privilege. *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 954 F. Supp. 2d 127, 140 (E.D.N.Y. 2013). *See also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee* ("*ISKCON*"), No. 75 Civ. 5388, 1985 WL 315, at *9 (S.D.N.Y. Feb. 28, 1985) (holding that evidence that plaintiffs' and their associations were subject to "occasionally overt hostility" was sufficient to apply First Amendment privilege against extensive discovery).

Moreover, self-censorship by sources and civil society partners will directly undermine DAWN's ability to effectively execute its core advocacy practices. Without access to ground-level sources, human rights organizations are limited in their ability to investigate, gather information, independently fact-check, and create evidentiary records.[33] As a result, organizations will not be able to monitor and report on human rights to the public, nor be able to submit credible evidence to the U.S. government to advocate for sanctions. *See, e.g.*, *AFL & CIO v. FEC*, 333 F.3d 168, 176–78 (D.C. Cir. 2003) (barring disclosure of nonpublic communications exchanged between two organizations where disclosure would "interfere[] with internal group operations and effectiveness" and chill future political activity) (citing *Buckley*, 424 U.S. at 64–68). Disclosure of sensitive associational information would thus chill organizations' right to petition the government, including petitions to impose sanctions as here. *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("Certainly the right to petition extends to all departments of the Government."); *Martin v. City of Del City*, 179 F.3d 882, 887 (10th Cir. 1999) (Petition Clause protects the right "to petition the executive branch"); *DoorDash, Inc.*, 754 F. Supp. 3d at 577 (citing *In re Johns-Manville Corp.*, 32 B.R. 728, 733 n.7 (S.D.N.Y. 1983) ("Lobbying for proposed

---

[33] Rep. of the Human Rights Council on Surveillance and Human Rights 7, U.N. Doc. A/HRC/41/35, https://perma.cc/4H4C-UTVM.

legislation is quintessential First Amendment-protected activity")). Compelled disclosure of protected speech and sensitive associational information would therefore encroach on Respondents' First Amendment rights.

### B. All documents and communications relating to DAWN's investigative reporting and newsgathering activities are protected under the reporter's privilege.

The Second Circuit "has long recognized the existence of a qualified privilege for journalistic information." *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 32 (2d Cir. 1999). Courts have frequently applied that privilege in adjudicating Section 1782 discovery applications. *See, e.g.*, *In re Shervin Pishevar*, 439 F. Supp. 3d 290, 307 (S.D.N.Y. 2020).

The reporter's privilege extends to the *newsgathering process*, rather than to the *reporter*. *See, e.g.*, *Chevron Corp. v. Berlinger*, 629 F.3d 297, 307 (2d Cir. 2011) ("A person need not be a credentialed reporter working for an established press entity to establish entitlement to the privilege"); *von Bulow ex rel. Auersperg v. von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987) (holding the privilege may be invoked by an individual "involved in activities traditionally associated with the gathering and dissemination of news, even though he may not ordinarily be a member of the institutionalized press"). This emphasis on the newsgathering process reflects the Supreme Court's unwillingness to define a "reporter" for the purpose of asserting a reporter's privilege. *See Branzburg v. Hayes*, 408. U.S. 665, 703–04 (1972) (reasoning that the "liberty of the press is the right of the lonely pamphleteer . . . just as much as the large, metropolitan publisher"); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 352 (2010) ("With the advent of the Internet and the decline of print and broadcast media . . . the line between the media and others who wish to comment on political and social issues becomes far more blurred.").

Instead, the "talisman" for invoking the reporter's privilege is "intent to disseminate to the public at the time the gathering of information commences." *von Bulow*, 811 F.2d at 145. For that

19

reason, courts have noted that the reporter's privilege does not protect information and sources gathered solely for use in "private lobbying." *See Schiller v. City of New York*, 245 F.R.D. 112, 119 (S.D.N.Y. 2007). Human rights advocacy organizations, however, often engage in *concurrent* public and non-public advocacy efforts, including when participating in sanctions advocacy. Here, DAWN investigated Petitioner's role in orchestrating violence against Palestinian civilians for widespread publication *and* submitted a non-public report petitioning the government to impose sanctions on Petitioner. Whitson Decl. ¶¶ 12–13.

