# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: APPLICATION OF ISAAC LEVI PILANT, FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING | Case No. 1:25-mc-00760-JMA-LKE |

## PROPOSED BRIEF OF *AMICI CURIAE* OF FORMER NATIONAL SECURITY OFFICIALS AND JEWISH ORGANIZATIONS IN SUPPORT OF PETITIONER

Deedee Bitran
STANDWITHUS SAIDOFF LEGAL
P.O. Box 341069
Los Angeles, CA 90034-1069
(310) 836-6140
Deedeeb@standwithus.com

Susan B. Tuchman
ZIONIST ORGANIZATION OF AMERICA
633 Third Avenue, Suite 31-B
New York, NY 10017

HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
Joseph T. Burns
jburns@holtzmanvogel.com
Susan Greene
sgreene@holtzmanvogel.com
Erielle Davidson
edavidson@holtzmanvogel.com
2300 N. Street NW, Suite 643
Washington D.C. 20037

*Counsel for Proposed* Amici Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

SUMMARY OF ARGUMENT .................................................................................................... 1

INTEREST OF AMICI ................................................................................................................ 1

ARGUMENT ................................................................................................................................. 2

I.   There is no federal statute providing for the confidentiality of NGO reports made to the federal government. ................................................................................................ 2

II.  DAWN is a bad-faith actor whose status as an NGO does not render it automatically immune from discovery. ...................................................................................... 4

III. There is no risk of reprisal to DAWN, should discovery be compelled. ...................... 10

IV.  Disclosure of the requested information does not infringe upon Respondent's right to association under the First Amendment. ....................................................................... 13

V.   Even if DAWN demonstrates that disclosure of the requested information would result in a chilling effect or injury, Petitioner has met his burden of establishing a compelling interest in the information. ..................................................................................... 17

    1.   The information sought is highly relevant to Petitioner's future claims. ......... 18

    2.   The requests are narrowly tailored to avoid unnecessary interference with protected activities. ................................................................................................ 19

    3.   The information sought cannot be obtained elsewhere. .................................... 19

VI.  Petitioner's discovery request is not protected under the reporter's privilege. ............. 20

CONCLUSION ............................................................................................................................. 22

CERTIFICATE OF COMPLIANCE ......................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Adler v. Pataki*,
    185 F.3d 35 (2d Cir. 1999) ...........................................................................13

*Am. Civil Liberties Union, & The N.Y. Civil Liberties Union v. Vance* ,
    591 U.S. 786 (2020) (No. 19-635) .................................................................17

*Am. Resort Dev. Ass'n v. Wesley Fin. Grp., L.L.C. (In re Documents)  (In re Documents)*,
    No. 3:24-MC-11-DCLC-DCP, 2024 WL 1401332 (E.D. Tenn. Apr. 1, 2024) .....................14, 16

*Brief of Amici Curiae Am. Civil Liberties Union & ACLU of the Dist. of Columbia in Support of Respondents, Trump v. Mazars* ,
    591 U.S. ___ (2020) (No. 19-715) .................................................................17

*Cervantes v. Time, Inc.*,
    464 F.2d 986 (8th Cir. 1972) ........................................................................18

*Doordash Inc. v. City of N.Y.*,
    754 F. Supp. 3d 556 (S.D.N.Y. 2024) ...........................................................10

*Doordash, Inc. v. City of N.Y.*,
    754 F. Supp. 3d 556 (S.D.N.Y. 2024) .................................................13, 14, 16, 17

*Fighting Finest, Inc. v. Bratton*,
    95 F.3d 224 (2d Cir. 1996) ..........................................................................14

*FOP Pa. Lodge v. Twp. of Springfield*,
    668 F. Supp. 3d 375 (E.D. Pa. 2023) ...........................................................18

*Gonzales v. NBC*,
    194 F.3d 29 (2d Cir. 1998) ......................................................................20, 22

*Hispanic Leadership Fund, Inc. v. Walsh*,
    No. 1:12-CV-1337, 2014 WL 12586844 (N.D.N.Y. June 9, 2014) ................................15

*In re in re Chevron Corp.*,
    709 F. Supp. 2d 283 (S.D.N.Y. 2010) ...........................................................21

*In re Petrol. Prods. Antitrust Litig.*,
    680 F.2d 5 (2d Cir. 1982) ...........................................................................20

*Matusick v. Erie Cnty. Water Auth.*,
    739 F.3d 51 (2d Cir. 2014) ..........................................................................13

*NAACP v. Ala.*,
    357 U.S. 449 (1958) ...................................................................................13

*Sanitation & Recycling Indus. v. City of N.Y.* ,
    107 F.3d 985 (2d Cir. 1997) ........................................................................13

*Schiller v. City of N.Y.*,
  245 F.R.D. 112 (S.D.N.Y. 2007) ................................................................................21

*Sherwin-Williams*,
  No. 1:12-CV-1337, 2005 WL 2128938 (N.D.N.Y. Aug. 24, 2005) ..............................15

*United States v. Markiewicz*,
  732 F. Supp. 316 (2d Cir. 1990) ................................................................................20

## Statutes

28 U.S.C. § 1782 ..............................................................................................1, 22

50 U.S.C. § 11 ..........................................................................................................4

50 U.S.C. § 1641 ......................................................................................................4

50 U.S.C. § 1701 ......................................................................................................3

50 U.S.C. § 1703 ...................................................................................................4, 7

50 U.S.C. § 204 ........................................................................................................4

50 U.S.C. § 401 ........................................................................................................4

50 U.S.C. §§ 1701 –1707 ........................................................................................3

50 U.S.C. §§ 1702 –03 ............................................................................................4

## Other

89 Fed. Reg. 7605 (Feb. 5, 2024) ...........................................................................3

*Id.*
  ...............................................................................................................................17

## SUMMARY OF ARGUMENT

There is no statute or information-sharing framework between non-governmental organizations (NGOs) and the U.S. Government that automatically entitles NGOs to immunity from discovery. Respondents and their supporting Amici fail to point to a single statute that immunizes them from discovery here.

Furthermore, Democracy for the Arab World Now (DAWN) is not an NGO that engages in rigorous and impartial reporting. Instead, DAWN is an advocacy, lawfare and lobbying group that supports Islamist movements and whose leadership expresses antisemitic views. Further, DAWN does not genuinely fear reprisal against itself, its employees or its sources, particularly given DAWN's (and Israeli NGO Yesh Din's) prior, very public announcements of their efforts to have the U.S. government sanction Petitioner.

