UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
*In re*: APPLICATION OF ISAAC LEVI PILANT,
FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782
TO CONDUCT DISCOVERY FOR USE IN A
FOREIGN PROCEEDING

**OPINION & ORDER**

**1:25-mc-00760 (JMA) (LKE)**

-----------------------------------------------------------------X

**LARA K. ESHKENAZI,** United States Magistrate Judge:

Before the Court is the motion of Isaac Levi Pilant ("Petitioner"), for Discovery under 28 U.S.C. § 1782 against Democracy for the Arab World Now, Inc. and Sarah Whitson ("DAWN," and together with Whitson, "Respondents"). For the reasons set forth below, the Court denies Petitioner's motion.

**I.     BACKGROUND**

   **A.     Factual Allegations**

On February 20, 2025, Petitioner filed a request for foreign discovery pursuant to 28 U.S.C. § 1782. (ECF No. 1.) Petitioner's application seeks authorization to issue subpoenas for testimony and compel the production of documents for use in his foreign proceeding. (*Id.*)

Petitioner is a dual U.S.-Israeli citizen residing in the settlement of Yitzhar in the West Bank, where he serves as the head of security after being drafted into the Israel Defense Force ("IDF") in the aftermath of the events of October 7, 2023. (Petitioner's Memorandum in Support "Mem. Supp.", ECF No. 6-1 at 2.) On August 28, 2024, a non-profit organization known as Yesh Din Volunteers for Human Rights ("Yesh Din") published a series of posts on its "X" account[1], accusing Petitioner of routinely engaging in violent conduct toward Palestinians and their property.

---

[1] X is a social media platform previously known as Twitter. https://x.com.

(*Id.*) On the same day, Petitioner was sanctioned under Executive Order 14115 and placed on the Special Designated Persons List ("SDN list"), resulting in the freezing of Petitioner's bank accounts and credit cards. (*Id.* at 2–3); Exec. Order No. 14115, 89 Fed. Reg. 7605 (Feb. 1, 2024). Approximately five months later, on January 28, 2025, President Trump removed Petitioner from the SDN list under Executive Order 14148. (*Id.*); Exec. Order No. 14148, 90 Fed. Reg. 8237 (Jan. 20, 2025).

Following the removal of Petitioner from the SDN list, Petitioner engaged counsel to commence a lawsuit against Yesh Din under Israel's Prohibition Against Defamation Act in the Tel Aviv Magistrate Court. (*Id.* at 3–4.) Petitioner has not yet filed the lawsuit in Israel but has attached a draft complaint to his Section 1782 application. (*Id.* at 12.) The proposed complaint alleges Yesh Din posted a series of posts on "X" accusing him "of engaging in illegal violence against Palestinian Arabs and their property in Judea and Samaria." (Proposed Israeli Lawsuit, ECF No. 6-3 ¶ 16.) Petitioner claims that Yesh Din provided these allegations to the United States government and other third parties, which ultimately led to the sanctions levied against him. (*Id.* ¶ 17.)

In support of his discovery request, Petitioner argues that Yesh Din was actively involved in providing false and offensive accusations to various third parties, notably Democracy for the Arab World Now, Inc. (Mem. Supp. at 14.) DAWN is a New York-based non-profit organization that advocates for democracy and human rights in the Middle East and North Africa. (*Id.* at 5.) On August 26, 2024—two days before Yesh Din's "X" posts and the placement of Petitioner on the SDN list—DAWN published an article entitled "US: Sanction Israeli MK Sukkot, Security Officer Yitzhak Filant [sic] and Yitzhar Settlement Leadership for Promoting Violence Against Palestinian Civilians," which contains numerous allegations against Petitioner. (*Id.*) At around the same time,

2

DAWN submitted a 23-page document to the U.S. Department of State and Treasury, in which it provided:

> detailed and comprehensive evidence about how these Israeli leaders have directly contributed to violence and instability in the West Bank through ideologically motivated crimes against Palestinian civilians, including violent attacks on Palestinians and their homes and schools, and dispossession and seizure of private Palestinian property.

(*Id.* at 6.)