Informing the public on matters relating to human rights abuses is core to a human rights organization's advocacy efforts and falls squarely within the purpose of the reporter's privilege. The reporter's privilege serves to safeguard a "paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment." *Baker v. F&F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972). Perpetrators of human rights violations often act in conditions of governmental authoritarianism and repression where information does not flow freely. Even, and maybe especially, in relatively open societies, human rights violators rely on secrecy to persist. Therefore, many human rights advocacy organizations incorporate investigative reporting and publishing functions to uncover—and hopefully end—such abuses. U.S.-based human rights watchdog organizations such as DAWN necessarily rely on credible primary sources located overseas to conduct these investigations, including gathering information and evidence from victims, family members, witnesses, whistleblowers, and ground-level civil society actors. This reporting depends on guaranteeing confidentiality to sources who speak at great existential risk about violence, repression, and other abuses perpetrated by governments and powerful individuals. Whitson Decl. ¶ 22. Human rights organizations publish

the resulting accounts to inform the public and generate political momentum for certain foreign policy measures, such as sanctions, to intervene in ongoing abuse and hold perpetrators accountable. Gathering information to engage in such dissemination and publishing lies at the heart of the activity protected by the reporter's privilege. *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 8 (2d Cir. 1982) (confidentiality is "essential to fulfillment of the pivotal function of reporters to collect information for public dissemination").

Although confidentiality guarantees in sanctions regimes allow human rights advocacy organizations to submit reports with comprehensive evidence of wrongdoing—containing sensitive and potentially identifying information—without compromising the security of sources, the reporter's privilege can nevertheless apply because confidential advocacy does not negate a human rights organization's intent to disseminate an overlapping account of wrongdoing to the public. In *Schiller*, the court held that NYCLU itself qualified "as a journalistic enterprise for purposes of the privilege" for information collected from arrested protestors for use "at least in part" to publish a "widely and publicly circulated" report. 245 F.R.D. at 119 (distinguishing partial intent to disseminate information to the public from intent to "merely" engage in non-public advocacy). Because human rights advocacy organizations routinely engage in both public-facing reporting and non-public petitioning, the reporter's privilege protects any information gathered pursuant to different advocacy strategies so long as there is some intent to publicize. *See*, *e.g.*, *In re McCray, Richardson, Santana, Wise, and Salaam Litigation*, 928 F. Supp. 2d 748 (S.D.N.Y. 2020) (finding that the reporter's privilege applied to a nonparty production company's film outtakes despite the company's post-newsgathering advocacy advancing a viewpoint discussed in the film because even though the outtakes were unpublicized, they were obtained with intent to inform the public). Therefore, the reporter's privilege applies to all requested documents and

communications mentioning Petitioner, as they implicate DAWN's investigative reporting and publishing practices.

**C. Petitioner cannot show a compelling interest, nor even a likelihood of relevance, to justify disclosure of any privileged documents or communications.**

To establish a compelling interest that overcomes the First Amendment privilege, a requesting party must show that disclosure is "crucial to [his] case," or that it goes to the "heart of the claims." *ISKCON*, 1985 WL 315, at *8, 17 (requiring both "central relevance" and "the unavailability of alternative sources of information" to establish compelling need). In an overlapping analysis, a party can overcome the reporter's privilege for confidential newsgathering materials upon a "clear and specific showing" that the information is: (i) highly material and relevant, (ii) necessary or critical to the maintenance of the claim, and (iii) not obtainable from other available sources. *Schiller*, 245 F.R.D. at 118. For nonconfidential information, the burden is less onerous but still requires a showing that the requested materials are of "likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36. As Respondents explain, Opp. 11–13, 15, Petitioner's request for documents and communications fail to satisfy the relevance requirements of the reporter's privilege, let alone the heightened showing under the First Amendment.

*Amici* highlight one additional point. Petitioner has not articulated a rational connection between Yesh Din, DAWN, and the U.S. government's imposition of sanctions. In his draft complaint, Petitioner claims that Yesh Din's alleged defamation "directly resulted" in the imposition of sanctions against him. To support this theory, Petitioner speculates Yesh Din shared defamatory information with DAWN and DAWN then presumably included this information in its evidentiary report submitted to the U.S. government. However, in making the decision to impose sanctions on any individual, the Secretary of the Treasury, in consultation with the Secretary of

State and the Attorney General, considers a range of information, including as provided by other countries and non-governmental organizations. *See supra* Part I.

Even if discovery shows that DAWN's evidentiary report included Yesh Din's alleged defamation, Petitioner will not be able to ascertain the extent of the government's reliance on this information and how additional corroborating evidence weighed in its deliberations. Furthermore, given the necessary nonpublic nature of sanctions proceedings, Petitioner does not know whether other organizations and embassies submitted additional evidentiary reports for the government's consideration. DAWN's public-facing article itself cited evidence from multiple sources, including "[h]uman rights groups, Israeli and Palestinian media, and eyewitnesses" documenting Petitioner's participation. *See supra* note 1. Therefore, discovery into nonparty DAWN and its exchange of documents and communications with the U.S. government is in no way "crucial to the . . . case," nor does it go to the "heart of the claims." *ISKCON*, 1985 WL 315, at *8 (internal quotation marks omitted). Petitioner's discovery request should be denied.