Moreover, neither the U.S. Constitution nor common law immunizes DAWN from discovery here. The First Amendment does not shield Respondents from producing discovery, for Petitioner has a compelling interest in the information sought, and, given DAWN's unique role in ushering in the sanctioning of Petitioner, such information cannot be obtained elsewhere. Similarly, a reporter's privilege, if it even were applicable, is easily overcome here, because the information sought was not expected to remain confidentiality, is highly relevant to Petitioner's anticipated action in Tel Aviv Magistrate Court, and cannot be obtained elsewhere.

## INTEREST OF AMICI

**Victoria Coates** is a former national security official who served as Deputy Assistant to the President and Deputy National Security Advisor for the Middle East and North Africa from 2019 to 2020. Before that role, she worked on the National Security Council staff in a variety of capacities

1

from 2017 to 2020. During her time in the Administration, Ms. Coates assisted, *inter alia*, in developing the "maximum pressure" campaign of sanctions against Iran. Ms. Coates currently serves as Vice President of the Kathryn and Shelby Cullom Davis Institute for National Security and Foreign Policy at The Heritage Foundation.

**Robert Greenway** is a former national security official who served in a variety of roles on the National Security Council from 2017 to 2021, including as Senior Director of the National Security Council's Middle Eastern and North African Affairs Directorate, where, *inter alia*, he assisted in devising the robust sanctions program against Iran. Prior to that role, he served as a Senior Intelligence Officer at the Defense Intelligence Agency and as a member of the United States Army Special Forces. He currently is the Director of the Allison Center for National Security at The Heritage Foundation, where he focuses on national security policy.

**StandWithUs Saidoff Legal** is a division of StandWithUs, an international, nonprofit Israel education organization founded in 2001 that supports Israel and fights antisemitism around the world. StandWithUs Legal vigorously challenges antisemitism through legal action.

The **Zionist Organization of America** is the oldest pro-Israel organization in the United States whose leaders have included U.S. Supreme Court Justice Louis Brandeis. ZOA remains on the front lines of Jewish activism, defending Israel and the Jewish people, seeking justice for American victims of international terrorism, and fighting antisemitism in all its forms.

## ARGUMENT

### I.     There is no federal statute providing for the confidentiality of NGO reports made to the federal government.

There is no federal statute promising confidentiality for NGO reports to the federal government.  Executive Order ("E.O.") 14115—which authorized the now rescinded West Bank-related sanctions program—has no provision promising to keep information received from NGOs

2

confidential.[1]

Amici supporting DAWN repeatedly reference the now-expired Global Magnitsky Human Rights Accountability Act (GMA)[2] as the foundational legislation for NGO-governmental information-sharing arrangements, but reliance on the GMA is also misplaced. The GMA expired in 2022. Moreover, E.O. 14115 never even cites to the GMA.[3] Even if the GMA applied here, the GMA merely requires the U.S. President to consider "credible information" received from NGOs–not false and defamatory information like the information at issue here.

DAWN's supporting Amici are well aware that NGO sources are not confidential. Amicus Human Rights First (HRF) admits in its 2020 Global Magnitsky Sanctions FAQs document that information provided by NGOs to the U.S. Government may be discoverable.[4] Because of the possibility of disclosure, HRF publicly recommends to NGOs that they anonymize names that they wish to keep confidential. Indeed, the discoverability of information provided to the U.S. Government is even more foreseeable here, where NGOs unlawfully targeted a U.S. citizen for sanctions.

Moreover, E.O. 14115 was issued pursuant to the emergency authorities granted under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701 *et seq.*, and related authorities.[5] The IEEPA contains reporting requirements, including regular reports to Congress and

---

[1] *See* Exec. Order No. 14,115, 89 Fed. Reg. 7605 (Feb. 5, 2024).

[2] *See* Global Magnitsky Human Rights Accountability Act, Pub. L. No. 114-328, §§ 1261–1265, 130 Stat. 2533 (2016).

[3] When the U.S. Government wishes GMA sanctions to apply, it says so specifically. For instance, the Accountability for Human Rights Abuses in Iran section 5592 of the FY2923 NDAA [National Defense Authorization Act] states that it is U.S. policy to hold to account any official of the government of the Islamic Republic of Iran who is responsible for human rights abuses in the form of politically motivated imprisonment, including through the imposition of sanctions pursuant to the Global Magnitsky Human Rights Accountability Act and other available authorities.

[4] HUMAN RIGHTS FIRST, *Global Magnitsky Sanctions: Frequently Asked Questions* (Sept. 2022), https://humanrightsfirst.org/wp-content/uploads/2022/09/Global-Magnitsky-FAQs.pdf.

[5] International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. §§ 1701–1707).

the sharing of classified information to the courts for *in camera* review, precisely to increase transparency and track costs related to presidential exercises of emergency authorities.[6] Given the requirements for all this reporting to assure transparency, it hardly makes sense for DAWN to argue that confidentiality is the chief priority in the context of E.O. 14115, which similarly contains its own transparency emphasis, independent of the IEEPA.[7]

Lastly, by portraying itself as a critical element of a national security regime, DAWN effectively is asserting privileges and prerogatives traditionally reserved for the U.S. Government. To that end, the U.S. Government is free to intervene in this litigation at any time in order to request limitations on discovery if the U.S. Government believes the sanctions program at issue would be so imperiled, as both DAWN and its supporting Amici have declared. But the U.S. Government has not intervened here nor has it suggested that it intends to do so.

## II.    DAWN is a bad-faith actor whose status as an NGO does not render it automatically immune from discovery.

The irony of the name Democracy for the Arab World Now—or "DAWN"—is that DAWN is a fundamentally anti-democratic, illiberal advocacy and lobbying group masquerading here as an unbiased reporting outlet seeking peace in the Middle East. Indeed, the pro-Islamist, anti-Israel bent of DAWN and its Executive Director Sarah Whitson comes at the expense of truth. Such an organization should not be immune from providing discovery, particularly when the organization furnishes false information to the U.S. Government resulting in a U.S. citizen being unlawfully

---

[6] *See, e.g.*, *id.* § 1702–03.