Pursuant to 28 U.S.C. § 1782, Petitioner seeks to depose DAWN's executive director Sarah L. Whitson, (Deposition Subpoena, ECF No. 6-1) as well as a broad array of documents, including:

> (1) All Documents and Communications prepared by DAWN that mention or otherwise discuss Pilant, beginning from 2022 until the present time;
>
> (2) All Documents and Communications in the possession of DAWN that were used or relied upon in making the allegations that appear in the Article (as defined above) or any other allegations concerning Pilant;
>
> (3) All Documents and Communications exchanged between employees of DAWN that mention or otherwise discuss Pilant, beginning from 2022 until the present time;
>
> (4) All Documents and Communications between DAWN and any other third party that mention or otherwise discuss Pilant, beginning from 2022 until the present time;
>
> (5) All Documents and Communications between DAWN and any U.S. government agency, including any employee, officer, representative, etc. of a U.S. government agency, that mention or otherwise discuss Pilant, beginning from 2022 until the present time; and
>
> (6) The 23-page document that was submitted to the U.S. Department of State and Treasury referred to in the Article (as defined above).

(Subpoena *Duces Tecum,* ECF No. 6-1, at 1–2.)

### B. Procedural History

Petitioner filed his motion for discovery on February 24, 2025. (Disc. Appl., ECF No. 1.) Given the complexity of the issues presented, the undersigned magistrate judge directed Plaintiff to serve the discovery motion on Respondents by March 14, 2025. (3/4/2025 Text Order.) Respondents filed a notice of appearance on March 20, 2025 (Notice of Appearance, ECF No. 9), and Petitioner and Respondents subsequently fully briefed the issues. (ECF Nos. 6 (Mem. Supp.), 12 (Mem. Opp.), 19 (Reply).) The Court also received amicus briefing from the American Civil Liberties Union ("ACLU"), New York Civil Liberties Union ("NYCLU"), and Human Rights First ("HRF") opposing Petitioner's application for discovery (ECF No. 14-1), and Victoria Coates, Robert Greenway, StandWithUs Saidoff Legal, and the Zionist Organization of America supporting Petitioner's application for discovery (ECF No. 21-1). Respondents filed a memorandum of law in response to the amicus brief in support of Petitioner on May 28, 2025. (ECF No. 24.)

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 1782, "[t]he district court of the district in which a person resides or is found may order him to give his testimony or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782. Accordingly, a district court has the authority to grant a § 1782 application where:

> (1) the person or entity from whom discovery is sought "resides" or is "found" in the district where the application is made; (2) the requested material is "for use" in a foreign proceeding; and (3) the application is made by a foreign or international tribunal or any interested person.

*In re BonSense.org*, 95 F.4th 75, 79 (2d Cir. 2024). Even if the statutory requirements are met, "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782(a). This provision is intended to provide "for the recognition of all privileges to which the person may be entitled, including privileges recognized by foreign law." *See In re Erato*, 2 F.3d 11, 14 (2d Cir. 1993). This "mandatory requirement[]" that discovery not violate a properly invoked privilege must be "satisfied" before the Court can consider whether or not to "grant the application in its discretion." *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 97 (2d Cir. 2020).

If there are no legally applicable privileges and the application satisfies the statutory requirements, a district court may grant discovery under § 1782 in its discretion. *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015). Such discretion "is not boundless" and "must be exercised" to effectuate the "twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance" to United States courts. *Id.* In exercising discretion, the Supreme Court has identified four factors that "bear consideration in [a court's] ruling on a § 1782(a)" application: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the characters of the proceedings underway abroad, and the receptivity of the foreign government or the court of agency abroad to U.S. federal court judicial assistance"; (3) "whether the request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome" (hereafter, the "*Intel* Factors"). *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–65 (2004).

5

### B. Analysis

#### 1. Statutory Requirements of 28 U.S.C. § 1782

The only statutory requirement in dispute is whether Petitioner Pilant has demonstrated that the requested discovery would be "for use" in a foreign proceeding. (*See* Mem. Opp. at 15–18.) Petitioner argues that the "for use" requirement is met because the Israeli Proceeding "is 'within reasonable contemplation.'" (Mem. Supp. at 12.) Respondents contend that Petitioner has not demonstrated how the requested discovery is relevant to the proposed Israeli action, noting that he "has failed to connect the dots between any theory underlying his foreign claims and the discovery sought before this Court." (Mem. Opp. at 15-18.)

"The 'for use' statutory prerequisite assesses 'the practical ability of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal.'" *BonSens.org*, 95 F.4th at 80 (quoting *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017)). The Court must first determine that the proceeding for which the discovery is sought is "adjudicative in nature." *In re Ativos Especiais II – Fundo de Investimento em Direitos Creditorios – NP*, 24-MC-119, 2024 WL 4169550, at *4 (S.D.N.Y. Sept. 12, 2024). The foreign proceeding need not be pending, but it must be more than speculative. *Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 124 (2d Cir. 2015) (stating that petitioners must "make an objective showing that the planned proceedings [are] within reasonable contemplation."); *see also BonSens.org*, 95 F. 4th at 80 ("our precedent makes clear that an applicant must still demonstrate that the intended use of the discovery is more than merely speculative."). Although the requested discovery "need not be necessary" for Petitioner to prove their claim in the foreign proceeding, *Mees*, 793 F.3d at 298, it must at least be "marginally relevant to the foreign proceeding." *Id.* at 299 n.10 (citing *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1101 n.6 (2d Cir. 1995).)