**D. The Court should use its broad discretion under Section 1782 to deny Petitioner's discovery request as an attempt to circumvent First Amendment protections and silence critics through judicial harassment.**

As the Supreme Court has held, "a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so." *Intel Corp.*, 542 U.S. at 264–65. The Supreme Court has articulated factors courts must consider in the exercise of this discretion, including "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," as well as whether the request is "unduly intrusive or burdensome." *Id.* The Second Circuit interprets the *Intel* factors to be "non-exclusive" and directs that they should not be "applied mechanically." *Kiobel ex rel. Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244–45 (2d Cir. 2018)

("A district court should also take into account any other pertinent issues arising from the facts of the particular dispute.").

Here, even if the legally applicable privileges did not preclude discovery, the Court has broad discretion under Section 1782 to deny discovery requests that will unduly burden a non-party's First Amendment interests or is contrary to U.S. policy. *See, e.g.*, *In re Gliner,* 133 F.4th at 933 n.8 (incorporating First Amendment interests in applying the *Intel* factors). Petitioner's request burdens DAWN's First Amendment freedoms and circumvents proof-gathering limits and protections that Congress and the Executive have imbedded into the implementation of human rights sanctions programs. *See supra* Part II. Petitioner's request also contravenes a longstanding judicial and legislative commitment to safeguard fundamental free speech and free press interests.

Petitioner's overbroad and highly intrusive request, lacking relevance and necessity to his foreign litigation, reveals an intent to weaponize Section 1782 to silence his critics. It cannot be that when a public figure accuses one foreign speaker of defamation in a foreign jurisdiction, it opens U.S. human rights advocacy organizations to intrusive and retaliatory discovery for *possibly* engaging with said speaker. Moreover, First Amendment considerations are especially acute when a foreign litigant not only seeks information that may be privileged but also seeks it for use in an action that the First Amendment would bar if it were brought in the United States. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 271, 279–80 (1964) (establishing "actual malice" standard in a defamation lawsuit by a public figure, based in "profound national commitment" to free speech"); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967). Courts also favor First Amendment-protective policies promoting the public's right to receive information. The Supreme Court has emphasized "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences," *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969),

24

and "the circulation of information to which the public is entitled in virtue of the constitutional guaranties." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936). There is no judicial interest in allowing foreign litigants to abuse civil discovery processes to undermine U.S. policy promoting free speech in the public interest.

## CONCLUSION

Because discovery is barred by the First Amendment and reporter's privileges, and because the requested discovery threatens the interests and rights of civil society and NGOs to report on human rights abuses and to share information confidentially with the U.S. government to inform implementation of its human rights and corruption sanctions, the Court should deny Petitioner's application for discovery pursuant to 28 U.S.C. § 1782.

Dated: April 25, 2025                    Respectfully Submitted,

/s/ *Nathan Freed Wessler*
Nathan Freed Wessler
Steven M. Watt*
American Civil Liberties Union Foundation
125 Broad St., 18th Fl.
New York, NY 10004
(212) 549-2500
nwessler@aclu.org
swatt@aclu.org

Jennifer Stisa Granick**
American Civil Liberties Union Foundation
425 California Street, Seventh Floor
San Francisco, CA 94110
(415) 343-0758
jgranick@aclu.org

Amanda Strayer**
Human Rights First
825 21st Street NW
PMB 253
Washington, D.C. 20006
(202) 547-5692
strayera@humanrightsfirst.org

Molly K. Biklen
Robert Hodgson
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
mbiklen@nyclu.org
rhodgson@nyclu.org

*Counsel for Amici* [†]

\* Application for reciprocity admission from S.D.N.Y. forthcoming

\*\* Application for admission pro hac vice forthcoming

[†] Counsel thank law student Anjali Dhillon for her assistance drafting the brief

## CERTIFICATE OF COMPLIANCE

Pursuant to L. Civ. R. 7.1(c), the undersigned hereby certifies that this brief of *amicus curiae* is no more than 25 pages, as required by the Court's Individual Practice Rules.

Dated: April 25, 2025                              /s/ *Nathan Freed Wessler*
                                                   Nathan Freed Wessler