[7] Note that Para. 11 of E.O. 14115 authorizes extensive reporting as follows: "Sec. 11. The Secretary of the Treasury, in consultation with the Secretary of State, is authorized to submit recurring and final reports to the Congress on the national emergency declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c))."

4

sanctioned and seriously harmed.

At its core, DAWN is not an organization that engages in reporting on human rights abuses. It is an advocacy group, as it has routinely boasted in its Form 990 documents each year.[8] The subject of that advocacy is anti-Israel and pro-Islamist in nature. While it is free to pursue its own extremist advocacy agenda (within bounds of anti-terrorism laws), it is in no way, shape, or form a "human rights organization." Instead, anti-Israel lobbying and lawfare is effectively DAWN's bread and butter. DAWN repeatedly has lobbied the Senate and international bodies to block arms sales to Israel[9] and to impede shipping companies from shipping arms to Israel[10] while Israel is defending itself from attacks on seven fronts. DAWN advocates restoring U.S. taxpayer funding to UNRWA,[11]

---

[8] For instance, DAWN's 2023 Form 990 boasts that DAWN is

> the leading organization demanding urgent reforms to U.S. foreign policy in the Middle East and accountability for some of the region's worst abusers. . . . . through our research and advocacy, we have made important strides in reshaping the narrative about how people assess continued U.S. political and military support for some of the worst Middle Eastern governments and a broadened understanding of the harms such support causes not only to the people of the region but to U.S. national interests and the integrity of our democracy.

Similarly, DAWN's 2022 Form 990 asserts that DAWN is "the leading advocate" for reforming U.S. policies that support governments in the Middle East and North Africa (MENA). DAWN's 2020 (apparently DAWN's first year in legal existence) and 2021 Forms 990 also characterize DAWN as "conducting advocacy."

[9] NGO Monitor has a report on DAWN documenting numerous such instances. *See* NGO MONITOR, *Democracy for the Arab World Now (DAWN)*, https://ngo-monitor.org/ngos/democracy-for-the-arab-world-now-dawn/ (last visited May 19, 2025). Also *see, e.g.,* DAWN, Over 100 Organizations Call for US Senate to Block Arms Sales to Israel (Oct. 24, 2024), https://dawnmena.org/over-100-organizations-call-for-us-senate-to-block-arms-sales-to-israel/.

[10] DAWN, DAWN Joins 70+ Organizations Urging Maersk Shareholders To Demand Human Rights Accountability In Arms Shipments To Israel (Mar. 18, 2025), https://dawnmena.org/dawn-joins-70-organizations-urging-maersk-shareholders-to-demand-human-rights-accountability-in-arms-shipments-to-israel/ (last visited May 19, 2025).

[11] DAWN, DAWN Joins 124 Organizations Urging Congress to Restore UNRWA Funding (Mar. 4, 2025), https://dawnmena.org/dawn-joins-124-organizations-urging-congress-to-restore-unrwa-funding/.

while disregarding that UNRWA employs hundreds of Hamas members—including Hamas terrorists who perpetrated the massacre in Israel on October 7, 2023—and that UNRWA hides arms for Hamas, allows Hamas to locate communications centers in UNRWA facilities, and teaches generations of young Gazans to seek to aspire to murder Jews. Unsurprisingly, DAWN has also pushed to stop the United Nations from adopting the International Holocaust Remembrance Alliance (IHRA) working definition of antisemitism. Finally, DAWN frequently demands that charges be brought against various Americans and Israelis for their support of Israel's defensive war against Hamas in Gaza, submitting lawfare complaints to the International Criminal Court.

DAWN's claims to impartiality are belied by the fact that DAWN routinely attacks the only democracy in the Middle East—Israel—while never reporting on any of the following: Hamas's brutality against Palestinian Arabs; Gaza protests against Hamas and its incessant human rights abuses; Hamas's brutal response to such protests; the Palestinian Authority's human rights abuses against its own people in Judea and Samaria; and Palestinian Arabs' human rights abuses committed against Israelis in Judea and Samaria, including "unlawful killings; physical abuses; and crimes involving violence or threats."[12]

In addition to turning a blind eye to abusive Arab regimes in the Palestinian territories, DAWN also whitewashes and promotes Islamist movements, such as the Muslim Brotherhood, which founder Jamal Khashoggi supported.[13] Mr. Khashoggi's opinion is not unique at DAWN. Several fellows and board members have supported Islamism, as well—the very antithesis of

---

[12]   U.S. Dep't of State, *2023 Country Reports on Human Rights Practices: Israel, West Bank and Gaza* at 4 (Mar. 2024), https://www.state.gov/wp-content/uploads/2024/03/528267_WEST-BANK-AND-GAZA-2023-HUMAN-RIGHTS-REPORT.pdf.

[13]   Martha Lee, *The DAWN of an Islamist Think Tank in DC,* MIDDLE EAST FORUM (Jan. 4, 2021), https://www.meforum.org/dc-acquires-yet-another-disinformation-thinktank-61908; *see also* Michael Doran & Tony Badran, *Why the Saudis Despised Jamal Khashoggi*, HUDSON INSTITUTE (Oct. 18, 2018), https://www.hudson.org/foreign-policy/why-the-saudis-despised-jamal-khashoggi; Yeshaya Rosenman, *Democratic terrorism: Jamal Khashoggi's vision of political Islam – opinion*, JERUSALEM POST (Sept. 14, 2024), https://www.jpost.com/opinion/article-819834.

democracy.[14] For instance, Esam Omeish, one of DAWN's founders and a former board member, once served as the National President of the Muslim American Society (MAS), which, according to federal prosecutors, "was founded as the overt arm of the Muslim Brotherhood in America."[15] Nihad Awad, one of the founders of the Council on American-Islamic Relations (CAIR), currently sits on DAWN's board. In 2007, CAIR was an unindicted co-conspirator in one of the largest terrorism financing cases that the U.S. Department of Justice has ever prosecuted.[16] Mr. Awad previously worked for the now-defunct Islamic Association for Palestine, which was found civilly liable for providing material support to Hamas.[17]

The first days of DAWN set the tenor of the organization, for one of its inaugural publications featured a fawning piece on the supposed plight of Saudi cleric Salman al-Odah, portraying him as a reformer and scholar.[18] In reality, al-Odah had been jailed in the 1990s for promoting jihad in Iraq and Afghanistan and had once served as a mentor to 9/11 architect Osama bin Laden.[19] At the time of authorship, al-Odah was a member of the Board of Trustees for the International Union of Islamic Scholars, which several Arab countries have listed as a terrorist organization for its support of terror attacks worldwide, including in the West.[20] Given the fellows and the makeup of DAWN's board, it should come as no surprise that al-Odah's son served as DAWN's Director of Research until 2023.[21]

---

[14] Lee, *supra* note 13.