The Court agrees with Respondents that Petitioner has failed to show that the requested discovery "is marginally relevant to the foreign proceeding." *Id.* The proposed Israeli complaint—which mentions neither DAWN nor Sarah Whitson—rests solely on three X posts by Yesh Din, published after DAWN's article and government submission. (*See generally* Proposed Israeli Lawsuit, ECF No. 6-3.) Petitioner identifies no evidence, and the record before this Court contains none, linking DAWN's actions to Yesh Din's alleged conduct. Accordingly, Petitioner has failed to meet his burden of establishing at least some relevance to the foreign proceeding.

Furthermore, the breadth of Petitioner's discovery request suggests an attempt to obtain information that far exceeds the scope of the allegations in the anticipated foreign proceeding. The proposed subpoena *duces tecum* seeks all documents and communications mentioning, discussing, or concerning Petitioner, including those prepared by DAWN, in DAWN's possession, reviewed by DAWN, exchanged between DAWN employees, exchanged "between DAWN and any other third party," and exchanged "between DAWN and any U.S. government agency." (Subpoena *Duces Tecum*, ECF No. 6-1, at 1.) These broad requests undoubtedly include documents that have no relevance to Yesh Din's alleged defamation of Petitioner. Indeed, such sweeping and untailored discovery requests do not suggest targeted discovery relevant to the allegations in the draft complaint, but rather, an impermissible fishing expedition. *See In re Harbour Victoria Inv. Holdings Ltd. Section 1782 Petitions*, No. 15-MC-127, 2015 WL 4040420, at *7–*8 (S.D.N.Y. June 29, 2015) (determining Section 1782 request was an impermissible fishing expedition where requested discovery would help petitioner determine whether or not to commence proceedings). Accordingly, the Court concludes that Petitioner has failed to satisfy the "for use" requirement.

## 2. The Reporters' Privilege

Respondents argue that, even if Petitioner were able to satisfy § 1782's statutory elements, discovery is not warranted because the requested discovery material is protected by the reporters' privilege. (Mem. Opp. at 13–15.) The Court agrees. The Second Circuit "has long recognized the existence of a qualified privilege for journalistic information", *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 32 (2d Cir. 1999), and has applied the reporters' privilege in adjudicating § 1782 discovery applications, *see Chevron Corp. v. Berlinger*, 629 F.3d 297, 307 (2d Cir. 2011). Second Circuit precedent places function over form, emphasizing the "informative function" of the press, thereby extending the privilege to any individual "involved in activities traditionally associated with the fathering and dissemination of news, even though he may not ordinarily be a member of the institutionalized press." *von Bulow v. von Bulow*, 811 F.2d 136, 142, 145 (2d Cir. 1987); *see also Chevron Corp.*, 629 F.3d at 307 ("[a] person need not be a credentialed reporter working for an established press entity to establish entitlement to the privilege."); *Schiller v. City of New York*, 245 F.R.D. 112, 119 (S.D.N.Y. 2007) (holding that the New York Civil Liberties Union qualified "as a journalistic enterprise for purposes of the privilege.") Accordingly, "[t]he talisman invoking the journalist's privilege is intent to disseminate to the public at the time the gathering of information commences." *von Bulow*, 811 F.2d at 145 (upholding denial of reporters' privilege where individual asserting the privilege did not have intent to disseminate to the public at the time the information was collected); *Schiller*, 245 F.R.D. at 119 (explaining that the privilege applies to individuals who gather information "with the intent of using the information collected, at least in part, to publish a report that would be widely and publicly circulated.")