[15] Democracy for the Arab World Now (DAWN) and Expa nding US Lawfare, NGO MONITOR (Mar. 3, 2024), https://ngo-monitor.org/reports/dawn-lawfare/.

[16] U.S. DEP'T OF JUSTICE, OFFICE OF INSPECTOR GEN., 1-20 13-007R, EXECUTIVE SUMMARY: REVIEW OF FBI INTERACTIONS WITH THE COUNCIL ON AMERICAN ISLAMIC RELATIONS (2013).

[17] Daniel I. Schlessinger, *Justice for Hamas's First American Victim*, CITY JOURNAL (Jan. 8, 2024), https://www.city-journal.org/article/justice-for-hamass-first-american-victim.

[18] *"Expressing Cynicism about the Government's Achievements": KSA Imprisons Salman Alodah, a Popular Scholar Advocating for Reform*, DAWN (Oct. 16, 2020), https://dawnmena.org/expressing-cynicism-about-the-governments-achievements-ksa-imprisons-salman-alodah-a-popular-scholar-advocating-for-reform/.

[19] *Salman Al-Odah: The chameleon cleric*, ARAB NEWS (updated Feb. 22, 2021), https://www.arabnews.com/node/1479231/saudi-arabia.

[20] *Id.*

[21] *See supra* note 19.

DAWN's anti-Israel, pro-Islamist agenda is undoubtedly driven by its Executive Director, Sarah Whitson. From 2004 through 2020, Whitson served as executive director of Human Rights Watch ("HRW")'s Middle East and North Africa (MENA) Division.[22]  During Whitson's tenure at HRW, HRW's founder Robert Bernstein publicly condemned HRW in *The New York Times* for having "lost critical perspective on a conflict in which Israel has been repeatedly attacked by Hamas and Hezbollah, organizations that go after Israeli citizens and use their own people as human shields."[23] Mr. Bernstein named Ms. Whitson as the driver behind the group's sharp anti-Israel turn. Bernstein believed that Whitson and others in HRW's MENA division "consistently ignored the context of Israeli actions—context that might have created a more accurate picture."[24] After *The New York Times* published Bernstein's opinion piece criticizing HRW's anti-Israel bias and credibility, Whitson and a colleague traveled to Gaza to meet with Hamas officials to reassure them of HRW's "neutrality and objectivity."[25] Ms. Whitson also attempted to raise money from Saudi donors "by highlighting her organization's investigations of Israel, and its war with Israel's 'supporters.'"[26]

Whitson's anti-Israel animus often crosses into antisemitism. In 2015, Whitson reportedly equated Israel's military actions in Gaza with the Holocaust.[27] She also invoked an antisemitic blood libel in her response to a post on Twitter (now X) about how Jewish Israelis would be getting a taste of what Palestinian Arabs had been enduring.  Whitson lamented in response: "Such a tiny taste.

---

[22] *Sarah Leah Whitson*, DAWN, https://dawnmena.org/experts/sarah-leah-whitson/ (last visited May 19, 2025).
[23] Roeber L. Bernstein, *Rights Watchdog, Lost in the Mideast*, N.Y. TIMES (Oct. 19, 2009), https://www.nytimes.com/2009/10/20/opinion/20bernstein.html.
[24] Ben Birnbaum, *Minority Report*, NEW REPUBLIC (Apr. 27, 2010), https://newrepublic.com/article/74543/minority-report-2.
[25] *HRWs Sarah Leah Whitson Travels to Gaza to Reassure Hamas*, NGO MONITOR (Jul. 28, 2010), https://ngo-monitor.org/hrw_s_sarah_leah_whitson_travels_to_gaza_to_reassure_hamas/.
[26] Jeffrey Goldberg, *Fundraising Corruption at Human Rights Watch*, ATLANTIC (July 15, 2009), https://www.theatlantic.com/international/archive/2009 /07/fundraising-corruption-at-human-rights-watch/21345/.
[27] @sarahleah1, X (Jan. 29, 2015, 2:28 AM), https://x.com/sarahleah1/status/560700886805389312.

Missing a tablespoon of blood."[28] In addition, Whitson promoted a bizarre antisemitic conspiracy theory that Israel participated in the massacre of innocent people who were celebrating and dancing at the Nova music festival on October 7, 2023. Whitson posted on social media: "Shocking revelations that Israeli attack helicopters killed at least some of the rave concert revelers."[29] In fact, as Whitson knew or should have known that there were no Israeli "attack helicopters," and the murders of the concertgoers were committed by Hamas, Fatah, Palestinian Islamic Jihad, and other Gazan terrorists, not Israel.

The antisemitic bent of the organization is hardly surprising. Mr. Khashoggi, DAWN's founder, when tweeting in Arabic, frequently defamed the "Jews," a term he used to refer to both Israeli and American Jews.[30] "The Jews have no history in Palestine so they invented the Wailing Wall, which is a Mamluk structure, and after 1967 saw the tomb of Joseph in Nablus and they decided to take it," wrote Mr. Khashoggi in October 2015.[31] He previously had referred to the "Jews" as "usurpers" and accused the "Jews" of passing legislation that criminalizes the questioning the Holocaust.[32]

DAWN knows—and even admitted on the Frequently Asked Questions page of its website—that foreign sanctions programs do not generally apply to U.S. citizens.[33] DAWN's report advocating for sanctions against Petitioner, whose U.S. citizenship could easily have been verified, shows DAWN's unmitigated malice. Yet, given the membership, leadership, and ideological underpinnings

---

[28] @SeanDurns, X (Mar. 15, 2020, 12:18 PM),
https://x.com/SeanDurns/status/1239224566368567296.
[29] Hillel Neuer, (@hillelneuer), INSTAGRAM,
https://www.instagram.com/hillelneuer/p/Cz4Qf_vNZcX/?next=%2Fbkfansclub%2Ffeed%2F&hl=hi&img_index=1 (last visited May 19, 2025).
[30] Seth J. Frantzman, *The Antisemitic Tweets of Murdered Saudi Writer Jamal Khashoggi,* MIDDLE EAST FORUM (Apr. 14, 2019), https://www.meforum.org/antisemitic-tweets-jamal-khashoggi.
[31] *Id.*
[32] *Id.*
[33] *See FAQs About DAWN's ICC Referral,* DAWN (Feb. 24, 2025), https://dawnmena.org/faq-icc/.

of DAWN, the malicious and defamatory report should come as no surprise.