Here, Petitioner's requested discovery qualifies as journalistic information barred by the reporters' privilege. DAWN was founded in June 2018 "to support democracy, human rights, and

8

the rule of law in the MENA [Middle East and North Africa] region" by investigating abuses, publishing public articles, and advocating before public bodies. (Sarah Whitson Declaration ("Whitson Decl."), ECF 12-1 ¶¶ 8, 11-14.) Consistent with that founding mission, DAWN investigated Petitioner's alleged role in orchestrating violence against Palestinian civilians in the Occupied West Bank. (*Id.* ¶¶ 21-22.) Subsequently, on August 26, 2024, DAWN submitted a report to the United States Departments of State and Treasury and "published an article on its website announcing the submission and summarizing the evidence that it had gathered[.]" *(Id.* ¶ 21.) DAWN asserts that it "adhered to its rigorous investigative, fact-checking, and editorial standards in preparing the August 26 Submission and Article." (*Id.* ¶ 21.) Based on this record, the Court concludes that DAWN investigated Petitioner "with the intent of using the information collected, at least in part, to publish a report that would be widely and publicly circulated." *Schiller*, 245 F.R.D. at 119.[2]

Although not raised by either party, the Court must also consider whether DAWN's non-public submissions to the State and Treasury Departments undermines its privilege claim. The Court concludes they do not based on DAWN's intention to publicize its findings. So long as there is some intent to publicize at the time the information is collected, the reporters' privilege protects information gathered pursuant to different advocacy strategies. The Southern District of New York's decision in *Schiller v. City of New York* is instructive on this point. In that case, the City of

---

[2] Petitioner argues that DAWN does not qualify for the reporters' privilege because DAWN did not "independently collect[] and create[] the information[.]" (Reply at 10 n.8. (citing *Chevron Corp.*, 629 F.3d at 307).) This argument misses the mark. The Second Circuit's decision in *Chevron Corp.* held that the reporters' privilege only applies to those acting as an "independent press." *Chevron Corp.*, 629 F.3d at 308. The Court explained that the privilege does not apply to "[t]hose who gather and publish information because they have been commissioned to publish in order to serve the objectives of others who have a stake in the subject of the reporting" because those individuals "are not acting as an independent press." *Id.* There is no evidence in the record to suggest that DAWN is "subservient to the objectives of others who have a stake in what will be published[.]" *Id.* Indeed, the record demonstrates that DAWN is guided by rigorous journalistic principles, including independence, fact-finding, and corroboration. (Whitson Decl. ¶ 15.)

9

New York subpoenaed documents from the New York Civil Liberties Union ("NYCLU"), including completed questionnaires that sought to document residents' interaction with the police. 245 F.R.D. at 114. According to NYCLU, "the questionnaires served a dual purpose: to assist in the determination whether to institute litigation and to provide information for a report on police conduct[.]" *Id.* The NYCLU refused to disclose the complete questionnaires, arguing that they were immune from discovery pursuant to the reporters' privilege. *Id.* at 115, 118. The Court agreed with the NYCLU, finding that it had "disseminated the questionnaires with the intent of using the information collected, at least in part, to publish a report that would be widely and publicly circulated." *Id.* at 119. Similarly, here, as evidenced by the August 26, 2024 Submission and Article, as well as DAWN's long-standing use of journalistic publications in the past, DAWN intended to both publicize its findings and submit them to the State and Treasury Departments at the time the information against Petitioner was attained. (*See* Whitson Decl. ¶¶ 8, 11-14, 21-22.) Accordingly, Respondents have met their initial burden of demonstrating that the privilege nominally applies to the requested material.

As Respondents have satisfied their initial burden of establishing the applicability of the privilege, the burden shifts to Petitioner to overcome the privilege. The Second Circuit has articulated two standards governing whether a party is able to overcome the reporters' privilege, depending on whether the requested material is confidential or non-confidential. If the material requested is confidential, then the party opposing the privilege can overcome it "only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982). "Although not absolute," this relatively high standard is necessary because "[f]orcing the press to breach a promise of confidentiality threatens

10

its ability in the future to perform its public function by impairing its ability to acquire information for publication." *Chevron Corp.*, 629 F.3d at 307 (citing *Id.* at 7-8). By contrast, "the showing needed to overcome the privilege [for non-confidential material] is less demanding than the showing required" for confidential materials. *Gonzales*, 194 F.3d at 36. Thus, Petitioner must show that the non-confidential "materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Id.*

Here, according to Respondents, some of the requested material is explicitly confidential while other material is non-confidential but nevertheless sensitive because it would reveal Respondents' investigative methods. (Mem. Opp. at 15; Whitson Decl. ¶ 22.) Based on the record before the Court, Petitioner has not met his burden under either standard because he has failed to demonstrate that the request material is minimally relevant to the proposed claims against Yesh Din. *See supra* Section II.A. Accordingly, the Court concludes that reporters' privilege bars the production of the requested discovery.[3]

### 3. The *Intel* Factors

Putting aside the statutory and privilege defects discussed above, the Court also denies the application in its discretion under the *Intel* factors. *Intel*, 542 U.S. at 264. The first factor the Court must consider is whether "the person from whom discovery is sought is a participant in the foreign proceeding[.]" *Id.* The Court is mindful of the Supreme Court's guidance that "when the person from whom discovery is sought is a participant in the foreign proceeding …, the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad[.]" *Id*. at 264. The Second Circuit has clarified that in evaluating this factor, the inquiry is not focused on the formal respondents but on "the real party from whom

---

[3] Respondents also raise a general First Amendment objection to Petitioner's application. (Mem. Opp., at 8-13.) The Court declines to address this objection, having resolved the matter on the more narrowly tailored reporters' privilege.