It would thus be unreasonable to conclude that DAWN should be immune from discovery in all cases by virtue of its status as a non-government organization (which, in and of itself, simply means that DAWN is unaffiliated with the U.S. Government). In fact, Ms. Whitson announced that DAWN *recommended* that the U.S. Government establish the very West Bank sanctions program at issue here.[34] U.S. citizens must have a forum for vindicating their rights, particularly when targeted by an advocacy and lawfare organization that holds such extremist views.

### III.    There is no risk of reprisal to DAWN, should discovery be compelled.

Ms. Whitson fails to tie her allegation that DAWN staff "have regularly experienced harassment, threats, and intimidation, and even bodily harm" as a function of their work, ECF No. 12-1, at PageID # 12, to the narrow discovery sought here. The law requires a case-specific showing—not a generalized claim—substantiating fear of reprisal. *See, e.g., Doordash Inc. v. City of New York*, 754 F. Supp.3d 556, 578 (S.D.N.Y. 2024). Respondents have provided no evidence of any danger to DAWN or DAWN's agents as a result of the discovery that Petitioner seeks.

DAWN's conduct preceding this lawsuit does not suggest any fear of reprisal—in fact, quite the opposite. As common sense would have it, NGOs that fear reprisal for providing information to the U.S. Government do not generally advertise that they provided information to the U.S. government. Yet, that is precisely what DAWN did. DAWN openly and proudly took credit on its website for the federal government's imposition of sanctions on Petitioner. DAWN also issued a press release on August 26, 2024, discussing the items included in its dossier and the length of the dossier.[35] Indeed, DAWN apparently intended to disclose the dossier's contents online, for DAWN

---

[34] DAWN, DAWN: Redefining U.S. Policy in the Middle East, YOUTUBE (May 19, 2025), https://www.youtube.com/watch?v=VgPodHGWF_0&ab_channel=DAWN.
[35] *US: Sanction Israeli MK Sukkot, Security Officer Yitzhak Filant and Yitzhar Settlement Leadership for Promoting Violence Against Palestinian Civilians*, DAWN (Apr. 26, 2024),

furnished a link to the dossier at the top of its press release. Although the link did not work, it showed DAWN's intent to make public what it had provided to the U.S. government, contrary to its current assertion that it needs confidentiality.

Furthermore, as Petitioner suggested, "the Court can issue a protective order, permit redactions, or seal sensitive filings—time-honored safeguards that preserve confidentiality without obstructing access to essential evidence." ECF No. 19, at PageID # 14. Petitioner has never indicated that he is interested in ascertaining the other parties involved in defaming him—rather, he would like to determine the degree to which *Yesh Din* is responsible for the contents of DAWN's reporting. These are two very different intentions, but DAWN attempts to obfuscate the two in order to suggest that Petitioner's subpoena targets the totality of DAWN's sourcing activity, thereby placing all of its sources for the dossier at risk. This is patently incorrect.

Significantly, DAWN has already maintained for months severely defamatory statements about Petitioner and other Israeli Jews on DAWN's website—and yet, DAWN suffered no violent reprisals. Granting limited discovery here will not place DAWN in any further jeopardy beyond that which it already placed on itself, particularly because Petitioner already has expressed his willingness to protect DAWN's other sources. Similarly, Yesh Din's public and defamatory posts on X discussing Petitioner remain active[36]—and yet Yesh Din has experienced no threats of violent reprisals.

In an attempt to invent a fear of reprisal where none exists, the Amici supporting Respondents cite unrelated, far-flung instances of reprisals that have no relevance here. ECF No. 14, at PageID # 17–19. For instance, NGOs apparently sought to remain anonymous when they reported on a

_____

https://dawnmena.org/us-sanction-israeli-mk-sukkot-security-officer-yitzhak-filant-and-yitzhar-settlement-leadership-for-promoting-violence-against-palestinian-civilians/.

[36] *See, e.g.,* @Yesh_Din, X (Aug. 28, 2024, 10:15 AM),
https://x.com/Yesh_Din/status/1828798537741783336.

Bangladeshi paramilitary unit because, in that instance, the NGOs evidently had a legitimate fear of reprisal. By contrast, here, DAWN announced its report to the whole world because it had no legitimate concerns of reprisal. Neither DAWN nor Yesh Din behaved in a manner that suggested confidentiality was imperative. In fact, quite the opposite.

The fact that the Congo tried Congolese whistleblowers *in absentia* and sentenced them to death also has no relevance to the Israeli-American matter here. Israel does not even have a death penalty.[37] To suggest that a similar drastic fate awaits either DAWN or its sources is absurd and insulting, particularly given the civil rights protections in the sophisticated Israeli legal system.[38]

Moreover, Respondents cited no instances concerning the wrongful sanctioning of a U.S. citizen. U.S. citizens subject to unlawful sanctions must have the opportunity and a forum to vindicate their rights and redress the injuries that resulted from unlawful sanctions, particularly when an NGO potentially involved in said sanctions is U.S.-based.

Furthermore, if Yesh Din defamed Petitioner, then Yesh Din *should* face a lawful proceeding in Tel Aviv Magistrate Court. Providing information to the U.S. Government does not confer immunity from civil process on an NGO.

DAWN's supporting Amici further contend that granting Petitioner's request "would invite similar actions from other sanctioned persons and could subject NGOs to near limitless exposure to harassing lawsuits." *See* ECF No. 14-1 at PageID # 20. As a threshold matter, the present case is not a lawsuit. It is a petition for limited discovery. Second, the only "harassment" suffered in the present matter is the wrongful sanctioning of a U.S. citizen as the result of reckless reporting by DAWN. In fact, the opposite is true—*not allowing* discovery in the instant matter ensures that individuals may

---

[37] Israel made just one exception in its 77-year history, imposing the death penalty in 1962 against Adolph Eichmann, architect of the Nazi extermination camps.