11

documents are sought." *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018). In other words, "[t]he factor looks to substance and not form." *Ativos Especiais II*, 2024 WL 4169550, at *10. Accordingly, a § 1782 applicant "does not strengthen its application when it seeks documents nominally from a third party when those documents are, in fact, under the control of a party." *Id.* Although neither DAWN nor Whitson are parties in the proposed proceeding in Israel, Petitioner can nevertheless "obtain the records from the party to the foreign proceeding," Yesh Din. *Id.* at *11. Any communications or documents that Respondents received from Yesh Din could be obtained directly from Yesh Din in the proposed case. (Declaration of Jonathan Berman ("Berman Decl."), ECF No. 12-2 ¶¶ 6–13 [explaining standard discovery procedures in Israel].) Therefore, the first factor weighs against granting Petitioner's application.

The second factor examines "the nature of the foreign tribunal, the characters of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264. Respondents do not dispute that proceedings before Israeli courts occur before impartial tribunals, similar to proceedings before federal and state courts of general jurisdiction in the United States. (*See generally* Mem. Opp.) Additionally, the Court has no reason to believe the Tel Aviv Magistrate Court will not be receptive to receiving evidence obtained via a proceeding in the United States. *See In re RSM Prod. Corp. v. Noble Energy, Inc.*, 195 F. Supp. 3d 899, 905 (S.D. Tex. 2016) (holding the second factor weighed in favor of granting the application because the "parties do not dispute that Israeli courts are generally receptive to § 1782 evidence"). Accordingly, the second factor weighs in favor of granting Petitioner's application.

The third factor requires the Court to consider "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or

12

the United States." *Intel*, 542 U.S. at 265. Here, Petitioner's request circumvents Israeli proof-gathering restrictions by seeking discovery unavailable there, including depositions and pre-filing discovery. (Berman Decl., ¶¶ 6, 9-10 [explaining that Israeli law only permits discovery after a civil proceeding is commenced and further noting that "civil litigants are not permitted to take depositions as part of civil discovery" in Israel]); *see Kiobel*, 895 F.3d at 245 n.3 (2d Cir. 2018) (finding that district court abused its discretion in granting discovery from applicant who sought to "bypass Dutch discovery restrictions and gain access to documents she could not otherwise acquire"). Petitioner's expert affidavit does not contest these points. (*See generally* Declaration of Lawrence Marc Zell ("Zell Decl."), ECF No. 19-1.) In fact, Mr. Zell's declaration expressly concedes that the discovery sought from DAWN "would not be obtainable in Israel." (Zell Decl. ¶ 6.) Petitioner's attempt to circumvent foreign proof-gathering restrictions weighs against granting his § 1782 application under *Intel*'s third factor. *Kiobel*, 895 F.3d at 245 n.3; *see also In re RSM*, 195 F. Supp. 3d at 905–06 (finding that the third factor weighed against petitioners where "it is clear that Petitioners are attempting to get discovery in the United States … due to restrictions they face in getting the documents … in Israel.").

Finally, the fourth factor requires the Court to examine whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. "Blanket requests" which seek all materials in Respondents' possession that mention, discuss, or concern Petitioner (*see* Subpoena *duces tecum*, ECF No. 6-1), "are plainly overbroad and impermissible." *Vaigasi v. Solow Mgmt. Corp.*, 11-CV-5088, 2016 WL 616386, at *15 (S.D.N.Y. Feb. 16, 2016). Accordingly, the fourth factor also counsels against granting Petitioner's application.

Accordingly, after considering the *Intel* factors, the Court exercises its discretion to deny Petitioner's application.

## **CONCLUSION**

For the stated reasons, Petitioner's application for discovery pursuant to 28 U.S.C. §1782 (ECF No. 1) is DENIED.

**SO ORDERED**.

Dated: Brooklyn, New York
September 18, 2025

*Lara K. Eshkenazi*
LARA K. ESHKENAZI
United States Magistrate Judge