[38] For a detailed discussion of the Israeli legal system and its degree of sophistication, see generally Aharon Barak's *The Judge in a Democracy* (2008). Mr. Barak served as President of the Israeli Supreme Court from 1995 to 2006.

continue to be unlawfully sanctioned thanks in part to reckless reporting by bad-faith NGOs. DAWN has failed to demonstrate that disclosure of the requested material would result in reprisal, and without making such a showing, they cannot succeed on their constitutional claims either.

**IV.    Disclosure of the requested information does not infringe upon Respondents' right to association under the First Amendment.**

The First Amendment right to freedom of association protects two distinct types of associational activities: intimate association, which refers to the right to enter into and maintain certain close personal relationships, and expressive association. *Matusick v. Erie County Water Auth.*, 739 F.3d 51, 77 (2d Cir. 2014). Expressive association protects the right to associate with others for the purpose of engaging in activities protected by the First Amendment, including speech, assembly, petitioning the government for redress of grievances, and the exercise of religion. *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984)). While the right to expressive association extends to groups that engage in political, social, and economic activities, like DAWN, the right to expressive activity is not absolute. *Sanitation & Recycling Indus. v. City of New York*, 107 F.3d 985, 997 (2d Cir. 1997) (citing *Roberts*, 468 U.S. at 623). In the context of discovery, the First Amendment creates a qualified privilege from disclosure of information concerning certain activities protected by the freedoms of speech and association, but only if disclosure of that information would result in a chilling effect or injury. *NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (sustaining First Amendment objection to disclosure of membership lists; NAACP provided all other requested data).

A party asserting that disclosure of discovery materials in civil litigation would violate the First Amendment bears the burden of showing a reasonable probability of a chilling effect or injury to their associational rights. *Doordash Inc. v. City of New York*, 754 F. Supp.3d 556, 578 (S.D.N.Y. 2024). The party asserting privilege must provide concrete evidence of harm to its ability to associate

13

or effectively advocate. *Id.* This burden is not negligible. Indeed, the Second Circuit ruled that to be cognizable, the interference with associational rights must be "direct and substantial" or "significant." *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (quoting *Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UWA*, 485 U.S. 360, 367 n.5 (1988)).

DAWN cannot meet this burden.  The subpoena at issue here requests three documents: 1) internal documents and communications discussing Petitioner; 2) the content of information provided to the U.S. Government; and 3) the identities of third parties with whom DAWN communicated regarding Petitioner. ECF No. 2-2, at PageID # 4.  The first two categories of information do not relate to DAWN's ability to associate with others for the purpose of engaging in activities protected by the First Amendment and therefore do not implicate freedom of association. Thus, the only category of requested information that possibly implicates DAWN's right to freely associate concerns the identities of the third parties that shared information about Petitioner with DAWN. The question before the Court, then, is whether disclosure of these identities will result in injury or a chilling effect on DAWN's associational rights. However, as stated above, the information identifying DAWN's sources or partners can be redacted or provided subject to a protective order— solutions proposed by Petitioner himself to curb any potential impact on DAWN's First Amendment rights. *See* ECF No. 19, at PageID # 14. But, even without redaction or a protective order, disclosure of the requested materials does not infringe on DAWN's First Amendment rights.

Respondents bears the burden of establishing that disclosure will result in direct and substantial or significant harms to their associational rights. This burden cannot be met by reliance on speculative or remote assertions. *See In re Documents*, No. 3:24-MC-11-DCLC-DCP, 2024 WL 1401332, at *7 (E.D. Tenn. Apr. 1, 2024) ("the party relying on the associational privilege must go beyond conclusory statements and demonstrate through proofs a basis for the assertions made")

14

(citations omitted); *Hispanic Leadership Fund, Inc. v. Walsh*, No. 1:12-CV-1337, 2014 WL 12586844, at *4 (N.D.N.Y. June 9, 2014) (rejecting as "speculative and remote" organization president's unsupported claim that disclosure would chill organization's ability to raise funds and engage in "open and honest" discussions with contributors); *Sherwin-Williams*, No. 1:12-CV-1337, 2005 WL 2128938, at *5 (N.D.N.Y. Aug. 24, 2005) ("Speculating that the document demands may cause a withdrawal of membership does not bolster [movant trade association's] claim of a First Amendment infringement."). Here, DAWN's allegations of harm are supported by nothing more than flimsy conjecture. This is legally insufficient.

DAWN claims that discovery into its activities relating to Petitioner will "negatively impact [its] ability [to] advocate for democracy and civil rights in the MENA region, share with and receive information from partners and sources abroad, and seek accountability through the U.S. Government's sanctions process." ECF No. 12, at PageID # 8. In support of this lofty claim, DAWN alleges that it faces "harassment, threats, and intimidation" because of its high-risk work in the region. ECF No. 12, at PageID # 12.  DAWN's broad, sweeping proclamations relate to the entirety of DAWN's work throughout the Middle East and North Africa and offer no connection to its work in Israel. To meet its burden, DAWN must establish why disclosure of the information in *this* case will lead to injury or a chilling effect. DAWN is extrapolating the entirety of human rights abuses and acts of associated retribution in the MENA region to the instant matter, which relates to a single Jewish farmer eking out a living in Judea.

Petitioner is not an abusive or powerful person with enormous financial resources who could or would put DAWN, or those mentioned in DAWN's files, in danger. Petitioner is an ordinary American-Israeli citizen—not an Arab monarch or kleptocrat with assassination teams at his disposal. DAWN provides neither the context for nor the details of the circumstances leading to the alleged harassment, threats, and intimidation it purportedly endured in the past, making it impossible for the

15

Court to assess the likelihood of this conduct occurring here. DAWN cannot satisfy its burden of showing harm that is not remote or speculative or that is significant or direct and substantial. *See In re Documents*, 2024 WL 1401332, at *7.

DAWN also cites to "baseless legal threats"[39] online death threats, and "extremely high-risk environments," including one instance where an individual posted photographs of a DAWN senior staff member's children to X. ECF No. 12, at PageID # 12–14. Despite these purported risks, DAWN chooses to publish the identities of its board members, experts, and other partners on its website and elsewhere online.[40] DAWN cannot step into the spotlight at its convenience and simultaneously claim that its work is so confidential and risky that it merits protection for fear of reprisal.

DAWN describes a myriad of instances where it has suffered reprisal at the hands of MENA governments but does not provide instances of any such conduct by the Israeli government. *See, e.g.*, ECF No. 12-1, at PageID # 13 ("Our website has been blocked by multiple MENA governments, severely restricting local access to our advocacy and reporting."). The organization would be hard-pressed to provide such instances; Israel is the only democratic country in the Middle East. DAWN's baseless attempts to compare actions by autocratic and authoritarian regimes to speculative future conduct by the Israeli government do not satisfy the reasonable probability standard. *Doordash*, 754 F. Supp.3d at 578.

Indeed, the *only* concrete harm that DAWN cites in an attempt to support its privilege claim is Mr. Khashoggi's murder in 2018. ECF No. 12-1, at PageID # 12. But Mr. Khashoggi's fate is irrelevant here. DAWN was not operational until three years after Mr. Khashoggi's death in 2021.[41]

---

[39] "[U]sing the judicial process" does not constitute 'reprisal' within the meaning of the First Amendment associational privilege." *In re Documents*, 2024 WL 1401332, at *7 (citation omitted).
[40] *See Who We Are*, DAWN MENA, https://dawnmena.org/about/who-we-are-2/ (last accessed May 16, 2025).
[41] *See, e.g.,* Democracy for the Arab World Now, Inc., IRS Form 990, at 2 (2022), available at https://dawnmena.org/wp-content/uploads/2024/09/DAWN-0100.02-Public-Disclosure-Copy-of-Amended-2022-Form-990.pdf.

Moreover, DAWN's "Israel-Palestine" advocacy did not begin until 2022, four years after Khashoggi's death.[42] DAWN cannot reasonably assert that Khashoggi's murder by Saudi government agents somehow indicates that DAWN's agents are at similar risk in Judea and Samaria.

Amici supporting Respondents are effectively arguing that self-proclaimed human rights organizations are "above the law" and that they are immune from responding even to limited and narrow discovery requests. Under this standard, the list of individuals and groups entitled to immunity from discovery under this definition would be endless.[43] Furthermore, such a position is quite rich, considering Amicus American Civil Liberties Union (ACLU) itself has repeatedly filed briefs aimed at obtaining discovery from the U.S. Government, arguing that no one is "above the law."[44]

**V.    Even if DAWN demonstrates that disclosure of the requested information would result in a chilling effect or injury, Petitioner has met his burden of establishing a compelling interest in the information.**

Even if Respondents demonstrate injury or a chilling effect, Petitioner's need for the information outweighs the potential chilling effect on associational rights and therefore entitles Petitioner to discovery.[45] This Court must balance the qualified First Amendment privilege against need of the party seeking discovery for the subpoenaed materials. *Id.* Petitioner has demonstrated a

---

[42] *Id.*

[43] For instance, Iran has "hit lists" of numerous current and former U.S. Government officials, including President Donald Trump, as well as of Israeli officials and American-Jewish leaders, including the president of Amicus Zionist Organization of America. If DAWN is immune from all discovery, these individuals should likewise be immune from all discovery.

[44] For example, the ACLU filed an amicus brief urging the Supreme Court to confirm that the president is not "above the law" and must comply with congressional subpoenas for his personal financial records. *See* Brief of Amici Curiae American Civil Liberties Union and ACLU of the District of Columbia in Support of Respondents, *Trump v. Mazars*, 591 U.S. __ (2020) (No. 19-715). In *Trump v. Vance,* the ACLU argues that Trump does not have the right to absolute immunity to quash grand jury subpoenas directed to his accountant for Trump's personal financial records. *See* Brief amici curiae of The American Civil Liberties Union, and The New York Civil Liberties Union, 591 U.S. 786 (2020) (No. 19-635).

[45] *See* 6 Moore's Federal Practice - Civil § 26.48 (2025).

compelling interest in the discovery he is seeking.

In determining whether a compelling interest exists, courts will consider whether the information sought is "'highly relevant' to claims or defenses in the litigation, whether requests are carefully tailored to avoid unnecessary interference with protected activities, and whether the information is available through other sources." *FOP Pa. Lodge v. Twp. of* Springfield, 668 F. Supp.3d 375, 389-90 (E.D. Pa. 2023). Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe the information they hope to obtain and its importance to their case with a reasonable degree of specificity. *See Cervantes v. Time, Inc.*, 464 F.2d 986, 994 (8th Cir. 1972).

### 1. The information sought is highly relevant to Petitioner's future claims.

The information sought here is critical to Petitioner's ability to pursue legal remedies. The U.S. Government decided to sanction Petitioner in reliance on false information and without first verifying that Petitioner was even eligible for sanctions. As a result of this gross negligence, Petitioner was placed on the Special Designated Persons List, rendering him unable to access his bank accounts or credit cards for five months. ECF No. 6, at PageID # 7.

DAWN took credit for providing the information to the U.S. Government that ultimately resulted in Petitioner's sanctioning. Petitioner's relief came only when President Trump signed a new executive order, terminating E.O. 14115. Discovery of the documents that formed the basis for the U.S. Government's improper and illegal sanctions is the only way that Petitioner will be able to assess the strength of any potential claims and hold accountable the entities and individuals who provided this false information. The requested information goes to the heart of Petitioner's claims. Shielding DAWN from unflattering discovery would further harm Petitioner who, without access to the requested information, will be unable to seek relief for the harms he has endured.

2. **The requests are narrowly tailored to avoid unnecessary interference with protected activities.**

The information sought by Petitioner is limited in scope; he seeks only information that is necessary for determining the veracity of his claims. The discovery request seeks the contents of the dossier, communications with the third parties upon which DAWN relied in drafting the dossier, and internal communications relating to the drafting of the dossier. Each element sought by Petitioner is narrowly tailored to assist in answering the question of whether Yesh Din's defamatory communications contributed to the sanctioning of Petitioner and to what degree.

The dossier, which likely served as the basis of Petitioner's unlawful sanctioning, is not accessible online, despite DAWN's attempts to make it publicly accessible. The dossier, when cross referenced with Yesh Din's public communications and private communications with DAWN, will be helpful in determining the degree to which Yesh Din contributed to the information that was ultimately shared with the U.S. Government.

In that same vein, communications with third parties in relation to the drafting of the dossier are essential for understanding whether Yesh Din was the primary source for DAWN's reporting (in which case, Yesh Din's liability is much larger) or was merely a small component. Clarification is unequivocally necessary on this point before Petitioner may proceed with an Israeli defamation suit against Yesh Din. DAWN's reliance upon Yesh Din in its report to the U.S. Government would affect both Yesh Din's liability in the matter and the scope of damages owed to Petitioner as a result.

Finally, Petitioner seeks DAWN's internal communications because DAWN is the entity best positioned—and perhaps the *only* entity positioned—to answer the question of to what degree Yesh Din is responsible for the contents of the dossier.

3. **The information sought cannot be obtained elsewhere.**

Petitioner seeks discovery here because he cannot obtain the information from the anticipated

proceedings in Tel Aviv Magistrate Court. Though seeking discovery from Yesh Din may provide some information about the communications between Yesh Din and DAWN, discovery from Yesh Din cannot produce the dossier at issue, communications with the U.S. Government related to the dossier, DAWN's communications with other third-parties that might have contributed to the dossier, and any internal discussions DAWN may have had when evaluating the veracity of Yesh Din's claims. These items can be produced only by DAWN.

In sum, even if DAWN had demonstrated a reasonable probability of reprisal from disclosure of the requested material, Petitioner has adequately demonstrated that he has a compelling interest in the information, meaning that it is not protected by the First Amendment.

### VI.    Petitioner's discovery request is not protected under the reporter's privilege.

DAWN has not established that the requested information is protected by the reporter's privilege. The reporter's privilege in the Second Circuit is a privilege that applies to both confidential and nonconfidential information gathered by journalists, though nonconfidential information is subject to only a qualified privilege. *Gonzales v. NBC*, 194 F.3d 29, 32 (2d Cir. 1998). While DAWN may characterize itself as a newsgathering organization—despite the litany of advocacy and lawfare it conducts—its assertion of the reporter's privilege in the instant matter is easily overcome. In the Second Circuit, disclosure by the subpoenaed party may be required "upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *In re Petroleum Products Antitrust Litigation*, 680 F.2d 5, 7 (2d Cir. 1982). Determinations as to whether the privilege is applicable are performed on a case-by-case basis. *United States v. Markiewicz*, 732 F. Supp. 316 (2d. Cir. 1990). "[W]hen protection of confidentiality is not at stake, the privilege should be more easily overcome." *Gonzales,* 194 F.3d at 36.

To that point, DAWN has not provided a single affidavit indicating that Yesh Din or any of its other sources requested or expected that their communications would be confidential—in fact, neither affidavit submitted by DAWN mentions Yesh Din once. *See, e.g., Schiller v. City of N.Y.*, 245 F.R.D. 112, 120 (S.D.N.Y. 2007) ("[T]he NYCLU has not identified a single instance in which a respondent requested confidentiality, nor has it proffered affidavits from protestors attesting that they believed that their communications were confidential."). Rather, DAWN relies on generalized language to indicate that its sources expect confidentiality. Whitson claims that "[w]e generally provide explicit assurances of confidentiality to vulnerable sources and whistleblowers given well-founded fears of harm and retaliation." ECF No. 12-1, at PageID #7. Such nonspecific language is insufficient to demonstrate an expectation of confidentiality pursuant to the reporter's privilege. *See id.*

The behavior of the source in question is often a tell-tale sign as to whether the source expects confidentiality. Here, Yesh Din made no indication that it wished to remain "behind-the-scenes" with regards to sharing information about Petitioner. Instead, the very same day that Petitioner was wrongfully sanctioned and just two days after DAWN published its report, Yesh Din posted a series of tweets on X, announcing the U.S. Government sanctions on Petitioner and detailing its own involvement in investigating Petitioner.[46] Courts have recognized that this type of behavior is a cause for concern when parties publicize their actions only to later hide behind unsubstantiated claims of privilege. *See, e.g., In re in re Chevron Corp.*, 709 F. Supp. 2d 283, 308 (S.D.N.Y. 2010) ("We are concerned instead with a claim of privilege with respect to depictions of persons who agreed to appear on camera and to the public use of their images and words in a film in the unlimited discretion of the film maker."). If anything, Yesh Din's social media activity suggests that, had the sanctions been deemed lawful, the organization would have been happy to have been explicitly associated with

---

[46]

DAWN's efforts to have Petitioner sanctioned. Absent an affidavit indicating such, DAWN cannot claim confidentiality on behalf of an organization that is publicizing its actions.

Therefore, because DAWN has yet to demonstrate a concrete expectation of confidentiality from any of its sources, Petitioner need only show that "the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36.

Since the test for establishing compelling interest under the First Amendment mirrors the test for overcoming the reporter's privilege, Amici here will refrain from repeating the same arguments detailed in Section V. However, it is irrefutable that the information sought, while narrow in scope, is highly relevant to Petitioner's impending claims and cannot be obtained elsewhere. Because these two metrics have been amply satisfied, DAWN's claim to the reporter's privilege fails.

## CONCLUSION

The requested discovery, limited in its scope, poses no identifiable threat to the work of DAWN. Rather, the request is part of a larger effort to hold one NGO—Yesh Din—accountable for abusing its privileges to advocate for the unlawful sanctioning of a U.S. citizen. Discovery from DAWN is highly relevant to determining the degree to which Yesh Din played a role in Petitioner's unlawful sanctioning, and DAWN fails to adequately demonstrate that the information is protected by the First Amendment's associational privilege or reporter's privilege. Therefore, the Court should grant Petitioner's application for discovery pursuant to 28 U.S.C. § 1782.

Dated: May 20, 2025                                  Respectfully Submitted,


                                                     */s/ Joseph T. Burns*

                                                     Joseph T. Burns
                                                     Susan Greene

Erielle Davidson
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Ste. 643
Washington, DC 20037

Deedee Bitran
STANDWITHUS SAIDOFF LEGAL
P.O. Box 341069
Los Angeles, CA 90034-1069
(310) 836-6140
Deedeeb@standwithus.com

Susan B. Tuchman
ZIONIST ORGANIZATION
OF AMERICA
633 Third Avenue,
Suite 31-B
New York, NY 10017

*Counsel for Proposed* Amici Curiae

## CERTIFICATE OF COMPLIANCE

Pursuant to L. Civ. R. 7.1(c), the undersigned hereby certifies that this brief of *amicus curiae* is no more than 25 pages, as required by the Court's Individual Practice Rules.

Dated: May 20, 2025                                    /s/ *Joseph T. Burns*
                                                       Joseph T. Burns